**FILED**

**DECEMBER 28, 2007**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

14338-2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**07 C 7287**

| | |
|---|---|
| JAMES N. QUINN and GUY DAVID, individually and as trustee of the Guy David Declaration of Trust dated March 3, 2001, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| | ) No. |
| v. | ) ) |
| PLASTIVAL CANADIAN HOLDINGS, INC., a corporation of Canada and PLASTIVAL US HOLDINGS, INC., a Delaware corporation, | ) ) ) ) ) |
| Defendants. | ) ) |

**JUDGE LEFKOW
MAGISTRATE JUDGE SCHENKIER**

## COMPLAINT

Plaintiffs, JAMES N. QUINN and GUY DAVID, individually and as trustee of the Guy David Declaration of Trust dated March 3, 2001, by their attorney, LAWRENCE A. STEIN of HUCK BOUMA PC, complain of defendants, PLASTIVAL CANADIAN HOLDINGS, INC., a corporation of Canada, and PLASTIVAL US HOLDINGS, INC., a Delaware corporation, for breach of contract, as follows:

1.      Plaintiff, JAMES N. QUINN, is deemed a citizen of the state of Illinois, because he is a permanent resident of the United States domiciled in Illinois, by virtue of the last sentence of 28 U.S.C. § 1331(a).

2.      Plaintiff, GUY DAVID, individually and as trustee of the Guy David Declaration of Trust dated March 3, 2001, is an alien, a subject of Canada, by virtue of the following:

a.    He is a citizen of Canada, residing in the province of Quebec;

b.    The transfer of assets to the trust were real and not simply for purposes of collection, and invested him as trustee with the full title to those assets; and

c.    As trustee, he has legal title to trust property and sues in his own name.

3.    Defendant, PLASTIVAL CANADIAN HOLDINGS, INC., is a citizen of Connecticut because it was not incorporated by any state, but is rather a Canadian corporation, and because it has its principal place of business at 9 Greenwich Office Park, Greenwich, Connecticut, by virtue of 28 U.S.C. § 1331(c)(1).

4.    Defendant, PLASTIVAL US HOLDINGS, INC., is a citizen of Delaware and Connecticut because it is a Delaware corporation, with its principal place of business at 9 Greenwich Office Park, Greenwich, Connecticut.

5.    The amount in controversy in this action exceeds $75,000.00, exclusive of interest and costs.

6.    This court has jurisdiction over the subject matter of this action by virtue of 28 U.S.C § 1332(a)(1), (2), and (3).

7.    Personal jurisdiction and venue are proper in the Northern District of Illinois because the defendants agreed to venue and personal jurisdiction here.

8.    On or about July 7, 2005, the plaintiffs agreed to sell, and in fact sold, various securities and other assets to the defendants for approximately $41,000,000 in an immediate payment, under certain terms and conditions set forth in a written agreement signed by the parties ("Agreement"), including post-closing adjustments to the price.

9.    An accurate copy of Agreement of the parties is attached as exhibit A.  The schedules

2

to the Agreement are attached as exhibit B.

10.    At the closing of the Agreement, the defendants paid the plaintiffs approximately $25,600,000, and deposited approximately $7,800,000 into escrow with Wells Fargo Bank, N.A.

11.    On or about July 7, 2005, the defendants paid the preliminary estimate of the price by paying the plaintiffs approximately $25,600,000 and depositing $7,800,000 into escrow. The parties have agreed not to make the escrowee a party to these proceedings. An accurate copy of the escrow agreement is attached as exhibit C.

12.    The defendants breached the Agreement in the following respects:

    a.    Failing to agree to release to the plaintiffs the full balance remaining in escrow in the approximate amount of $958,702.51;

    b.    Failing to pay the plaintiffs the net sum of $74,842 as required by the Agreement regarding adjustments for working capital;

    c.    Failing to pay the plaintiffs $4,408,639.81 due but unpaid at closing; and

    d.    Affirmatively stating that they will not pay the plaintiffs $4,400,000 which will come due after the final calculations relating to working capital as a post-closing adjustment to the purchase price.

13.    The plaintiffs have performed all their obligations to the defendants under the Agreement.

WHEREFORE, plaintiffs, JAMES N. QUINN and GUY DAVID, individually and as trustee of the Guy David Declaration of Trust dated March 3, 2001, request judgment against the defendants, PLASTIVAL CANADIAN HOLDINGS, INC. and PLASTIVAL US HOLDINGS, INC., in the sum of $9,842,184.32, or such other amount as the proofs may sustain at trial, and for their

3

costs and attorneys fees, and for all other relief deemed appropriate under the circumstances.

Respctfully submitted,

HUCK BOUMA PC

/s/     Lawrence A. Stein

Lawrence A. Stein

Lawrence A. Stein
**HUCK BOUMA PC**
1755 South Naperville Road
Wheaton, Illinois 60187
Telephone (630) 221-1755
Facsimile (630) 221-1756
Email lstein@huckbouma.com

*COUNSEL FOR THE PLAINTIFFS*

R:\14000s\14300-14399\14338-2\Pleadings\Complaint.wpd

4

**Execution Copy**

**SECURITIES AND ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**GUY DAVID, JAMES N. QUINN**

**AND**

**THE GUY DAVID DECLARATION OF TRUST DATED MARCH 6, 2001**

**PLASTIVAL, INC., PLASTIVAL INC. AND 4038673 CANADA INC.**

**AND**

**PLASTIVAL US HOLDINGS, INC. AND PLASTIVAL CANADIAN HOLDINGS INC.**

**Dated as of July 7, 2006**

```
EXHIBIT A
```

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ................................................................................................ 1
  Section 1.1    Certain Definitions................................................................................ 1
  Section 1.2    Terms Defined Elsewhere.................................................................... 9
  Section 1.3    Interpretation...................................................................................... 11

ARTICLE II PURCHASE AND SALE OF SHARES ................................................... 12
  Section 2.1    Purchase and Sale of Shares and Owned Real Property and Assignment and Assumption ........................................................................................ 12
  Section 2.2    Closing ............................................................................................... 12
  Section 2.3    Closing Estimates .............................................................................. 12
  Section 2.4    Payment of Estimated Purchase Price and Other Amounts.......... 13
  Section 2.5    Closing Balance Sheet ...................................................................... 14
  Section 2.6    Payment of Final Purchase Price ...................................................... 16
  Section 2.7    Closing Deliveries............................................................................. 16
  Section 2.8    Release of the Escrow Amount.......................................................... 18
  Section 2.9    Sellers' Guaranty .............................................................................. 19
  Section 2.10   Termination of Affiliate Obligations ................................................ 19
  Section 2.11   Minute Book Deficiencies ................................................................. 20
  Section 2.12   Reorganization .................................................................................. 20

ARTICLE III REPRESENTATIONS AND WARRANTIES AS TO THE COMPANY, PREE AND THE GUY DAVID TRUST ....................................................... 21
  Section 3.1    Company Organization...................................................................... 21
  Section 3.2    PREE Organization............................................................................ 21
  Section 3.3    The Guy David Trust Organization ................................................... 21
  Section 3.4    Authorization ..................................................................................... 22
  Section 3.5    No Conflict or Violation; Required Consents.................................... 22
  Section 3.6    Capitalization..................................................................................... 22
  Section 3.7    Financial Statements; Existing Indebtedness.................................... 24
  Section 3.8    No Material Undisclosed Liabilities .................................................. 25
  Section 3.9    Absence of Certain Changes............................................................. 25
  Section 3.10   Tax Matters ........................................................................................ 27
  Section 3.11   Material Contracts.............................................................................. 33
  Section 3.12   Personal Property............................................................................... 35
  Section 3.13   Real Property ..................................................................................... 35
  Section 3.14   Compliance with Law ....................................................................... 36
  Section 3.15   Permits ............................................................................................... 36
  Section 3.16   Litigation............................................................................................ 37
  Section 3.17   Hazardous Materials ......................................................................... 37
  Section 3.18   Labor and Employment Matters; ERISA........................................... 38
  Section 3.19   Intellectual Property.......................................................................... 42
  Section 3.20   Insurance ........................................................................................... 43
  Section 3.21   Affiliate Transactions; Interests in Clients, Suppliers, Etc ............ 43

Page

Section 3.22    Suppliers ........................................................................ 43
Section 3.23    Customers ....................................................................... 44
Section 3.24    Warranty Matters ........................................................... 44
Section 3.25    Product Liability Claims ................................................ 44
Section 3.26    Accounting Records; Internal Controls ......................... 44
Section 3.27    Books and Records ......................................................... 45
Section 3.28    Prior Acquisitions .......................................................... 45
Section 3.29    Prohibited Payments ...................................................... 45
Section 3.30    Brokers ........................................................................... 45
Section 3.31    Disclaimer of Other Representations and Warranties ..... 45

ARTICLE IV  ADDITIONAL REPRESENTATIONS AND WARRANTIES OF THE
               SELLERS AND PREE ..................................................... 46
Section 4.1     Authorization .................................................................. 46
Section 4.2     Title to Shares and the Owned Real Property .................. 46
Section 4.3     Governmental Consents and Approvals; No Conflict or Violation ............ 46
Section 4.4     Compliance with Law ..................................................... 47
Section 4.5     Brokers ........................................................................... 47

ARTICLE V  REPRESENTATIONS AND WARRANTIES OF THE BUYER ......................... 47
Section 5.1     Organization .................................................................... 47
Section 5.2     Authorization .................................................................. 47
Section 5.3     Governmental Consents and Approvals; No Conflict or Violation ............ 47
Section 5.4     Compliance with Law ..................................................... 48
Section 5.5     Brokers ........................................................................... 48
Section 5.6     Investment Intent ............................................................ 48
Section 5.7     Certain Proceedings ........................................................ 48
Section 5.8     Financial Ability ............................................................. 48
Section 5.9     National Instrument 45-106 Compliance ......................... 48

ARTICLE VI  COVENANTS .......................................................................... 49
Section 6.1     Approvals and Consents .................................................. 49
Section 6.2     Additional Agreements; Reasonable Commercial Efforts .......... 49
Section 6.3     Non-Solicitation, Non-Hire, Confidentiality .................. 49
Section 6.4     Subsection 256(9) Election ............................................. 51
Section 6.5     Certificate of Authorization ............................................ 51

ARTICLE VII  TAX MATTERS ...................................................................... 51
Section 7.1     Tax Returns ..................................................................... 51
Section 7.2     Tax Audits and Contests; Cooperation. ........................... 54
Section 7.3     Tax Indemnification ........................................................ 55
Section 7.4     Tax Indemnification Procedures. ..................................... 56
Section 7.5     Post-Closing Tax Matters ............................................... 56
Section 7.6     Allocation of Purchase Price ........................................... 56
Section 7.7     Transfer Taxes ................................................................ 56
Section 7.8     Proration of Owned Real Property Taxes. ....................... 57
Section 7.9     Effect on Purchase Price ................................................. 57

                                                                                    Page

ARTICLE VIII INDEMNIFICATION .................................................................... 57
      Section 8.1      Survival of Representations, Etc. ........................................ 57
      Section 8.2      General Indemnification ..................................................... 57
      Section 8.3      Third Party Claims ............................................................. 58
      Section 8.4      Limitations on Sellers' Indemnification Obligations................ 60
      Section 8.5      Exclusive Remedy ............................................................. 61

ARTICLE IX MISCELLANEOUS ......................................................................... 61
      Section 9.1      Entire Agreement; Assignment ........................................... 61
      Section 9.2      Validity ............................................................................. 61
      Section 9.3      Notices .............................................................................. 61
      Section 9.4      Governing Law .................................................................. 62
      Section 9.5      Consent to Jurisdiction...................................................... 63
      Section 9.6      WAIVER OF JURY TRIAL ................................................ 63
      Section 9.7      Parties in Interest .............................................................. 63
      Section 9.8      Personal Liability .............................................................. 63
      Section 9.9      Expenses ........................................................................... 64
      Section 9.10     Specific Performance ........................................................ 64
      Section 9.11     Counterparts...................................................................... 64
      Section 9.12     Negotiation of Agreement ................................................. 64

## SECURITIES AND ASSET PURCHASE AGREEMENT

THIS SECURITIES AND ASSET PURCHASE AGREEMENT (this **"Agreement"**), dated as of July 7, 2006, is by and among Guy David (**"David"**), James N. Quinn (**"Quinn"**) and the Guy David Declaration of Trust Dated March 6, 2001, an Illinois trust (the "**Guy David Trust**" and collectively with David and Quinn, the **"Sellers"**), Plastival Inc., a Canadian corporation (**"Plastival Canada"**), Plastival, Inc., an Illinois corporation (**"Plastival US"** and together with Plastival Canada, collectively, the **"Company"**), 4038673 Canada Inc., a Canadian corporation (**"PREE"**), Plastival US Holdings, Inc., a Delaware corporation (**"US Holdings"**) and Plastival Canadian Holdings Inc., a Canadian corporation (**"Canadian Holdings"** and together with US Holdings, collectively, the **"Buyer"**).

### R E C I T A L S

WHEREAS, the Guy David Trust and Quinn collectively own 2,668 shares of Plastival US (the "**US Shares**");

WHEREAS, David, Quinn and the Guy David Trust own all of the issued and outstanding shares of capital stock of Plastival Canada (the "**Canadian Shares**");

WHEREAS, PREE is the owner of the Owned Real Property (as hereinafter defined); and

WHEREAS, (i) the Guy David Trust and Quinn desire to sell the US Shares to US Holdings, and US Holdings desires to purchase and acquire the US Shares from the Guy David Trust and Quinn, (ii) the Guy David Trust, David, and Quinn desire to sell the Canadian Shares to Canadian Holdings, and Canadian Holdings desires to purchase and acquire the Canadian Shares from the Guy David Trust, David, and Quinn, and (iii) PREE desires to sell the Owned Real Property to Canadian Holdings, and Canadian Holdings desires to purchase and acquire the Owned Real Property from PREE, upon the terms and subject to the conditions set forth in this Agreement.

WHEREAS, the transactions described above shall occur simultaneously.

### A G R E E M E N T

NOW THEREFORE, in consideration of the respective covenants and promises contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1  <u>Certain Definitions</u>.  As used herein, the terms below shall have the following meanings.  Any such terms, unless the context otherwise requires, may be used in the singular or plural, depending upon the reference.

"**Action**" means any action, claim, suit, litigation, proceeding, labor dispute, arbitral action, governmental audit, inquiry, criminal prosecution, investigation or unfair labor practice charge or complaint.

"**Affiliate**" means, with respect to any Person, any other Person which directly or indirectly Controls, is Controlled by or is under common Control with such Person.

"**Assets**" means all of the Company's and its Subsidiaries' right, title and interest in and to the business, properties, assets and rights of any kind, whether tangible or intangible, real or personal, used in connection with the Business and owned by the Company or a Subsidiary or in which the Company or a Subsidiary has any interest.

"**Books and Records**" means all books of account, ledgers, Tax Returns and other tax records, personnel records, historic documents relating to Employee Plans, sales and purchase records, customer and supplier lists, referral sources, research and development reports and records, production reports and records, equipment logs, operating guides and manuals, business reports, plans and projections and all other documents, files, correspondence and other information of the Company and its Subsidiaries and PREE (whether in written, electronic or other form) other than the corporate records of the Company and its Subsidiaries and PREE.

"**Business**" means the Company's business, whether conducted directly, or indirectly through its Subsidiaries.

"**Business Day**" means any day that is not a Saturday, Sunday or other day on which banks are required or authorized by law to be closed in the State of Illinois.

"**Canadian Closing Certificates**" means certificates to be issued by the Canada Revenue Agency (the "**CRA**") under subsection 116(2) of the ITA in the names of each of the Sellers in respect of the sale of all of the Canadian Shares, with certificate limits in an amount not less than their respective allocable shares of the portion of the Purchase Price payable for the Canadian Shares (and allocated between the classes of shares), including any upward adjustments after the Closing.

"**Certificate of Authorization**" means all authorizations, approvals, permits, certificates of authorization required under any applicable law to be issued by any competent Governmental Authority with respect to the operation of the Owned Real Property or Plastival Canada's operation thereof.

"**Certificate of Authorization Escrow Amount**" means US$15,000, together with any dividends, interest, gains and other distributions on such escrowed amounts, as reduced from time to time by the amount of monies distributed therefrom in accordance with Section 2.8 and the Escrow Agreement.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended, including any successor provisions and transition rules, whether or not codified.

"**Company Product**" means any product manufactured, marketed or distributed at any time by the Company or any Subsidiary.

"**Control**"or "**control**" means, as to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise (the terms "Controlled by" and "under common Control with" shall have correlative meanings).

"**Court Order**" means any judgment, decision, consent decree, injunction, ruling or order of any Governmental Authority that is binding on any Person or its property under applicable law.

"**Default**" means (a) any violation, breach or default or (b) the occurrence of an event that, with the passage of time, the giving of notice or both, would constitute a violation, breach or default.

"**Employee Plan**" means (a) any "employee benefit plan", within the meaning of Section 3(3) of ERISA, whether or not it is subject to ERISA and whether written or oral, or (b) any other employee benefit plan, arrangement, program, policy or practice including, but not limited to, (i) the portion of any employment or consulting agreement which provides employee benefits, (ii) an arrangement providing for insurance coverage (including split-dollar life, health, disability, or retirement insurance) or workers' compensation benefits, (iii) an incentive pay, bonus or deferred bonus arrangement, (iv) a stock purchase, stock award, stock appreciation right or stock option arrangement, (v) a cafeteria plan, (vi) a death benefit or survivor income arrangement, (vii) an arrangement providing termination allowance, salary continuation, severance pay, retention compensation or similar benefits, (viii) a change in control arrangement or similar arrangement, (ix) an equity compensation or profit-sharing plan, (x) a deferred compensation plan, (xi) any health or welfare plan providing health, disability or disability benefits, employee relocation, tuition reimbursement, psychiatric or other counseling, employee assistance, dependent care assistance, or legal assistance plan or arrangement, (xii) a fringe benefit arrangement (cash or noncash), (xiii) a holiday or vacation plan or policy or (xiv) any other compensation plan, arrangement, program, policy or practice.

"**Encumbrance**" means any claim, lien, pledge, option, charge, easement, servitude, security interest, deed of trust, mortgage, hypothec, conditional sales agreement, encumbrance or other right of third parties, voluntarily incurred or arising by operation of law, and includes any agreement to give any of the foregoing in the future, and any contingent sale or other title retention agreement or lease in the nature thereof.

"**Environmental Law**" means any and all U.S. and Canadian, state, provincial and local statutes, laws, common law, regulations, ordinances, rules, judicial and administrative orders, injunctions, decrees or other legal requirements relating to pollution or protection of the environment, including ambient air, surface water, groundwater, land or oceans, occupational safety and health, or to the effect on the environment or human health of emissions, discharges or releases of Hazardous Substances, or otherwise relating to the Handling of Hazardous Substances or the investigation, clean-up or other remediation or analysis thereof.

"**ERISA**" means the U.S. Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any entity which has ever been a single employer with the Company or any of its Subsidiaries under Section 4001(b) of ERISA or Section 414(b), (c), (m) or (o) of the Code.

"**Escrow Account**" means the account into which the Escrow Amount is deposited with the Escrow Agent and held by it, subject to disbursement as provided in Section 4 and in the Escrow Agreement.

"**Escrow Agent**" means Wells Fargo, N.A., or such other Person reasonably acceptable to both the Sellers and the Buyer, in its capacity as escrow agent under the Escrow Agreement.

"**Escrow Agreement**" means the Escrow Agreement among the Buyer, the Sellers and the Escrow Agent.

"**Existing Indebtedness**" means (i) all indebtedness of or any obligation of the Company, the Subsidiaries, or PREE (whether as obligor or as guarantor) for borrowed money, whether current, short-term, or long-term, secured or unsecured, (ii) all indebtedness of the Company or the Subsidiaries (whether as obligor or as guarantor) for the deferred purchase price for purchases of assets outside the Ordinary Course which is not evidenced by trade payables, (iii) all lease obligations of the Company or the Subsidiaries (whether as obligor or as guarantor) under leases which are (or are required to be treated as) capital leases in accordance with GAAP, (iv) all off-balance sheet financings of the Company or the Subsidiaries (whether as obligor or as guarantor) including, without limitation, synthetic leases and project financing, (v) any payment obligations of the Company or the Subsidiaries (whether as obligor or as guarantor) in respect of banker's acceptances or letters of credit (other than stand-by letters of credit in support of ordinary course trade payables), (vi) any liability of the Company or the Subsidiaries (whether as obligor or as guarantor) with respect to interest rate swaps, collars, caps and similar hedging obligations, (vii) any present, future or contingent obligations of the Company or the Subsidiaries under any (A) phantom stock or equity appreciation rights, plan or agreement, (B) consulting, deferred pay-out or earn-out arrangements in connection with the purchase of any business or entity, or (C) non-competition agreement, (viii) any accrued or earned bonuses, (ix) all indebtedness of or any obligation of the Company or the Subsidiaries owed to the Sellers or to any Seller Affiliated Person not canceled pursuant to Section 2.10 hereof, (x) any unpaid Seller Expenses, (xi) any other lease obligations and (xii) any accrued interest.  For the avoidance of doubt, any item included as a "liability" in the calculation of Working Capital shall not constitute Existing Indebtedness.

"**Family Member**" means, with respect to any individual, a member of such individual's immediate family, which shall include such individual's spouse, parents, children, siblings, aunts, uncles, mothers-in-law, fathers-in-law, sons-in-law, daughters-in-law, brothers-in-law and sisters-in-law, and their respective descendants (whether lineal or adopted).

"**GAAP**" means accounting principles generally accepted in the United States, consistently applied, except that with respect to the audited financial statements of Plastival Canada, "GAAP" means accounting principles generally accepted in Canada, consistently applied.  For purposes of clarification, with respect to all combined or consolidated financial

statements including Plastival US and Plastival Canada, "GAAP" shall mean accounting principles generally accepted in the United States, consistently applied. All financial statements using United States GAAP shall be stated in United States dollars, and all financial statements using Canadian GAAP shall be stated in Canadian dollars.

"**Governmental Authority**" means any U.S. or Canadian state, provincial, municipal, national, local, non-U.S. or non-Canadian or other governmental department, court, commission, board, bureau, agency or instrumentality or political subdivision thereof, or any entity or officer exercising executive, legislative or judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case having jurisdiction over the applicable Person.

"**Handling**" means the production, use, generation, emission, storage, treatment, transportation, arrangement for transportation, recycling, disposal, discharge, Release or other handling or disposition of any kind of any Hazardous Substance.

"**Holdings**" means Plastival Holdings, Inc., a Delaware corporation.

"**Hazardous Substance**" means any hazardous or toxic substance, waste or material, pollutant or contaminant defined by or otherwise regulated, by any Environmental Law, including without limitation, petroleum and petroleum products, polychlorinated biphenyls or asbestos.

"**Income Tax**" means all Taxes (i) based upon, measured by, or calculated with respect to, net income (ii) based upon, measured by, or calculated with respect to multiple bases (including, but not limited to, corporate franchise and occupation Taxes) if such Tax is predominantly based upon, measured by, or calculated with respect to net income.

"**Income Tax Return**" means a Tax Return in respect of an Income Tax.

"**Indemnity Escrow Amount**" means US$1,375,000, together with any dividends, interest, gains and other distributions on such escrowed amounts, as reduced from time to time by the amount of monies distributed therefrom in accordance with Section 2.8 and the Escrow Agreement.

"**Intellectual Property**" means all of the following in any jurisdiction throughout the world: (i) patents, patent applications, improvements, patent disclosures and other patent rights (including any divisions, continuations, continuations-in-part, reissues, reexaminations, or interferences thereof, whether or not patents are issued on any such applications and whether or not any such applications are modified, withdrawn, or resubmitted); (ii) trademarks, service marks, trade dress, trade names, corporate names, logos and slogans (and all translations, adaptations, derivations and combinations of the foregoing) and Internet domain names, together with all goodwill associated with each of the foregoing; (iii) copyrights and copyrightable works; (iv) registrations and applications for any of the foregoing; (v) trade secrets, confidential information, know-how, processes, procedures, customer lists and personally-identifiable information, databases, concepts, ideas, designs, research or development information, techniques, technical information, specifications, operating and maintenance manuals, engineering drawings, methods, technical data, discoveries, modifications, extensions,

-5-

improvements, and other proprietary information and rights (whether or not patentable or subject to copyright or trade secret protection) and inventions; (vi) computer software (including but not limited to source code, executable code, data, databases and documentation); and (vii) all other intellectual property.

"**IRS**" means the U.S. Internal Revenue Service.

"**ITA**" means the Income Tax Act (Canada).

"**Knowledge,**" with respect to the Company or its Subsidiaries or PREE, means the actual knowledge of any of David, Quinn and Nicole Gravel; and with respect to representations and warranties set forth in Section 3.19(e) only, Julian Chiropec and, with respect to representations and warranties set forth in Section 3.22 and Section 3.23 only, Christian LaPlante and Gerard Hogue.

"**Liability**" means any direct or indirect liability, indebtedness, obligation, commitment, expense, claim, deficiency, guarantee or endorsement of or by any Person of any type, whether known or unknown, and whether accrued, absolute, contingent, matured or unmatured.

"**Litigations**" shall mean (i) the case styled as Victor Gonzales, on behalf of himself and other persons similarly situated, known and unknown v. Plastival, Inc. and Labor Network, Inc., No. 0564864, currently pending in the United States District Court for the Northern District of Illinois, Eastern Division, alleging that Plastival US and its employment agency, Labor Network, Inc. failed to pay overtime to workers employed by both Labor Network, Inc. and Plastival US working at Plastival US's facility; (ii) the principal action for damages (for costs incurred pertaining to the restoration of premises leased by the plaintiff located at 2025-2037 Francis-Hughes, Laval (Québec) H7S 2G2, which premises were formerly occupied by Plastival Canada, the plaintiff alleging that Plastival Canada contaminated the said premises and did not proceed to their decontamination) and action in warranty currently pending in the Superior Court of Québec, district of Montréal, as case number 500-05-064513-011, involving 135770 Canada Inc., as plaintiff, Plastival Canada, 154640 Canada Inc., 140927 Canada Inc. and Garadex Inc., as defendants, 154640 Canada Inc., 140927 Canada Inc. and Garadex Inc., as plaintiffs in warranty, and Plastival Canada, as defendant in warranty; (iii) Overnite Transportation Company v. Plastival US, No. 2005-L-005065, currently pending in the Circuit Court of Cook County, Illinois, Law Division, First District and (iv) the case of Alejandra Lopez v. Plastival, No. 06 WC 002436, currently pending before the Illinois Workers Compensation Commission, filed on January 18, 2006, the plaintiff alleging workers compensation claims.

"**Material Adverse Effect**" means (a) with respect to the Company, PREE or the Sellers, any event, condition or circumstance that has had or would reasonably be expected to have, individually or in the aggregate with other events, conditions and circumstances, a material adverse effect or change on the condition (financial or otherwise), business, results of operations, Assets or Liabilities of the Company and its Subsidiaries and PREE, taken as a whole, or the ability of the Company, PREE or the Sellers to consummate this Agreement or the transactions contemplated hereby, and (b) with respect to the Buyer, any material adverse effect or change in

the ability of the Buyer to consummate this Agreement or the transactions contemplated hereby; provided, however, that for the purposes of determining whether a Material Adverse Effect has occurred, there shall be excluded (i) the effect of any change that is generally applicable to the United States or Canadian economies or securities markets or the world economy or international securities markets, or (ii) the effect of any change arising in connection with natural disasters, acts of war, sabotage or terrorism, military actions or the escalation thereof, in each case, to the extent that such events, circumstances or conditions do not disproportionately affect the Company and its Subsidiaries; (iii) the effect or change in condition of the Company caused by the changes to the Company's product sold to Lowe's Companies, Inc. to make all of such product compliant with the model buildings codes published by Southern Building Code Congress International, Inc.; or (iv) the effect of any change required or permitted by this Agreement.

"**Ordinary Course**" means the ordinary course of business of the Business, consistent with the past customs and practice of the Company and its Subsidiaries.

"**Organizational Documents**" means, with respect to a Person, the certificate or articles of incorporation, certificate or articles of formation, by-laws, limited liability company operating agreement or other similar organizational documents of such Person.

"**Permits**" means all licenses, permits, franchises, approvals, authorizations, registrations, consents or orders of, or filings with, any Governmental Authority necessary for the conduct of the Business.

"**Permitted Encumbrances**" means (a) liens for Taxes, assessments and other governmental charges not yet due and payable or that are being contested in good faith by appropriate proceedings and for which there are reserves on the consolidated balance sheet of the Company, (b) inchoate statutory, mechanics', laborers' and materialmen's liens arising in the Ordinary Course for sums not yet due, (c) statutory and contractual landlord's liens under leases pursuant to which the Company or a Subsidiary is a lessee for sums not yet due, and (d) with regard to Owned Real Property, without limitation, (i) any and all matters of record in the jurisdiction where the Owned Real Property is located, including restrictions, reservations, covenants, conditions, oil and gas leases, mineral severances and liens, and (ii) any easements, servitudes, rights-of-way, building or use restrictions, prescriptive rights, encroachments, protrusions, rights and party walls that do not detract (other than in immaterial respects) from the value or otherwise interfere (other than in an immaterial manner) with the current use of any of the Owned Real Property.

"**Person**" means any person or entity, whether an individual, trustee, corporation, partnership, limited partnership, limited liability company, trust, unincorporated organization, business association, firm, joint venture or Governmental Authority.

"**Personal Property**" means all machinery, equipment, furniture, motor vehicles, other miscellaneous supplies, tools, fixed assets and other tangible personal property owned or leased by or used by the Company or a Subsidiary in connection with the Business.

"**Pre-Closing Tax Period**" means any Taxable Period ending on or before the Closing Date and the portion of any Straddle Period for which the Sellers are responsible as set forth in <u>Section 7.1(f)</u>.

"**Real Property Leases**" means all leases, subleases or occupancy agreements pursuant to which the Company or any of its Subsidiaries leases, subleases, uses or occupies any real property (other than the Owned Real Property), including all amendments thereto.

"**Regulations**" means any laws (including common law), statutes, ordinances, regulations, rules, notice requirements, court decisions, agency guidelines, principles of law and orders of any U.S. or Canadian, state, provincial or local government and any other Governmental Authority.

"**Release**" means any release, spill, leak, discharge, disposal, dispensing, pumping, pouring, emitting, emptying, injecting, leaching, placing, dumping, or allowing to escape or the threat thereof.

"**Retiree**" means (i) any retired or former employee, director or officer of the Company or any of its Subsidiaries or (ii) any former independent contractor of the Company or any of its Subsidiaries.

"**Senior Officers**" means any of Guy David and James N. Quinn.

"**Software**" means, as they exist anywhere in the world, computer software programs, including all source code, object code, specifications, databases, designs and documentation related to such programs.

"**Straddle Period**" means a Taxable Period that begins before and ends after the Closing Date.

"**Subsidiary**" means a corporation or other entity of which 50% or more of the voting power or value of the equity securities or equity interests is owned, directly or indirectly, by the Company.

"**Target Working Capital**" means an amount equal to US$8,000,000.

"**Tax**" and "**Taxes**" mean (i) any and all U.S. and Canadian, state, provincial, local, municipal, school non-U.S. or non-Canadian and other taxes, levies, charges, fees, imposts, duties, assessments, reassessments, deductions, withholdings and similar governmental charges (including any interest, fines, assessments, penalties or additions to tax imposed in connection therewith or with respect thereto) imposed by any governmental entity ("**Taxing Authority**"), whether direct or direct, whether or not measured in whole or in part by net income, including, without limitation (t) taxes imposed on, or measured by, income, franchise, profits or gross receipts, (u) ad valorem, value added, capital gains, sales, goods and services, use, real or personal property, capital, capital stock, license, branch, payroll, estimated, minimum, environmental, withholding, employment, social security (or similar), unemployment, compensation, utility, severance, production, excise, stamp, occupation, premium, windfall profits, transfer and gains taxes, and customs duties, (v) all income taxes (including any tax on or

based upon net income, gross income, income as specially defined, earnings, profits or selected items of income, earnings or profits); (w) all of the following taxes:  capital, corporate, gross receipts, federal Goods and Services Tax ("**GST**"), Québec Sales Tax ("**QST**"), any other sales, use, turnover, value-added, ad valorem, transfer, real or personal property, business, franchise, license, withholding, payroll, wage, employer health, employment, excise, severance, utility, compensation and social security; (x) all workers' compensation plan premiums, employment insurance premiums or compensation, Canada and/or Québec pension plan contributions, and retirement contributions; (y) all stamp, occupation, premium, property or windfall profits taxes and alternative or add-on minimum taxes; and (z) all other taxes, fees, assessments or charges of any kind whatsoever; and (ii) any transferee liability in respect of any items described in clause (i) above.

"**Tax Legislation**" means, collectively, the Income Tax Act (Canada) and the corresponding law of any other jurisdiction, including, but not limited to, the United States and Canada.

"**Taxable Period**" means any taxable year or any other period that is treated as a taxable year (including any taxable period ending on or prior to the Closing Date or beginning on or after the Closing Date) with respect to which any Tax may be imposed under any statute, rule, or regulation.

"**Tax Return**" means any and all returns, reports, elections, estimates, declarations, documentation, information reports or statements, schedules, claims for refunds, disclosures and other forms and documents (including all exhibits, statements and other attachments thereto and amendments thereof) relating to, and required to be filed or maintained in connection with, the calculation, determination, assessment or collection of, any Taxes (including estimated Taxes) or in fact filed with any Taxing Authority.

"**Transaction Documents**" means this Agreement, the Escrow Agreement and the employment agreements with the Senior Officers.

"**Use**" means to use, reproduce, prepare derivative works based upon, distribute, perform, display, make, have made, sell, offer to sell, export, import, license, sublicense and otherwise exploit.

"**Withholding Escrow Amount**" means 25% of the portion of the Purchase Price payable for the Canadian Shares including any upward adjustments after the Closing, as reduced from time to time by the amount of monies distributed therefrom in accordance with Section 2.8 and the Escrow Agreement.

Section 1.2     Terms Defined Elsewhere.  The following is a list of additional terms used in this Agreement and a reference to the Section hereof in which such term is defined:

| **Term** | **Section** |
| --- | --- |
| Accounting Principles | Section 2.3(d) |
| Acquisition Agreements | Section 3.28 |
| Agreement | Preamble |

| Term | Section |
|------|---------|
| Amalco | Section 2.12(c) |
| Auditor | Section 2.5(a) |
| Buyer | Preamble |
| Buyer Indemnitees | Section 8.2(a) |
| Canada Newco | Section 2.12(a) |
| Canadian Closing Certificate Due Date | Section 2.8(b)(i) |
| Canadian Shares | Recitals |
| Certificate of Authorization Expenses | Section 6.5(b) |
| Closing | Section 2.2 |
| Closing Balance Sheet | Section 2.5(a) |
| Closing Date | Section 2.2 |
| Closing Purchase Price Certificate | Section 2.5(a) |
| Company | Preamble |
| Company Employee Plan | Section 3.18(b)(i) |
| Contest | Section 7.2(a) |
| Deed of Sale | Section 2.7(b)(ii)(A) |
| Dispute Notice | Section 2.5(b) |
| Estimated Closing Balance Sheet | Section 2.3(d) |
| Estimated Closing Purchase Price Certificate | Section 2.3(d) |
| Estimated Purchase Price | Section 2.1 |
| Estimated Working Capital | Section 2.3(d) |
| Estimated Working Capital Statement | Section 2.3(d) |
| Exposure Cap | Section 8.4(e) |
| Final Closing Balance Sheet | Section 2.5(c) |
| Final Working Capital | Section 2.5(c) |
| Final Working Capital Statement | Section 2.5(c) |
| Financial Statements | Section 3.7(a) |
| Guy David Trust | Preamble |
| Indemnified Party | Section 8.3(a) |
| Independent Auditor | Section 2.5(c) |
| Insurance Policies | Section 3.20 |
| Interim Financial Statements | Section 3.7(a) |
| Labor Union | Section 3.18(a)(i) |
| Leased Real Property | Section 3.13(b) |
| Losses | Section 8.2(a) |
| Maillé Inc. | Section 3.10(b)(xxxii) |
| Material Contracts | Section 3.11(a) |
| Notary | Section 2.7(b)(ii)(A) |
| Owned Real Property | Section 3.13(a) |
| Pending Claim | Section 2.8 |
| Plastival Canada | Preamble |
| Plastival US | Preamble |
| PREE | Preamble |
| Pre-Closing Income Tax Return | Section 7.1(b) |
| Pre-Closing Taxes | Section 7.1(a) |

| Term | Section |
|------|---------|
| Purchase Price | Section 2.1 |
| Real Property | Section 3.13(c) |
| Regulation 45-106 | Section 5.9 |
| Release Date | Section 2.8 |
| Reorganization | Section 2.12 |
| Responsible Party | Section 8.3(a) |
| Seller | Preamble |
| Seller Affiliated Person | Section 2.10 |
| Seller Expenses | Section 2.3(b) |
| Seller Indemnitees | Section 8.2(b) |
| Selling Group | Section 3.10(b)(xxxii) |
| Shares | Section 3.6(a) |
| Specified Exceptions | Section 8.4(f) |
| Tax Indemnified Buyer Party | Section 7.3 |
| Tax Loss | Section 7.3 |
| Tax Sharing Agreements | Section 3.10 |
| Third Party Claim | Section 8.3(a) |
| Threshold | Section 8.4(d) |
| Transfer Taxes | Section 7.7 |
| Top Customers | Section 3.23 |
| Top Suppliers | Section 3.22 |
| US Shares | Recitals |
| WARN Act | Section 3.18(b)(xiii) |
| Wire Transfer Instructions | Section 2.4(a) |
| Working Capital | Section 2.3(d) |
| Working Capital Statement | Section 2.5(a) |
| Year-End Financial Statements | Section 3.7(a) |

Section 1.3    Interpretation.  In this Agreement, unless otherwise specified or where the context otherwise requires:

(a)    the headings of particular provisions of this Agreement are inserted for convenience only and will not be construed as a part of this Agreement or serve as a limitation or expansion on the scope of any term or provision of this Agreement;

(b)    words importing any gender shall include other genders;

(c)    words importing the singular only shall include the plural and vice versa;

(d)    the words "include," "includes" or "including" shall be deemed to be followed by the words "without limitation;"

(e)    the words "hereby," "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement;

(f)    references to "Articles," "Exhibits," "Annexes," "Sections" or "Schedules" shall be to Articles, Exhibits, Sections or Schedules of or to this Agreement; and

(g)    references to any Person include the successors and permitted assigns of such Person.

## ARTICLE II
## PURCHASE AND SALE OF SHARES

Section 2.1    Purchase and Sale of Shares and Owned Real Property and Assignment and Assumption.  The aggregate consideration for (a) the Shares shall be equal to (A) (1) US$10,243,860 for the US Shares (payable by US Holdings) and (2) US$30,902,446 for the Canadian Shares (payable by Canadian Holdings), subject to the following adjustments, which will be allocated on a reasonable basis after the Closing by the Buyer between Plastival US and Plastival Canada and accordingly between the US Shares and the Canadian Shares, plus (B) if the Final Working Capital is greater than the Target Working Capital by more than US$100,000, the excess amount over US$100,000, minus (C) if the Final Working Capital is less than the Target Working Capital by more than US$100,000, the excess amount over US$100,000, minus (D) the Existing Indebtedness outstanding as of the Closing Date (prior to giving effect to the Closing), and (b) the Owned Real Property shall be C$7,163,265 (collectively, the "**Purchase Price**").  To facilitate the Closing, the amounts of Final Working Capital and Existing Indebtedness shall be determined based on the Estimated Closing Purchase Price Certificate delivered pursuant to Section 2.3(a) and these estimated amounts shall be allocated after the Closing by the Buyer on a reasonable basis between Plastival US and Plastival Canada.  The Purchase Price, as estimated in accordance with the preceding sentence, is referred to as the "**Estimated Purchase Price**."  The Purchase Price shall be allocated between the Sellers and the various classes of stock of Plastival Canada as set forth in Schedule 2.1.

Section 2.2    Closing.  The purchase and sale of the Shares and the Owned Real Property (the "**Closing**") as well as the payment of all amounts described in Section 2.4(b) hereof shall occur and shall be deemed to have occurred simultaneously in all respects and shall take place on the date of this Agreement (the "**Closing Date**"), at the offices of Dykema Gossett PLLC, 10 South Wacker Drive, Suite 2300, Chicago, Illinois 60606, unless another time, date or place is agreed to by the parties hereto, or remotely via the exchange of executed documents.

Section 2.3    Closing Estimates.

(a)    Prior to the Closing Date, the Sellers shall have furnished to the Buyer a certificate signed by each of the Sellers (the "**Estimated Closing Purchase Price Certificate**") setting forth a good faith estimate of (i) Seller Expenses, (ii) Existing Indebtedness outstanding as of the Closing Date (prior to giving effect to the Closing), (iii) Estimated Working Capital, and the portions of the amounts described in clauses (i) through (iii) above attributable to each of Plastival Canada and Plastival US, all in accordance with this Section 2.3.

(b)    The Sellers shall have, in good faith, prepared or caused to be prepared and delivered to the Buyer prior to the Closing Date, a list of the amount of all accrued and

unpaid fees, expenses and other similar amounts arising from the provision of services prior to the Closing Date that have been or are expected to be incurred on or prior to the Closing Date on behalf of the Sellers or the Company in connection with the preparation, negotiation and execution of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby (together with invoices therefor, wire transfer instructions for such Persons and an acknowledgement that such invoice represents a final bill for services provided by such Person prior to and including the Closing Date ), including the following:  (i) the fees and disbursements of, or other similar amounts charged by, counsel to the Sellers and the Company, (ii) the fees and expenses of, or other similar amounts charged by, any accountants, agents, financial advisors, consultants and experts employed by the Sellers and the Company and (iii) the out-of-pocket expenses, if any, of the Sellers and the Company (the expenses set forth in this Section 2.3(b) are collectively referred to as the "**Seller Expenses**").

(c)     The Sellers shall have, in good faith, prepared or caused to be prepared and delivered to the Buyer prior to the Closing Date, a statement with reasonable detail setting forth the Existing Indebtedness which was outstanding as of the Closing Date , together with all fully executed UCC-3 termination statements, discharges, financing or termination statements, RV forms and other terminations, pay-off letters and/or releases, or, at the Buyer's option, assignments, necessary to terminate, release or assign, as the case may be, all Encumbrances set forth on Schedule 3.12 and on Schedule 3.13(a), or, related thereto in substance reasonably satisfactory to the Buyer, and to radiate the registration of such Encumbrances on the relevant registries.

(d)     The Sellers shall have, in good faith, prepared or caused to be prepared and delivered to the Buyer prior to the Closing Date, an estimated consolidated balance sheet of the Company as of the Closing Date (the "**Estimated Closing Balance Sheet**"), together with a written statement setting forth in reasonable detail its estimate of Working Capital on the Closing Date (the "**Estimated Working Capital**") as reflected on the Estimated Closing Balance Sheet (the "**Estimated Working Capital Statement**").  The Estimated Closing Balance Sheet will be prepared on a basis consistent with the preparation of the Financial Statements, except to the extent that such Financial Statements are inconsistent with GAAP, in which case, the Estimated Closing Balance Sheet shall be prepared consistent with GAAP (as so required to be prepared, the "**Accounting Principles**").  For purposes of this Agreement, "**Working Capital**" shall be calculated as provided in Schedule 2.3(d), and the Estimated Working Capital Statement shall be prepared in accordance with the instructions set forth on Schedule 2.3(d).

Section 2.4     Payment of Estimated Purchase Price and Other Amounts.

(a)     Prior to the Closing Date, the Sellers shall have designated in writing the accounts to which the payments set forth in this Section 2.4 shall be made (the "**Wire Transfer Instructions**").

(b)     On the Closing Date, the Buyer will make, or cause to be made, the following payments, which payments shall be allocated after the Closing by the Buyer between US Holdings and Canadian Holdings based on the amounts of the Purchase Price allocable to the US Shares, the Canadian Shares and the Owned Real Property, respectively:

(i)     to such accounts designated in the Wire Transfer Instructions by wire transfer of immediately available funds, an amount in the aggregate equal to the Existing Indebtedness outstanding as of the Closing Date (prior to giving effect to the Closing);

(ii)     without double-counting amounts to be paid pursuant to clause (i) above, to such accounts designated in the Wire Transfer Instructions by wire transfer of immediately available funds, the amount of the Seller Expenses;

(iii)     to an account or accounts, in the name of the Sellers, designated in the Wire Transfer Instructions, by wire transfer of immediately available funds, an amount equal to (A) the Estimated Purchase Price calculated in accordance with Section 2.1, minus (B) the Indemnity Escrow Amount, minus (C) the Withholding Escrow Amount, minus (D) the Certificate of Authorization Escrow Amount, minus (C) without double counting amounts included in clause (A) above, the Seller Expenses; and

(iv)     to the Escrow Account, designated in the Wire Transfer Instructions, by wire transfer of immediately available funds, an amount equal to the (A) Indemnity Escrow Amount, plus (B) the Withholding Escrow Amount, plus (C) the Certificate of Authorization Escrow Amount.

(c)     To the extent Buyer shall be liable for any amounts resulting from its assumption of certain obligations under the Deed of Sale for the purchase of the Owned Real Property dated December 22, 1999 between the Crown of Canada and the City of Terrebonne or the Deed of Sale dated September 14, 2002 between the City of Terrebonne and PREE, Sellers shall reimburse Buyer for such amounts.

Section 2.5     Closing Balance Sheet.

(a)     As promptly as possible, KPMG LLP or another firm chosen by Buyer in its sole discretion (the "**Auditor**") will prepare or cause to be prepared, and will provide to Sellers and Buyer, a consolidated balance sheet of the Company as of the Closing Date (the "**Closing Balance Sheet**"), together with a written statement (the "**Closing Purchase Price Certificate**") setting forth in reasonable detail (i) its determination of the Working Capital as of 12:01 a.m. on the Closing Date as reflected on the Closing Balance Sheet (the "**Working Capital Statement**"), (ii) the Existing Indebtedness as of the Closing Date, (iii) a calculation of the Purchase Price, (iv) a calculation of the difference between the Estimated Purchase Price and the Purchase Price and (v) the portions of the amounts described in clauses (i) through (iv) attributable to each of Plastival Canada and Plastival US.  The Closing Balance Sheet will be prepared in accordance with the Accounting Principles and the Working Capital Statement shall be prepared in accordance with the instructions set forth on Schedule 2.3(d).  The Auditor will be provided access at reasonable hours and upon reasonable notice to all work papers of the Company or its Affiliates, including the Sellers, used in the preparation of the Closing Balance Sheet and the Working Capital Statement.

(b)     The Closing Balance Sheet, the Working Capital Statement and the Purchase Price, as set forth in the Closing Purchase Price Certificate (as well as the allocation of such amounts between Plastival Canada and Plastival US and accordingly the amount payable by

(i) US Holdings for the US Shares and (ii) Canadian Holdings for the Canadian Shares, as determined by the Auditor) will be final, conclusive and binding on the parties (and will be deemed to constitute a "**Final Closing Balance Sheet**" and "**Final Working Capital Statement**", respectively, pursuant to <u>Section 2.5</u>) unless either the Sellers or Buyer provides a written notice (a "**Dispute Notice**") to the other party no later than the twentieth (20th) Business Day after delivery of the Working Capital Statement and the Closing Purchase Price Certificate setting forth its objection to any item in the Closing Purchase Price Certificate, specifying in reasonable detail (i) any item on the Closing Balance Sheet and/or the Working Capital Statement which the Sellers or Buyer, as the case may be, believes has not been prepared in accordance with the Accounting Principles or the instructions set forth on <u>Schedule 2.3(d)</u>, as applicable, and the basis for such determination, (ii) the correct amount of such item in accordance with the Accounting Principles or the instructions set forth on <u>Schedule 2.3(d)</u>, as applicable, and (iii) the basis for such objection and setting forth its proposed modification to such item.  Any item or amount to which no dispute is raised in the Dispute Notice and which is not otherwise affected by the disputed items or amounts will be final, conclusive and binding on the parties.

(c)    The Buyer and the Sellers will attempt to resolve the matters raised in a Dispute Notice in good faith.  Ten (10) Business Days after delivery of the Dispute Notice, either the Buyer or the Sellers may provide written notice to the other that it elects to submit any unresolved dispute to Deloitte & Touche, PricewaterhouseCoopers, or another independent accounting firm chosen jointly by the Buyer and the Sellers (the "**Independent Auditor**").  The Independent Auditor will promptly review the unresolved items from the Dispute Notice and resolve the dispute in accordance with the Accounting Principles or the instructions set forth on <u>Schedule 2.3(d)</u>, as applicable.  The final consolidated balance sheet of the Company as of the Closing Date and the related statement of the Working Capital on the Closing Date as reflected on such balance sheet as so determined by the Independent Auditor shall be referred to as the "**Final Closing Balance Sheet,**" and the "**Final Working Capital Statement**," respectively, and Working Capital as reflected on the Final Working Capital Statement shall be referred to as the "**Final Working Capital**".  The fees and expenses of the Independent Auditor will be borne by the Sellers and the Buyer in inverse proportion as they may prevail on the matters resolved by the Independent Auditor, which proportionate allocations shall be determined by the Independent Auditor at the time the determination of the Independent Auditor is rendered on the merits of the matters submitted.  The decision of the Independent Auditor with respect to the items of the Closing Balance Sheet, the Working Capital Statement and the Purchase Price submitted to it will be final, conclusive and binding on the parties absent manifest error (and in the event of such error, such error shall be identified to the other party in writing within three (3) months from the date of the Independent Auditor's determination), and judgment thereon may be entered by any court of competent jurisdiction.  Each of the parties to this Agreement agrees to use its commercially reasonable efforts to cooperate with the Independent Auditor and to cause the Independent Auditor to resolve any dispute no later than thirty (30) Business Days after selection of the Independent Auditor.  To the extent that any increase in the amount of a Liability on the Estimated Closing Balance Sheet is reflected in the Final Closing Balance Sheet or the Final Working Capital Statement, such increase shall not, in and of itself, constitute or give rise to a breach of any of the Sellers' representations and warranties contained in this Agreement and will not be double-counted for purposes of the indemnification provisions contained herein.

Section 2.6    Payment of Final Purchase Price.  Promptly, and in any event no later than the tenth (10th) Business Day after determination of the Final Working Capital Statement and the Purchase Price pursuant to Section 2.5(b) or (c):

(a)    if the Final Working Capital is less than the Target Working Capital by more than US$100,000, the Sellers shall pay to the Buyer the excess amount over US$100,000; provided, however, that the first US$375,000 of such amount shall be paid out of the Escrow Account; and

(b)    if the Final Working Capital is greater than the Target Working Capital by more than US$100,000, the Buyer shall pay to the Sellers the excess amount over US$100,000.

The amounts referred to in Section 2.6(a) and Section 2.6(b) shall be allocated after the Closing by the Buyer between the Purchase Price payable for the US Shares and the Canadian Shares.  Buyer shall withhold 25% of the amount payable pursuant to Section 2.6(b) allocable to the Canadian Shares unless such Seller obtained a Canadian Closing Certificate with a limit in an amount not less than such Seller's allocable share of the portion of the Purchase Price payable for the Canadian Shares (and allocated between the classes of Shares), including any upward adjustments after the Closing such as the amounts, if any, payable pursuant to Section 2.6(b) hereof.  Any amount withheld by the Buyer pursuant to this Section should be deposited in the Escrow Account.

Section 2.7    Closing Deliveries.

(a)    At the Closing, the Buyer shall deliver, or cause to be delivered, to the Sellers:

(i)    the amount calculated pursuant to Section 2.4(b)(iii), by wire transfer of immediately available funds to the account designated in the Wire Transfer Instructions;

(ii)    a certificate, duly executed by an authorized Secretary of the Buyer, dated the Closing Date, to the effect that: (A) (1) the certificate of incorporation and by-laws of the Buyer attached to such certificate are correct and complete, and were in full force and effect in the form as attached to such certificate on the date of adoption of the resolutions referred to in clause (3) below, (2) no amendment to such certificate of incorporation or by-laws of the Buyer has occurred since the date of adoption of the resolutions referred to in clause (3) below, and (3) the resolutions adopted by the board of directors of the Buyer authorizing this Agreement and the transactions contemplated hereby were duly adopted at a duly convened meeting thereof, at which a quorum was present and acting throughout, or by unanimous written consent, and such resolutions, as attached to such certificate, are correct and complete, remain in full force and effect, and have not been amended, rescinded or modified; and (B) the officers of the Buyer executing this Agreement and the other Transaction Documents to which the Buyer is a party and which are to be executed and delivered by the Buyer pursuant to this Agreement are incumbent officers of the Buyer, and the specimen signatures on such certificate are their genuine signatures;

(iii)    the Escrow Agreement, duly executed by the Buyer; and

(iv)    an opinion of counsel to the Buyer.

(b)    At the Closing, the Sellers shall deliver, or cause to be delivered, to the Buyer:

(i)    certificates representing the Shares, duly endorsed in blank (or accompanied by duly executed stock powers);

(ii)    the following documents with respect to the Owned Real Property:

(A) the deed of sale executed by PREE before a notary reasonably acceptable to the Buyer (the "**Notary**") to give effect to the sale of the Owned Real Property on the terms and conditions set forth in this Agreement (the "**Deed of Sale**"); in the case of any conflict or inconsistency between the provisions of the Deed of Sale and the provisions of this Agreement, the provisions of this Agreement shall prevail;

(B) all deeds, title opinions, title reports and other documents relating to title to the Owned Real Property as are in PREE's possession or control;

(C) evidence reasonably acceptable to the Buyer that all Taxes with respect to the Owned Real Property for the period up to the Closing have been paid; and

(D) such other deeds and documents as the Buyer may reasonably require to ensure that it receives good and marketable title to the Owned Real Property, free and clear of Encumbrances other than Permitted Encumbrances.

(iii)    the Company and the Sellers shall have provided to the Buyer written copies of the consents or approvals listed on Schedule 2.7(b)(iii) in form and substance reasonably acceptable to the Buyer;

(iv)    a certificate, duly executed by an authorized Secretary or Assistant Secretary of the Company, dated the Closing Date, to the effect that: (A) (1) the certificate of formation and limited liability company operating agreement attached to such certificate or the certificate of incorporation and by-laws are correct and complete, and were in full force and effect in the form as attached to such certificate on the date of adoption of the resolutions referred to in clause (3) below, (2) no amendment to the certificate of formation and limited liability company operating agreement or the certificate of incorporation and by-laws has occurred since the date of adoption of the resolutions referred to in clause (3) below, and (3) the resolutions adopted by the board of directors of the Company and the members of the Company, authorizing this Agreement and the transactions contemplated hereby, were duly adopted at a duly convened meeting thereof, at which a quorum was present and acting throughout, or by unanimous written consent, and such resolutions, as attached to such certificate, are correct and complete, remain in full force and effect, and have not been amended, rescinded or modified; and (B) the officers of the Company executing this Agreement and the Transaction Documents to which the Company is a party to be executed and delivered by the Company pursuant to this

Agreement are incumbent officers of the Company, and the specimen signatures on such certificate are their genuine signatures;

(v)      resignation letters from the directors of the Company and each Subsidiary resigning as a director of such entity effective as of the Closing Date;

(vi)      the Escrow Agreement, duly executed by the Sellers;

(vii)      an opinion of Canadian and US counsel to the Sellers;

(viii)      the employment agreements between Holdings and each of David and Quinn;

(ix)      any documents reasonably required by the Buyer's title insurer (if any), to permit the Company or the applicable Subsidiary to obtain title insurance insuring fee or leasehold (as applicable) title to the Real Property free and clear of all title exceptions other than those permitted hereunder, together with any endorsements reasonably required by the Buyer, such endorsements to be at the Buyer's expense, including a so-called "**Non-Imputation Endorsement**";

(x)      any and all real property transfer Tax Returns and other similar filings required by law in connection with the transactions contemplated hereby and relating to the Owned Real Property, any part thereof or ownership interest therein, all duly and properly executed and acknowledged by PREE, together with affidavits required by law or reasonably requested by the Buyer in connection with such filings, duly executed by PREE; and

(xi)      the affidavit, signed under penalties of perjury, described in U.S. Treasury Regulation Sections 1.897-2(h) and 1.1445-2(c)(3) establishing that Plastival US is not and was not a United States Real Property Holding Corporation, and will provide notice to the U.S. Internal Revenue Service pursuant to U.S. Treasury Regulation Section 1.897-2(h)(2).

Section 2.8      Release of the Escrow Amount.

(a)      Indemnity Escrow Amount.

(i)      Once the payment is made pursuant to Section 2.6, the amount of the Indemnity Escrow Amount (if any) in excess of US$1,000,000 shall be released to an account or accounts, in the names of the Sellers, as provided in the Escrow Agreement.

(ii)      The then remaining Indemnity Escrow Amount, minus the aggregate amount of any pending indemnification claims made pursuant to Article VII and Article VIII, shall be released to an account or accounts, in the names of the Sellers, as provided in the Escrow Agreement, on the first anniversary of the Closing Date (the **"Release Date"**). Thereafter, the remaining undistributed balance of the Escrow Amount shall be paid to the Sellers except to the extent of the amount of all pending claims made pursuant to Article VII and Article VIII prior to the Release Date (each, a **"Pending Claim"**).  At such time as all remaining Pending Claims have been resolved and paid, the remaining balance of the Escrow Amount shall be released and paid to the Sellers.

      (b)    <u>Withholding Escrow Amount</u>.

      (i)    If the Canadian Closing Certificates for each Seller are not delivered to the Buyer four (4) days prior to the later (the "**Canadian Closing Certificate Due Date**") of (A) if no Comfort Letter is issued, August 30, 2006, (B) if a Comfort Letter is issued, by the due date specified by the CRA in a letter addressed to Buyer, which letter is acceptable to counsel to Buyer and relieves Buyer from remitting amounts withheld within prescribed delays (provided, however,  that if no due date is specified by CRA in such letter, then the portion of the Withholding Escrow Amount allocable to each Seller who did not deliver a Canadian Closing Certificate shall not be released until required by CRA pursuant to such letter, any subsequent letter or other request or as otherwise required by law), then the portion of the Withholding Escrow Amount allocable to each Seller who did not deliver a Canadian Closing Certificate shall be released to the CRA, on behalf of the Buyer.  For purposes hereof, "Comfort Letter" shall mean a letter issued by CRA on or before August 26, 2006 addressed to Buyer acknowledging the receipt by CRA of notification under subsection 116 of the ITA and requesting that the Withholding Escrow Amount be held in trust for the Receiver General for Canada and not be remitted to CRA pending completion of the review of such notification, which letter from CRA is reasonably acceptable to counsel to Buyer and relieves Buyer from remitting amounts withheld within prescribed delays.

      (ii)    If the Canadian Closing Certificate for a Seller is delivered to the Buyer prior to the Canadian Closing Certificate Due Date, then the portion of the Withholding Escrow Amount allocable to such Seller shall be released to an account or accounts, in the names of such Seller, as provided in the Escrow Agreement.

      (iii)    If at such time as the CRA demands payment of all or a portion of the Withholding Escrow Amount and at such time the Canadian dollar equivalent of the amount to be paid exceeds the Withholding Escrow Amount by any amount, the Buyer, at its option, may demand payment by the Sellers, within one business day, into the applicable Escrow Account subaccount, pursuant to the Escrow Agreement, of the US dollar equivalent of such excess amount.  In the event that the Sellers fail to provide such monies in a timely manner after such demand is made, the Buyer may set off such amounts against other payments due to the Sellers until such excess amount is recaptured and paid into the applicable Escrow Account subaccount, pursuant to the Escrow Agreement.

      (c)    <u>Certificate of Authorization Escrow Amount</u>.  The Certificate of Authorization Escrow Amount, minus the Certificate of Authorization Expenses paid by the Buyer, shall be released to an account or accounts, in the names of the Sellers, as provided in the Escrow Agreement, upon the issuance of the Certificate of Authorization.

      Section 2.9    <u>Sellers' Guaranty</u>.  Each of David, Quinn and the Guy David Trust does hereby unconditionally and irrevocably guaranty to the Buyer and any successor and assigns the funding of all costs, expenses and other amounts to be paid pursuant to the Litigations.

      Section 2.10    <u>Termination of Affiliate Obligations</u>.  Except as set forth on <u>Schedule 2.10</u>, all Liabilities of the Company or its Subsidiaries, on the one hand, and the Sellers

or any Affiliate of the Sellers, any Family Member of any of the foregoing or any Person in which a Family Member has an interest (any of the foregoing, a "**Seller Affiliated Person**"), on the other hand, including (i) any and all indebtedness and intercompany accounts of Company or any Subsidiary, on the one hand, and the Sellers or any Seller Affiliated Person, on the other hand, (ii) any and all contracts between the Company or any Subsidiary, on the one hand, and the Sellers, or any Seller Affiliated Person, on the other hand and (iii) the arrangements set forth on Schedule 3.21, shall have been terminated in full, without any liability to the Company or any Subsidiary thereof following the Closing.

Section 2.11    Minute Book Deficiencies.  The minute book deficiencies set forth on Schedule 2.11 shall have been remedied to the satisfaction of the Buyer.

Section 2.12    Reorganization.  Canadian Holdings will make an election pursuant to Section 338(g) of the Code in connection with its acquisition of Plastival Canada, and as soon as practicable following the Closing Date, Plastival Canada and Plastival US will be reorganized (the "**Reorganization**") so that, following the Reorganization, US Holdings owns 100% of the outstanding capital stock of Plastival US. The Reorganization will be effected by the Buyer following the Closing in substantially the following manner:

(a)    Canadian Holdings has formed, or will form, a Canadian corporation ("**Canada Newco**") with a contribution of the minimal capital required to form a Canadian corporation, and Canada Newco will issue shares to Canadian Holdings, which shares will constitute 100% of the outstanding shares of Canada Newco;

(b)    Canadian Holdings will transfer all of the shares it owns in Plastival Canada together with the Owned Real Property to Canada Newco in return for a combination of (as determined by Canadian Holdings) (x) additional shares of Canada Newco ; (y) a note in an amount equal to the fair market value of  the shares of Plastival US held by Plastival Canada; and (z) an amount of indebtedness equal to the outstanding indebtedness of Canadian Holdings to Holdings and any third party lender or creditor (but in an aggregate amount not exceeding Canadian Holdings' cost of Plastival Canada shares and Owned Real Property);

(c)    Canada Newco and Plastival Canada will amalgamate on the day after the Closing Date under the laws of Canada, with the resulting company ("**Amalco**") continuing to be indebted for all debt described in steps Section 2.12(b)(y) and Section 2.12(b)(z);

(d)    Amalco will sell all of the shares it owns in Plastival US  (representing a one-third interest) to US Holdings in return for a note in an amount equal to the fair market value of the shares in Plastival US transferred (which amount is equal to the note in Section 2.12(b)(y));

(e)    Amalco will pay off the note it owes to Canadian Holdings (from step Section 2.12(b)(y)) by assigning to it the note it received from US Holdings in Section 2.12(d);

(f)    Canadian Holdings will distribute the note it received in Section 2.12(e) to Plastival Holdings, Inc.; and

(g)    US Holdings and Plastival US will amalgamate and Plastival US will survive such amalgamation.

This section is for informational purposes only.  Sellers and Buyer do not make any representations and warranties concerning the Reorganization and shall have no duty to indemnify Buyer for any damages, losses, liabilities, obligations, claims, interest or expenses (including attorneys' fees and expenses) in connection with the Reorganization.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES AS TO THE COMPANY, PREE AND THE GUY DAVID TRUST

The Sellers and PREE hereby, jointly and severally, represent and warrant to the Buyer as follows:

Section 3.1    Company Organization.  The Company and each Subsidiary are duly organized, validly existing and in good standing under the laws of its jurisdiction of organization as set forth on Schedule 3.1 with requisite corporate power and authority to conduct the Business as it is currently being conducted and to own or lease, as applicable, its Assets.  The Company and each Subsidiary is duly qualified to do business as a foreign entity and is in good standing in each jurisdiction where the character of its properties owned or leased or the nature of its activities make such qualification necessary, except where the failure to be so qualified or in good standing would not, individually or in the aggregate have, or reasonably be expected to have, a Material Adverse Effect on the Company.  Copies of the Organizational Documents of the Company and each Subsidiary, heretofore delivered to the Buyer, are correct and complete as of the date hereof.  Schedule 3.1 lists the jurisdictions in which the Company is qualified to do business as a foreign corporation.

Section 3.2    PREE Organization.  PREE is a resident of Canada within the meaning of the ITA, duly organized, validly existing and in good standing under the laws of its jurisdiction of organization as set forth on Schedule 3.2 with requisite corporate power and authority to own the Owned Real Property and was formed solely for the purpose of owning the Owned Real Property.  PREE is duly qualified to do business as a foreign entity and is in good standing in each jurisdiction where the character of its properties owned or leased or the nature of its activities make such qualification necessary, except where the failure to be so qualified or in good standing would not, individually or in the aggregate have, or reasonably be expected to have, a Material Adverse Effect on the Company.  Copies of the Organizational Documents of PREE, heretofore delivered to the Buyer, are correct and complete as of the date hereof.  Schedule 3.2 lists the jurisdictions in which PREE is qualified to do business as a foreign corporation.  Other than directly with respect to its ownership of the Owned Real Property, since its inception, PREE has not conducted any business, owned any assets, entered into any contractual obligation or incurred any Liability.

Section 3.3    The Guy David Trust Organization.  The Guy David Trust is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization as set forth on Schedule 3.3 with requisite trust power and authority to own the shares of Plastival US and Plastival Canada.  Copies of the Organizational Documents of the

Guy David Trust, heretofore delivered to the Buyer, are correct and complete as of the date hereof.

Section 3.4    Authorization.  The Company, PREE and the Guy David Trust, each has all requisite corporate power and authority, and has taken all action necessary, to execute and deliver this Agreement and the other Transaction Documents to which it is a party, to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the other Transaction Documents by the Company, PREE and the Guy David Trust and the consummation by the Company, PREE and the Guy David Trust of the transactions contemplated hereby and thereby have been duly approved by the board of directors and shareholders and trustees, as applicable of the Company, PREE and the Guy David Trust.  No other corporate or trust proceedings on the part of the Company, PREE and the Guy David Trust are necessary to authorize this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby.  This Agreement and the other Transaction Documents to which the Company, PREE and the Guy David Trust is a party have been, or will be, duly executed and delivered by the Company, PREE and the Guy David Trust and, assuming the due authorization, execution and delivery thereof by the Buyer, are, or will be, the valid and binding obligation of the Company, PREE and the Guy David Trust enforceable against each of them in accordance with its terms.  The officers and directors and trustees, as applicable, of the Company, PREE and the Guy David Trust and each Subsidiary are listed on Schedule 3.4.

Section 3.5    No Conflict or Violation; Required Consents.  Except as set forth in Schedule 3.5, neither the execution, delivery or performance of this Agreement or the other Transaction Documents nor the consummation of the transactions contemplated hereby or thereby will, subject to obtaining the consents listed on Schedule 2.7(b)(iii): (a) violate or conflict with any provision of the Organizational Documents of the Company or its Subsidiaries, PREE or the Guy David Trust, (b) require any filing with or notification to, or permit, authorization, consent or approval of, any Governmental Authority, (c) materially violate, conflict with, or result in or constitute a material Default under, or result in, or permit, the termination of, or accelerate the performance required by, any of the terms, conditions or provisions of any Material Contract, Real Property Lease, contract in connection with Intellectual Property or contract in connection with Employee Plans, (d) materially violate, conflict with, contravene or give any Person the right to exercise any remedy or obtain any relief under, any Court Order or Regulation or (e) result in the creation of any Encumbrance (other than a Permitted Encumbrance or any Encumbrance granted to any lender in connection with the transactions contemplated hereby) upon any of the properties or Assets of the Company or any of its Subsidiaries or PREE.

Section 3.6    Capitalization.

(a)    The issued and outstanding equity securities of Plastival US consists of 4002 Shares and the issued and outstanding equity securities of Plastival Canada consists of 2,737,998 Shares, which are owned in such amounts and by the Sellers as set forth on Schedule 3.6(a).  The Shares owned by the Sellers as set forth on such Schedule 3.6(a) are referred to herein as the "**Shares**".  Except as set forth on Schedule 3.6(a), no other class of

capital stock or other ownership interests of the Company is authorized or outstanding.  All such issued and outstanding equity securities have been duly authorized and validly issued and are fully paid and non-assessable and have not been issued in violation of any preemptive rights. There have been no anti-dilution adjustments under the terms of any of the Company's outstanding equity securities.  Immediately prior to the Closing, there will be no issued and outstanding equity securities of Plastival US or Plastival Canada which are owned directly or indirectly by Richard Maillé.  Plastival Canada holds all of the shares that it owns in Plastival US as capital property within the meaning of the ITA.

(b)    There are no (i) outstanding options, warrants, agreements, convertible or exchangeable securities or other commitments pursuant to which the Company is or may become obligated to issue, sell, transfer, purchase, return or redeem any equity securities of the Company, (ii) agreements pursuant to which registration rights in the equity securities of the Company have been granted, (iii) statutory or contractual preemptive rights or rights of first refusal with respect to the Shares, (iv) stock appreciation rights, phantom stock or similar plans or rights pursuant to which the Company has any obligations or (v) voting trusts, proxies, or similar agreements with respect to the equity securities of the Company.

(c)    Except as set forth on Schedule 3.6(c), the Company does not have any Subsidiaries and does not, directly or indirectly, own any interest in any other corporation, partnership, limited liability company, limited partnership, joint venture or other business association or entity.

(d)    Schedule 3.6(d) sets forth the authorized capital of each of the Subsidiaries, the number of issued and outstanding shares of capital stock of each Subsidiary, the holders thereof and the number of shares held by each such holder.  Other than as disclosed on Schedule 3.6(d), no other class of capital stock or other ownership interests of the Subsidiaries is authorized or outstanding.  All the outstanding shares of capital stock of each of the Subsidiaries have been duly authorized and validly issued and are fully paid, nonassessable and have not been issued in violation of preemptive rights and are owned by the Company free and clear of all Encumbrances.

(e)    There are no (i) outstanding options, warrants, agreements, convertible or exchangeable securities or other commitments pursuant to which any Subsidiary is or may become obligated to issue, sell, transfer, purchase, return or redeem any capital stock of such Subsidiary, (ii)  statutory or contractual preemptive rights or rights of first refusal with respect to the capital stock of any Subsidiary, (iii) stock appreciation rights, phantom stock or similar plans or rights pursuant to which any Subsidiary or the Company has any obligations or (iv) voting trusts, proxies or similar agreements with respect to the capital stock of any Subsidiary.

(f)    Except as disclosed on Schedule 3.7, there are no outstanding contractual obligations of the Company or any Subsidiary to make an investment in or guarantee the obligations of, any Person other than a Subsidiary that is wholly owned, directly or indirectly, by the Company.

(g)    PREE's issued and outstanding equity securities consists of 100_ Shares, which are owned in such amounts and by the Sellers as set forth on Schedule 3.6(g).  No other

class of capital stock or other ownership interests of PREE is authorized or outstanding. All such issued and outstanding equity securities have been duly authorized and validly issued and are fully paid and non-assessable and have not been issued in violation of any preemptive rights. There have been no anti-dilution adjustments under the terms of any of the PREE's outstanding equity securities.

(h)    There are no (i) outstanding options, warrants, agreements, convertible or exchangeable securities or other commitments pursuant to which PREE is or may become obligated to issue, sell, transfer, purchase, return or redeem any equity securities of PREE, (ii) agreements pursuant to which registration rights in the equity securities of PREE have been granted, (iii) statutory or contractual preemptive rights or rights of first refusal with respect to the equity securities of PREE, (iv) stock appreciation rights, phantom stock or similar plans or rights pursuant to which PREE has any obligations or (v) voting trusts, proxies, or similar agreements with respect to the equity securities of PREE.

(i)    PREE does not have any Subsidiaries and does not, directly or indirectly, own any interest in any other corporation, partnership, limited liability company, limited partnership, joint venture or other business association or entity.

Section 3.7    Financial Statements; Existing Indebtedness.

(a)    The Company heretofore has delivered to the Buyer correct and complete copies of (a) the audited balance sheet of each of Plastival US and Plastival Canada and the unaudited, combined balance sheet of the Company each dated as of December 31, 2004 and December 31, 2005, and the related audited statements of income, stockholder's equity and cash flows of each of Plastival US and Plastival Canada and the unaudited, combined statements of income, stockholder's equity and cash flows of the Company each for the fiscal year then ended, which audited financial statements are certified by Labelle, Rhéaume, Proulx, independent certified public accountants (including all related notes and schedules, the "**Year-End Financial Statements**") and (b) the unaudited, combined balance sheet of the Company dated as of March 31, 2006 and the related unaudited, combined statements of income, stockholder's equity and cash flows of the Company for the three (3) month period then ended (including all related notes and schedules, the "**Interim Financial Statements**" and, together with the Year-End Financial Statements, the "**Financial Statements**"). The Interim Financial Statements were prepared on a basis, and using principles, consistent with the preparation of the Year-End Financial Statements. The Financial Statements and notes thereto (a) have been prepared from the Books and Records of the Company, (b) have been prepared in accordance with GAAP on a consistent basis throughout the indicated periods, except that the unaudited financial statements contain no footnotes or year end adjustments and (c) present fairly in all material respects the financial condition, results of operations, cash flow and shareholders' equity of, in the case of the audited Financial Statements, each of Plastival US and Plastival Canada and, in the case of the combined Financial Statements, the Company for the periods covered thereby and as of the respective dates thereof.

(b)    All Existing Indebtedness is listed on Schedule 3.7 and will be paid off on the Closing Date.

Section 3.8     <u>No Material Undisclosed Liabilities</u>.  Except as otherwise disclosed on <u>Schedule 3.8</u>, there are no material Liabilities of the Company or its Subsidiaries, whether accrued, contingent, unliquidated, absolute, determined, determinable or otherwise, other than:

(a)     Liabilities provided for in the Financial Statements;

(b)     Liabilities arising in the Ordinary Course from contractual arrangements to which the Company or any Subsidiary is a party;

(c)     Liabilities incurred after the date of the balance sheet included in the Interim Financial Statements in the Ordinary Course; and

(d)     any Liability of a type that the Company is insured for losses arising out of such Liability under insurance policies retained by and for the benefit of the Company and its Subsidiaries.

Section 3.9     <u>Absence of Certain Changes</u>.  Except as set forth on <u>Schedule 3.9</u>, since January 1, 2006, there has not occurred any event, circumstance or fact that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect on the Company and neither the Company nor any of its Subsidiaries has:

(a)     operated the Business in any material respects other than in the Ordinary Course;

(b)     sold or transferred any material portion of its Assets or property, except for sales of its inventory in the Ordinary Course, and except as permitted by this Agreement;

(c)     acquired any material Asset, except inventory in the Ordinary Course;

(d)     suffered any material damage, destruction or loss, or any material interruption in use, of any material Assets or property (whether or not covered by insurance), on account of fire, flood, riot, strike or other hazard or act of God;

(e)     waived any material right other than in the Ordinary Course;

(f)     paid or declared any dividends or other distributions on its securities of any class or purchased or redeemed any of its securities of any class;

(g)     increased the compensation payable to any employee, officer or director or entered into any employment agreement with any employee, officer or director, other than in the Ordinary Course consistent with past practices;

(h)     had any Encumbrance placed upon any of the Company's or any Subsidiary's Assets, other than Permitted Encumbrances and Encumbrances to be terminated at the Closing;

(i)     taken any of the following actions:

(i)    amended the Organizational Documents of the Company or any Subsidiary or PREE;

(ii)    declared, set aside or paid any dividend or other distribution (whether in cash, stock or property) on any equity securities of the Company, except for dividends or distributions made in respect of Taxes, or redeemed or repurchased any equity securities of the Company;

(iii)    split, combined, reclassified or otherwise modified the terms of the equity securities of the Company or any of its Subsidiaries;

(iv)    sold, transferred, pledged or otherwise disposed of any material portion of the respective Assets of the Company and its Subsidiaries not in the Ordinary Course or any portion of the Owned Real Property;

(v)    materially increased the salary or other compensation payable to any of the employees (including its executive officers or directors) of the Company or any of its Subsidiaries, other than customary compensation increases awarded to its employees which have been awarded in the Ordinary Course and other than, with respect to new hires, such compensation payable by the Company or its Subsidiaries to an employee in the position of such new hire in the Ordinary Course;

(vi)    authorized for issuance, issued, sold, delivered or granted equity securities of the Company or any Subsidiary or any options, warrants, subscriptions or other rights therefor, or any securities convertible into or exchangeable or exercisable for equity securities of the Company or any Subsidiary;

(vii)    incurred any new capital expenditure in excess of US$50,000;

(viii)    acquired, by merger, consolidation or acquisition of stock, any business of any other Person or acquire a substantial portion of the assets of any Person outside of the Ordinary Course;

(ix)    settled or compromised any material pending or threatened Action;

(x)    adopted a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of the Company or any Subsidiary;

(xi)    (1) incurred or assumed any long-term debt or issued any long-term debt securities, except for borrowings under existing lines of credit in the Ordinary Course, (2) assumed, guaranteed, endorsed or otherwise become liable or responsible, whether directly, contingently or otherwise, for the obligations of any other Person or (3) made any loans, advances or capital contributions to or investments in any other Person, except for customary loans or advances to employees, in each case in the Ordinary Course;

-26-

(xii)    except as expressly contemplated by this Agreement, revalued in any material respect any of the Assets, including writing down the value of inventory or writing-off notes or accounts receivable other than in the Ordinary Course;

(xiii)    changed in any material respect any of the Company's or its Subsidiaries' current cash management practices (it being understood that the use of cash to reduce indebtedness of the Company or its Subsidiaries will not result in a breach of this Agreement by the Company), accounting methods, principles or practices utilized by the Company or the Subsidiaries, except to the extent required by law or by GAAP;

(xiv)    subjected any of its properties or Assets to any Encumbrances, other than Permitted Encumbrances;

(xv)    modified, amended, cancelled or terminated any Material Contract, except in the Ordinary Course;

(xvi)    made any loans, advances or capital contributions to, or investments in, any other Person other than loans, advances or capital contributions by the Company or any Subsidiary to (1) any Subsidiary or (2) any employee in connection with business expenses incurred by such employee in the Ordinary Course;

(xvii)    entered into any agreements that contain any "change of control" provisions that would be triggered by the consummation of the transactions contemplated by this Agreement;

(xviii)    made any change to its customer pricing, rebates or discounts, other than in the Ordinary Course;

(xix)    acquired, sold, leased, licensed, transferred, pledged, encumbered, granted or disposed of (whether by merger, consolidation, purchase, sale or otherwise) any material Intellectual Property, or entered into any material commitment or transaction with respect to any Intellectual Property outside the Ordinary Course consistent with past practice, or done any act or knowingly omitted to do any act whereby any material Intellectual Property may have become invalidated, abandoned, unmaintained, unenforceable or dedicated to the public domain; or

(xx)    agreed in writing or otherwise to take any of the actions described in Section 3.9(i)(i) through (xix) or any action which would make any of the representations or warranties of the Sellers or the Company contained in this Agreement untrue or incorrect.

(j)    made or changed any election with respect to Taxes, or changed any method of accounting for Tax purposes; or

(k)    agreed or otherwise committed to take any of the foregoing actions.

Section 3.10    Tax Matters.

-27-

(a)     None of the Company, PREE or any of their respective Subsidiaries are, or have ever been, members of an affiliated group of corporations, within the meaning of Section 1504(a) of the Code, or any analogous provision of state, provincial, local or non-U.S. law. None of the Company or the Subsidiaries or PREE is a party to any agreement, whether written or unwritten, providing for the payment of Taxes, payment for Tax losses, entitlement to refunds or similar Tax matters.  None of the Company or any of its Subsidiaries or PREE is a party to any agreement relating to the sharing, allocation or indemnification of Taxes, or any similar agreement, contract or arrangement, none of the Company or the Subsidiaries or PREE is a party to any agreement, whether written or unwritten, providing for the payment of Taxes, payment for Tax losses, entitlement to refunds or similar Tax matters (collectively, "**Tax Sharing Agreements**") or has any liability for Taxes of any Person under Treasury Regulation § 1.1502-6, Treasury Regulation § 1.1502-78 or similar provision of state, provincial, local or non-U.S. law, as a transferee or successor, by contract, or otherwise.

(b)     Except as otherwise disclosed in <u>Schedule 3.10</u>,

(i)     Plastival Canada has not engaged in trade or business in any jurisdiction other than Canada;

(ii)     each of the Company and its Subsidiaries and PREE has properly prepared all Tax Returns and filed (or joined in the filing of) when due (after taking into account all properly requested extensions) all Tax Returns required to be filed with respect to such Person, and all Tax Returns (including information provided therewith or with respect to thereto) are true, correct and complete in all material respects as of the time of such filing or after taking into account any changes thereto reflected on any amended Tax Returns;

(iii)     the Company and its Subsidiaries and PREE have fully and timely paid all Taxes owed by such Person (whether or not shown on any Tax Return), and have made adequate provision on their books for any Taxes that are not yet due and payable, for all Taxable Periods, or portions thereof, ending on or before the Closing Date;

(iv)     each of the Company and its Subsidiaries and PREE has withheld all Taxes required to be withheld in connection with any amounts paid or owing to any employee, customer, supplier, creditor, independent contractor, partner, stockholder, third party or any other Person and timely paid to the appropriate Taxing Authority proper and accurate amounts in all respects for all periods, or portions thereof, ending on or before the Closing Date in compliance with all Tax withholding and remitting provisions of applicable laws and have each complied in all respects with all Tax information reporting provisions of all applicable laws;

(v)     there is no outstanding request or agreement for any extension of time within which to file any Tax Return or pay any Taxes;

(vi)     the statute of limitations for each of the Company and its Subsidiaries and PREE has closed for all Taxable Periods ending prior to January 1, 2001;

(vii)     there has been no waiver or extension of any statute of limitations applicable to any claim for, or the period for the assessment or reassessment or collection of, any Taxes due from any of the Company or its Subsidiaries or PREE for any Taxable Period and no

-28-

request for any such waiver or extension is currently pending and no power of attorney granted by or with respect to any of the Company or its Subsidiaries or PREE for Taxes is currently in force;

(viii)    there is no action, suit, proceeding, investigation, audit or claim now pending or, to the Knowledge of the Company and PREE, threatened with respect to Taxes due from or with respect to any of the Company or its Subsidiaries or PREE, nor has any audit of any such Tax Return been conducted within the previous five (5) taxable years of any of the Company or its Subsidiaries or PREE (except as provided in clause (xv) below), no Taxing Authority has given notice of any intention to assert any deficiency or claim for additional Taxes against any of the Company or its Subsidiaries or PREE, and all deficiencies for Taxes asserted or assessed against any of the Company or its Subsidiaries or PREE have been fully and timely paid, settled or properly reflected in the Year-End Financial Statements;

(ix)    no claim has been threatened or made by any Taxing Authority in a jurisdiction where any of the Company or its Subsidiaries or PREE does not currently file a Tax Return that it is or may be subject to Tax by such jurisdiction;

(x)    no closing agreement pursuant to Section 7121 of the Code (or any predecessor provision) or any similar provision of any state, provincial, local or non-U.S. law has been entered into by or with respect to any of the Company or its Subsidiaries or PREE;

(xi)    no property owned by any of the Company or its Subsidiaries or PREE is "tax-exempt use property" within the meaning of Section 168(h) of the Code;

(xii)    none of the Company or the Subsidiaries or PREE is a party to any agreement, whether written or unwritten, providing for the payment of Taxes, payment for Tax losses, entitlement to refunds or similar Tax matters;

(xiii)    no private letter ruling of the IRS or other comparable ruling of any other Taxing Authority with respect to Taxes (other than a request for determination of the status of a Company Employee Plan) has been requested by or on behalf of any of the Company or the Subsidiaries or PREE and none of the Company or its Subsidiaries or PREE is subject to any private letter ruling of the IRS or comparable ruling of any other Taxing Authority;

(xiv)    none of the Company or its Subsidiaries or PREE has ever engaged in any transaction that is the same as, or substantially similar to, a transaction that would be a "reportable transaction" for purposes of Treasury Regulations Section 1.6011-4(b) (including any transaction which the IRS has determined to be a "listed transaction" for purposes of Treasury Regulations Section 1.6011-4(b)(2));

(xv)    the Company has provided to the Buyer copies of all Tax audit reports that have been issued with respect to the previous five (5) taxable years of the Company or the Subsidiaries or PREE, as the case may be;

(xvi)    there are no Encumbrances for Taxes upon the Assets or properties of the Company and  the Subsidiaries and PREE, except for Permitted Encumbrances;

(xvii)   none of the Assets and none of the property owned by any of the Company or its Subsidiaries or PREE is property required to be treated as being owned by another person pursuant to the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended and in effect immediately prior to the enactment of the Tax Reform Act of 1986;

(xviii)  none of the Company, any Subsidiary or PREE has been a distributing corporation or controlled corporation, within the meaning of Section 355 of the Code;

(xix)    none of the Company or any of its Subsidiaries will be required to include any item of income in, or exclude any item of deduction from, taxable income for any Taxable Period (or portion thereof) ending after the Closing Date as a result of any:  change in method of accounting period for a Taxable Period ending on or prior to the Closing Date; intercompany transaction or excess loss account descried in Treasury Regulations under Section 1502 of the Code (or analogous provisions of state, provincial, local or non-U.S. Tax law); installment sale or open transaction disposition made on or prior to the Closing Date; or prepaid amount received on or prior to the Closing Date;

(xx)     none of the Company nor any of its Subsidiaries is or has been a United States Real Property Holding Corporation, within the meaning of Section 897 of the Code;

(xxi)    the Company and PREE have given or otherwise made available to the Buyer (a) true, correct and complete copies of all Tax Returns relating to the Company and its Subsidiaries and PREE for Taxable Periods, or transactions consummated, for which the applicable statutory periods of limitations have not expired, and (b) examination reports and statements of deficiencies to the Company or its Subsidiaries or PREE;

(xxii)   except as may be owing at the Closing for Taxes deducted in the ordinary course of business from employees' wages but not yet remitted, no Company has any liability for the Taxes of any other person and no Company or Subsidiary is a party to or bound by, or have any obligations under, any Tax sharing agreement or similar contract or arrangement;

(xxiii)  neither the Company nor any of its Subsidiaries has claimed a deduction with respect to an outlay or expense that may be considered unreasonable under the circumstances;

(xxiv)  neither the Company nor any of its Subsidiaries has for the purposes of the GST or QST claimed any input tax credits or input tax refunds to which it is not entitled;

(xxv)   any interest paid, payable or otherwise accruing on any interest-bearing debt of each of the Company and its Subsidiaries is deductible (and to the extent that such debt exists on closing will continue to be deductible) in computing its income for tax purposes, and if any interest were paid or payable on any non-interest bearing debt of any Company or Subsidiary, the amount of such interest would be deductible in computing its

income for tax purposes and to the extent such debts exist on closing, the interest thereon will continue to be deductible for tax purposes;

(xxvi)  there are no circumstances which exist at or prior to Closing, and which would result in, or which have existed and resulted in, any of the Sections 80 to 80.04 or Section 78, of the ITA applying to any Company or Subsidiary;

(xxvii) Plastival Canada is a GST and QST registrant and its registration numbers for such purposes as well as any other sales tax numbers are set out in <u>Schedule 3.10</u>;

(xxviii)the representations and warranties contained in <u>Section 3.10(b)(xxii)</u> to <u>(xxvii)</u> which refer to the ITA are true and correct with respect to the same or equivalent provisions, if any, of the Québec Taxation Act or any other US federal, state, or provincial taxation legislation or applicable non-U.S. or non-Canadian taxation legislation;

(xxix)  no governmental authority has asserted any lien or other claim against the Company or any Subsidiary with respect to material unpaid taxes which has not been discharged or resolved;

(xxx)   Plastival Canada holds all the shares that it owns in Plastival US as non-depreciable capital property within the meaning of the ITA and thus without limiting the generality of the foregoing, all of the shares in the capital stock of Plastival US held by Plastival Canada were not acquired by Plastival Canada as an adventure or concern in the nature of trade nor with the primary or secondary intention to resell same at a profit;

(xxxi)  that the paid up capital (as determined under the ITA) of the issued share capital of each class of Plastival Canada does not exceed the purchase price to be paid pursuant to the terms of this Agreement and allocable to such class of shares by Buyer after the Closing; furthermore, the paid up capital of the issued share capital of Plastival Canada for Canadian tax purposes equals its paid up capital under corporate law and which amounts are disclosed in its Financial Statements;

(xxxii) to the Knowledge of the Sellers, that none of (1) David; (2) Quinn; (3) the Guy David Trust; (4) the trustees of the Guy David Trust; (5) a beneficiary of the Guy David Trust; (6) Richard Maillé; (7) 3677851 Canada Inc. ("**Maillé Inc.**"); (8) a shareholder of Maillé Inc.; (9) any person or group of persons who do not deal at arm's length with any of the foregoing persons mentioned in this <u>Section 3.10(b)(xxxii)(1)</u> to and including (9) (the aforesaid persons referred to in paragraph <u>Section 3.10(b)(xxxii)</u>(1) to (9) inclusive and any person or group of persons who do not deal at arm's length with any of the foregoing persons mentioned in this <u>Section 3.10(b)(xxxii)(1)</u> to and including (9) are hereinafter referred to as the "**Selling Group**") own or hold and whether directly or indirectly, (10) any ownership interest  in the Buyer or any of its Affiliates or in any entity or Partnership which holds an interest in the Buyer or any of its Affiliates;

(xxxiii)to the Knowledge of the Sellers, the  Selling Group does not own or hold, either directly or indirectly, any options or other rights to acquire any property referred to in <u>Section 3.10(b)(xxxii)</u>(10);

(xxxiv) to the Knowledge of the Sellers, none of the persons or partnerships in the Selling Group is either directly or indirectly a creditor of the Buyer or any of its Affiliates or of any entity or Partnership which holds an interest in the Buyer or any of its Affiliates (except in the case of Plastival Holdings, Canadian Holdings and US Holdings as may be set forth in this Agreement and the employment agreements between Holdings and each of David and Quinn);

(xxxv) to the Knowledge of the Sellers, no person or partnership in the Selling Group directly or indirectly will otherwise hold property in the Buyer or any of its Affiliates or in any entity or Partnership which holds an interest in the Buyer or any of its Affiliates, the fair market value of which is wholly or partly attributable, directly or indirectly to the property owned by Plastival Canada or property the fair market value of which is determinable primarily by reference to the fair market value of, or to any proceeds from the disposition of, particular property or properties owned by Plastival Canada, except in respect of any obligation that may arise under the terms of this Agreement or the employment agreements between Holdings and each of David and Quinn;

(xxxvi) to the Knowledge of the Sellers, none of the persons or partnerships in the Selling Group will directly or indirectly acquire, after the acquisition of all the issued share capital of Plastival Canada and Plastival US by Canadian Holdings and US Holdings, any property of the nature referred to in the above paragraphs Section 3.10(b)(xxxii) to (xxxv) inclusive as part of the series of transactions or events that includes the merger of Plastival Canada and Canada Newco and furthermore none of the said persons or partnerships in the Selling Group have any current intention or otherwise currently contemplate the acquisition of any of the aforesaid property referred to in paragraphs Section 3.10(b)(xxxii) to (xxxv) inclusive;

(xxxvii)     to the Knowledge of the Sellers, at or prior to Closing, that each person or partnership of the Selling Group deals at arm's length (within the meaning of the ITA) with Canadian Holdings and thus also deal at arm's length with Plastival Holdings and any person or group of persons that directly or indirectly controls Plastival Holdings;

(xxxviii)     that aside from Quinn, David and the Guy David Trust, there is no individual or any person or partnership with whom the individual does not deal at arm's length that performs services on behalf of Plastival Canada and is or by virtue of any arrangement may become entitled, directly or indirectly, to not less than 10% of the assets or the shares of any class in the capital stock of Plastival Canada or any corporation related to Plastival Canada within the meaning of the ITA;

(xxxix) no debts have ever been forgiven or extinguished in whole or in part in favor of Plastival Canada without it having repaid such debt in full and accordingly section 80 through to and including section 80.04 of the ITA (and their provincial counterparts) have never applied to Plastival Canada;

(xl)     the shares of Plastival US held by Plastival Canada were not acquired from Canada Newco or from any person or partnership that was not dealing at arm's length with Canada Newco or Canadian Holdings within the meaning of the ITA and thus

Plastival Canada did not acquire the shares of Plastival US from any person or group of persons that control directly or indirectly Holdings;

(xli)     the shares of Plastival US acquired by Plastival Canada prior to Closing were not acquired in substitution for any property that Plastival Canada may have acquired prior to Closing from Canada Newco or any person or partnership that was not dealing at arm's length with Canada Newco, Canadian Holdings or Holdings;

(xlii)    Plastival Canada has not claimed any reserve (other than a reserve referred to in paragraph 20(1)(n), subparagraph 40(1)(a)(iii) or 44(1)(e)(iii) of the ITA) in computing its income for its taxation year ending upon Closing;

(xliii)   Plastival Canada is a taxable Canadian corporation within the meaning of the ITA;

(xliv)   no dividends have been paid on the Canadian Shares; and

(xlv)    each payment made by Canadian Holdings to a third party pursuant to <u>Section 2.4</u> is made to a resident of Canada and is not subject to any withholding.

Section 3.11     <u>Material Contracts</u>.

(a)     <u>Schedule 3.11</u> discloses all written or oral contracts, agreements, understandings or instruments, including memoranda of understanding, described in clauses (i) through (xix) below which are in effect as of the date hereof and to which the Company or any of its Subsidiaries is a party or by which it or its Assets is bound ("**Material Contracts**"):

(i)     each agreement or arrangement of the Company or any Subsidiary that requires the payment or incurrence of Liabilities by the Company or any Subsidiary, subsequent to the date of this Agreement, of more than US$100,000 annually;

(ii)    each agreement or arrangement of the Company or any Subsidiary that requires the rendering of services by the Company or any Subsidiary, subsequent to the date of this Agreement, of more than US$100,000 annually, other than agreements or arrangements related to the sale of inventory in the Ordinary Course;

(iii)   each material partnership or joint venture arrangement or other similar contract, arrangement or agreement entered into by the Company or any Subsidiary in effect as of the date of this Agreement or within the two (2) year period prior to the date of this Agreement;

(iv)   each agreement or arrangement of the Company or any Subsidiary relating to the acquisition of any operating business or the capital stock of any other Person during the five (5)-year period ending with the date of this Agreement;

(v)      each agreement, arrangement, contract, commitment or obligation of the Company or any Subsidiary restricting or otherwise affecting the ability of the Company or any Subsidiary to compete in the Business in any jurisdiction;

(vi)     each contract with any Seller Affiliated Person and with any financial advisors, employees or consultants under which there are remaining obligations of either party after the Closing, including indemnification agreements;

(vii)    each material contract or commitment involving any Governmental Authority other than for sale of merchandise in the Ordinary Course;

(viii)   each lease for capital equipment that provides for ongoing payments by the Company or any Subsidiary in excess of US$10,000 annually;

(ix)     each stockholders agreement, registration rights agreement, voting agreement, voting trust agreement or similar agreements to which the Company or any Subsidiary is subject;

(x)      any indenture, mortgage, promissory note, loan agreement or other agreement or commitment for the borrowing of money, for a line of credit or for any capital leases;

(xi)     each agreement of agency, representation, distribution, or franchise which cannot be canceled by the Company or the applicable Subsidiary without payment or penalty upon notice of sixty (60) days or less;

(xii)    each guarantee (excluding endorsements of checks for deposit), performance, bid or completion bonds, or surety or indemnification agreement;

(xiii)   each contract relating to the issuance or ownership of any equity securities, or securities convertible into or exchangeable for equity securities, of the Company or any Subsidiary;

(xiv)    each contract between the Company or any Subsidiary and the Top Customers measured by consolidated dollar value for the twelve (12) calendar months ended December 31, 2005 (other than purchase orders);

(xv)     each contract between the Company or any Subsidiary and the Top Suppliers measured by consolidated dollar value for the twelve (12) calendar months ended December 31, 2005 (other than purchase orders);

(xvi)    each contract entered into since January 1, 2005 involving any resolution or settlement of any actual or threatened Action;

(xvii)   each contract involving any confidentiality, standstill or similar arrangement in effect on the date hereof;

(xviii)  each Tax Sharing Agreement; and

-34-

(xix)    each contract containing "change of control" provisions triggered by the execution of this Agreement or the consummation of the transactions contemplated hereby.

(b)    Correct and complete copies of such Material Contracts have heretofore been made available to the Buyer.  Each Material Contract is in full force and effect and is valid and enforceable by and against the Company or any Subsidiary which is party thereto and, to the Knowledge of the Company, each Material Contract is valid and enforceable against the other parties thereto, in each case in accordance with its terms.  Neither the Company nor any Subsidiary is in Default under any Material Contract, nor has it received written notice or, to the Knowledge of the Company, oral notice of any Default under any such Material Contract.

Section 3.12    Personal Property.  Except as disclosed on Schedule 3.12, the Company and its Subsidiaries have title to, or in the case of leased or subleased Personal Property, valid and subsisting leasehold interests in, or rights to use, the Personal Property owned or leased by them as of the date of this Agreement, free and clear of all Encumbrances, except for Permitted Encumbrances.  The Assets constitute all of the assets, rights and properties, tangible or intangible, real or personal, used in connection with the operation of the Business, as currently operated.  All of the material Personal Property owned by the Company and its Subsidiaries is (a) in good operating condition and repair in all material respects (except for ordinary wear and tear and scheduled maintenance) and (b) adequate in all material respects to meet all present requirements of the Business, as currently conducted.

Section 3.13    Real Property.

(a)    Owned Real Property.  Schedule 3.13(a) sets forth a correct and complete list of the real property owned in fee by PREE (the "**Owned Real Property**").  Neither the Company nor any of its Subsidiaries owns any real property.  Except as disclosed on Schedule 3.13(a), PREE has fee simple title to the Owned Real Property that it owns, free and clear of all Encumbrances, other than Permitted Encumbrances.  PREE has not leased or otherwise granted to any person other than the Company and its Subsidiaries the right to use or occupy such Owned Real Property or any portion thereof.

(b)    Leased Real Property.  Schedule 3.13(b) sets forth a correct and complete list of the Real Property Leases (including all modifications and amendments thereto, including any subordination, non-disturbance and attornment agreements entered into by the Company or its Subsidiaries).  All real property subject to Real Property Leases ("**Leased Real Property**") is held by the Company or a Subsidiary under valid leasehold interests free and clear of all liens other than Permitted Encumbrances.  Each of the Real Property Leases is valid and enforceable by and against the Company or a Subsidiary and, to the Knowledge of the Company, each Real Property Lease is valid and enforceable against the other parties thereto, in each case in accordance with its terms.  Neither the Company nor any Subsidiary is in Default under, or has received written notice or, to the Knowledge of the Company, oral notice, of any Default under any of the Real Property Leases.  The Leased Real Property:  (i) constitutes all real property and improvements leased or used by the Company or a Subsidiary; and (ii) is not subject to any subleases or subtenancies of any kind.

(c)    <u>Entire Premises</u>.  All of the land, buildings, structures and other improvements used by the Company and its Subsidiaries in the conduct of its Business are included in the Owned Real Property and the Leased Real Property.  The Leased Real Property and the Owned Real Property are hereinafter collectively referred to as the "**Real Property**".  Except as disclosed on <u>Schedule 3.13(c)</u>, neither the Company nor its Subsidiaries have owned or leased any property other than the Real Property.

(d)    <u>Condemnation</u>.  The Company and its Subsidiaries and PREE have not received notice and have no Knowledge of any pending, threatened or contemplated condemnation proceeding affecting the Real Property or any part thereof or of any sale or other disposition of the Real Property or any part thereof in lieu of condemnation.

(e)    <u>Expropriation</u>. PREE has not received written notice of, and to its Knowledge, there is not any pending or threatened action or governmental proceeding relating to the expropriation of the Owned Real Property.

(f)    <u>Miscellaneous Charges and Orders</u>.  The Company and its Subsidiaries and PREE have not entered into any agreement with municipal authorities or any other authority having jurisdiction which would have the result of making the Owned Real Property subject to any sewer charges, local improvement rates or charges of a similar nature other than are currently assessed.  The Company and its Subsidiaries and PREE have not received (i) written notice that any such rates or charges shall be, or are proposed to be, levied against the Owned Real Property or (ii) any work orders or inspector's orders or notices threatening such orders outstanding from any governmental authority with respect to the Owned Real Property or any part thereof and to the Knowledge of the Company and its Subsidiaries and PREE, there are no such orders outstanding.

Section 3.14    <u>Compliance with Law</u>.  The Company and its Subsidiaries and PREE are, and since January 1, 2004 have been, (a) in compliance in all material respects with all Regulations applicable to the Company and its Subsidiaries and PREE, the Business and/or their Assets or operations and (b) not in Default of any Court Order.  The continued use, occupancy and operation of the Owned Real Property and, to the Knowledge of the Company and PREE, the Leased Real Property does not constitute a nonconforming use under any Real Property Law.  For the avoidance of doubt, no representation or warranty is made in this <u>Section 3.14</u> with respect to (a) applicable laws with respect to Taxes, which are covered in <u>Section 3.10</u>, (b) Environmental Laws, which are covered in <u>Section 3.17</u>, (c) Permits, which are covered in <u>Section 3.15</u>, and (d) ERISA, which is covered by <u>Section 3.18</u>.

Section 3.15    <u>Permits</u>.  Neither the Company nor any Subsidiary or PREE is in Default, nor has the Company or any Subsidiary or PREE received any written notice or, to the Knowledge of the Company and PREE, oral notice of any claim of Default, with respect to any material Permit.  Such material Permits constitute all of the licenses, franchises and other permits issued by any Governmental Authority necessary for the Company and its Subsidiaries and PREE to own, operate, use and maintain the Assets in all material respects in the manner in which they are now operated and maintained and to conduct the Business as currently conducted. For the avoidance of doubt, no representation or warranty is made in this <u>Section 3.15 </u>with respect to Permits involving Environmental Laws which are covered in <u>Section 3.17</u>.

-36-

Section 3.16   <u>Litigation</u>.  Except as disclosed on <u>Schedule 3.16</u>, there is no material Action pending or, to the Knowledge of the Company and PREE, threatened against the Company or any Subsidiary or PREE.  All filings, pleadings, and other documents with respect to the Litigations have been delivered to the Buyer.  Neither the Company nor any Subsidiary nor PREE is subject to a Court Order.  For the avoidance of doubt, no representation or warranty is made in this <u>Section 3.16</u> with respect to (a) Taxes, which are covered in <u>Section 3.10</u>, or (b) ERISA, which is covered in <u>Section 3.18(b)</u>.

Section 3.17   <u>Hazardous Materials</u>.  Except in circumstances where the failure of a representation to be true and correct would not reasonably be expected to result in a liability in excess of US$100,000, individually or in the aggregate and except as disclosed on <u>Schedule 3.17</u>:

(a)      the operations and facilities of the Company and its Subsidiaries and PREE are, and have been for the preceding five (5) years, in material compliance with all requirements of applicable Environmental Laws;

(b)      the Company and its Subsidiaries and PREE possess all material Permits required under Environmental Laws for the operation of the Business, all applications for renewal have been timely filed  and the operations and facilities of the Company and its Subsidiaries and PREE comply, and have at all times complied, in all material respects with the requirements of such Permits;

(c)      neither the Company nor any Subsidiary nor PREE has disposed or arranged for disposal of Hazardous Substances on any third party real property that would reasonably be expected to subject the Company or any Subsidiary or PREE to material liability under any Environmental Law;

(d)      neither the Company nor any Subsidiary nor PREE has received any written notice of any pending Action (i) relating in any way to compliance by or liability of the Company or any Subsidiary or PREE under any Environmental Law; (ii) relating to or arising from the Handling of Hazardous Substances or any Environmental Law; or (iii) which seeks to suspend, revoke or terminate any environmental Permit necessary for the Handling of any Hazardous Substance in connection with the Business, and to the Knowledge of the Company and to the best Knowledge of PREE, no such Action, suit, proceeding or investigation is threatened;

(e)      neither the Company nor any Subsidiary has had and, to the Knowledge of the Company and PREE, no other Person has had a Release of any Hazardous Substances at, to or from the Real Property.  There was no Release of any Hazardous Substances at, to, or from any property formerly owned, operated, or otherwise controlled by the Company or any Subsidiary or PREE, while such property was owned, operated, or otherwise controlled by the Company, any Subsidiary or PREE;

(f)      neither the Company, any Subsidiary nor PREE has transported or arranged for the transport of any Hazardous Substances to any facility or site for the purpose of treatment, storage, reclamation, recycling, remediation or disposal which is (i) listed on the

National Priorities List ("**NPL**") or listed or proposed for listing on the Comprehensive Environmental Response, Compensation and Liability Information System or any similar state list, (ii) which is not listed and duly authorized under applicable Canadian or provincial Environmental Laws, or (iii) which is the subject of governmental enforcement actions or investigation which may lead to claims against the Company or any Subsidiary or PREE pursuant to Environmental Laws. Neither the Company, any Subsidiary nor PREE has received any written request for information, notice of claim, demand or notification that it is or may be potentially responsible with respect to any investigation or clean-up of a Release of Hazardous Substances;

(g)    there are no present (or, to the Knowledge of the Company, past) actions, activities, circumstances, conditions, events or incidents that would or would be reasonably likely to form the basis of a claim, action or proceeding under any Environmental Law against Sellers, the Company, any Subsidiary or PREE which claim, action or proceeding would result or which claim, action or proceeding would be reasonably likely to result in a material liability;

(h)    neither the Company nor any Subsidiary has assumed by contract or operation of law any environmental liability relating to any property or business now or formerly owned, operated or controlled by the Company, any Subsidiary or PREE; and

(i)    the Company and its Subsidiaries and PREE have made available to the Buyer copies of all material environmental reports, investigations, inspections, audits and other documents in their possession or control, relating to the Company's potential liabilities or obligations under Environmental Laws or with respect to the Real Property or Business.

Section 3.18    Labor and Employment Matters; ERISA.

(a)    Labor and Employment Matters

(i)    Neither the Company nor any Subsidiary is a party to any collective bargaining or similar agreement with respect to its employees with any labor organization, union, group or association ("**Labor Union**") and no Labor Union represents or, to the Knowledge of the Company, purports to represent such employees. To the Knowledge of the Company, there are no activities or proceedings of any labor union to organize any such employees. There are no strikes, slowdowns, work stoppages or lockouts pending or that have occurred within the prior three (3) years or, to the Knowledge of the Company, any threats of such activities, by any employees of the Company or any Subsidiary.

(ii)    Schedule 3.18(a)(ii) sets forth a correct and complete list of (A) all employees of Plastival Canada, (B) all employment agreements to which the Company or any Subsidiary is a party providing for annual compensation in excess of US$100,000, (C) all severance agreements, programs and policies of the Company or any Subsidiary with or relating to its employees, except programs and policies required to be maintained by Regulation, and (D) plans, programs, agreements and other arrangements of the Company or any Subsidiary with or relating to its employees which contain change in control, confidentiality, nondisclosure, noncompete, or intellectual property provisions, other than as contained in the employee manual of the Company, a copy of which has previously been provided to the Buyer. The Company has

heretofore made available to the Buyer correct and complete copies of all such agreements, plans, programs, policies, practices and other arrangements, or to the extent not in writing, descriptions of such agreements, plans, programs, policies, practices and other arrangements, in detail reasonably satisfactory to the Buyer.  The Sellers have no Knowledge that any current officer or key employee of the Company or any Subsidiary has provided notice of termination of his or her employment.

(iii)    The Company and each Subsidiary has paid all wages, salaries, bonuses and other remuneration to its employees and independent contractors when due and has made all deductions required by applicable law to be made in respect thereof, which deductions are consistent with past practice and have been reflected on the Financial Statements in accordance with GAAP, and has either remitted such deducted amounts to the respective Governmental Authority entitled to receive payment thereof or has provided for same in the Financial Statements.  For the avoidance of doubt, no representation or warranty is made in this Section 3.18(a)(iii) with respect to Taxes, which are covered in Section 3.10.

(iv)    Except as disclosed on Schedule 3.18(a)(iv), the Company and each Subsidiary is in compliance in all material respects with all applicable laws respecting employment and employment practices and standards, terms and conditions of employment, pay equity and workers' compensation, occupational health and safety, workers' hazardous materials handling, human rights legislation and wages and hours of work.  There have been no charges or complaints against the Company or any Subsidiary relating to unfair labor practices or discrimination, human rights, pay equity or under any legislation relating to employees or employment, and there are no outstanding, threatened or anticipated assessments, actions or other claims against the Company or any Subsidiary or their respective directors, officers or agents pursuant to any applicable laws, including Canada Pension Plan, employment insurance, Tax, employer health tax, employment standards, labor relations, occupational health and safety, human rights, workers' compensation and pay equity laws.

(v)    All Liabilities in respect of employees, consultants and other independent contractors of the Company and the Subsidiaries, including premium contributions, remittances and assessments for employment insurance, employer health tax, Canada Pension Plan, income tax, workers' compensation and any other employment-related legislation, accrued salary, wages, bonuses, commissions, vacation with pay, Taxes and other employee benefits plan payments are accurately reflected in all material respects on the Financial Statements in accordance with GAAP.  The workers' compensation claims experience of the Company and the Subsidiaries has not given rise to or resulted in any surcharge or additional premium being imposed on the Company or any Subsidiary under any workers' compensation legislation and there are not currently pending any claims or investigations with respect to any of the foregoing.

(b)    ERISA

(i)    Schedule 3.18(b) sets forth an accurate, correct and complete list of each Employee Plan which is maintained, administered, sponsored or contributed to by the Company or any of its Subsidiaries, which covers any employee, director, officer, independent contractor or Retiree of the Company or any of its Subsidiaries or with respect to which any of the Company or any of its Subsidiaries have any obligation to make contributions or have any

other actual or contingent liabilities.  Any Employee Plan listed in such schedule is referred to below as a "**Company Employee Plan**."

(ii)    The Company has made available to the Buyer with respect to each Company Employee Plan accurate and complete copies of (A) all written documents comprising such Company Employee Plan (including amendments, individual agreements, service agreements, trusts and other funding agreements), (B) the three most recent annual returns and all other reports and similar documents filed with respect to such Company Employee Plan, (C) the most recent audited financial statements and actuarial reports, if any, pertaining to such Company Employee Plan, (D) the summary plan description currently in effect and all material modifications thereto, if any, for such Company Employee Plan, (E) the most recent determination letter, opinion letter or notification letter, if any, from an appropriate Governmental Authority which covers such Company Employee Plan; and (F) all other correspondence to and from any plan beneficiaries and any Governmental Authority with respect to such Company Employee Plan.

(iii)    Each Company Employee Plan that is intended to be registered in accordance with the ITA and/or a provincial or federal Governmental Authority is so registered. Neither the Company nor any of its Subsidiaries has a Company Employee Plan which is intended to qualify under Section 401(a) of the Code.

(iv)    Each Company Employee Plan has been established, registered or qualified where required, funded, contributed to and maintained in all material respects in accordance with its terms and with all applicable laws.  All material reports, returns and similar documents with respect to any Company Employee Plan required to be filed with any Governmental Authority or distributed to any Company Employee Plan participant have been duly filed or distributed in a timely manner.

(v)    Neither the Company nor any of its Subsidiaries has, or is reasonably likely to incur, any material liability, fine, penalty or tax with respect to any Company Employee Plan or any other Employee Plan.  No "prohibited transaction," within the meaning of Section 406 of ERISA or Section 4975 of the Code has occurred with respect to any Company Employee Plan.  Except as disclosed on <u>Schedule 3.18(b)</u>, there have been no material violations of any reporting or disclosure requirement under applicable law with respect to any Company Employee Plan.  All contributions which are required to be made to, and payments from, the Company Employee Plans by their terms or under the applicable law have been made on a timely basis.

(vi)    None of the Company Employee Plans are defined benefit plans.

(vii)    No litigation or claim (other than routine claims for benefits), and no governmental administrative proceeding, audit or investigation is pending or, to the Knowledge of the Company or any of its Subsidiaries, threatened with respect to any Company Employee Plan.

(viii)    No Employee Plan which has ever been maintained, administered or contributed to by the Company or any of its Subsidiaries or any ERISA Affiliate, which has

ever covered any employee, director, officer, independent contractor or Retiree of the Company or any of its Subsidiaries, or to which the Company or any of its Subsidiaries or any ERISA Affiliate has ever had any obligation to make a contribution, is or ever was (A) a "multiemployer plan", as defined in Section 3(37) of ERISA, a "multiple employer plan", as described in Section 413(c) of the Code, a "multiple employer welfare arrangement", as defined in Section 3(40) of ERISA or a "multi-employer pension plan" as defined in the Supplemental Pension Plans Act (Québec), (B) subject to the funding requirements of Section 302 of ERISA or Section 412 of the Code, (C) subject to Title IV of ERISA or (D) maintained outside of the United States or Canada.

(ix)    No Company Employee Plan provides health or medical coverage, life insurance coverage, or coverage for any other welfare benefit to any Retiree, except for continuation coverage required by Section 4980B of the Code, Sections 601 to 608 of ERISA or any applicable state, provincial or local law.

(x)    Except for the adoption of a plan amendment which is required to bring the plan documents into conformity with statutory changes enacted in recent years, neither the Company nor any of its Subsidiaries is under any obligation (express or implied) to modify any Company Employee Plan, or to establish any new Employee Plan which will cover any employee, director, officer, independent contractor or Retiree of the Company or any of its Subsidiaries.

(xi)    No ERISA Affiliate has incurred, or is reasonably likely to incur, any material liability, fine, penalty or tax with respect to any Employee Plan for which the Company or any of its Subsidiaries could be liable.

(xii)    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in combination with another event) (A) result in any payment becoming due, or increase the amount of any compensation due, to any current or former employee of the Company or any of its Subsidiaries; (B) increase any benefits otherwise payable under any Company Employee Plan; (C) result in the acceleration of the time of payment or vesting of any such compensation or benefits; (D) result in the payment of any amount that could, individually or in combination with any other such payment, constitute an "excess parachute payment," as defined in Code Section 280G(b)(1); or (E) result in the triggering or imposition of any restrictions or limitations on the rights of the Company or any of its Subsidiaries to amend or terminate any Company Employee Plan.

(xiii)    Neither the Company nor any of its Subsidiaries have incurred any liability or obligation under the U.S. Worker Adjustment and Retraining Notification Act, and the regulations promulgated thereunder (the "**WARN Act**"), or any similar state or local law which remains unsatisfied.

(xiv)    Except as disclosed on <u>Schedule 3.18(b)</u>, to the Knowledge of the Sellers, neither the Company nor any of its Subsidiaries has any direct or indirect liability, whether absolute or contingent, with respect to any misclassification of any person as an independent contractor rather than as an employee, or with respect to any employee leased from another employer.

-41-

Section 3.19    Intellectual Property.

(a)    Schedule 3.19(a) is a correct and complete list of all registered patents or trademarks (or applications related thereto) owned or licensed by the Company or any of the Subsidiaries and which is Used by the Company or any of the Subsidiaries in the operation of the Business as of the date hereof.

(b)    (i) Neither the Company nor any Subsidiary has received notice of any material infringement by the Company or any of the Subsidiaries of the rights of any Person with respect to such Person's Intellectual Property, (ii) to the Company's Knowledge, the operation of the Business as currently conducted does not infringe, misappropriate or otherwise violate any material Intellectual Property rights of any Person and (iii) to the Company's Knowledge, except as disclosed on Schedule 3.19(b) no Person has infringed, misappropriated or otherwise violated any of the material Company Intellectual Property owned by the Company or any of the Subsidiaries.

(c)    All material license agreements related to Intellectual Property used in the Business as currently conducted are listed on Schedule 3.19(c), other than standard off-the-shelf license agreements that relate to software used by the Company or its Subsidiaries in the Ordinary Course.  All such license agreements are in full force and effect and are valid and enforceable by and against the Company or a Subsidiary, in each case in accordance with its terms.  Neither the Company nor any Subsidiary is in Default under any such license agreement, nor it has received written notice or, to the Knowledge of the Company, oral notice of a Default under any license agreement relating to the Company Intellectual Property.  The consummation of the transactions contemplated hereby will not result in any material Default under any license agreement relating to the Intellectual Property.

(d)    Except as disclosed on Schedule 3.19(d), there are no claims pending or, to the Knowledge of the Company, threatened, (i) contesting the right of the Company or any of its Subsidiaries to Use any of the Company's or such Subsidiary's products or services currently or previously Used by the Company or such Subsidiary or (ii) opposing or attempting to cancel any rights of the Company or such Subsidiary in or to any material Company Intellectual Property.  To the Knowledge of the Company, there is no third party U.S. patent or published U.S. patent application that contains claims for which an interference proceeding could be commenced against any patent or patent application of the Company or its Subsidiaries.

(e)    There are no statements, citations or decisions by any Governmental Authority specifically stating that any Company Product is defective or unsafe or fails to meet any standards promulgated by such Governmental Authority.  There have been no recalls ordered by any Governmental Authority with respect to any Company Product.  To the Company's Knowledge, there is no (a) fact, condition or set of circumstances relating to any Company Product that may impose upon the Company or any of its Subsidiaries a duty to recall any Company Product or a duty to warn customers of a defect or of any Hazardous Substance in any Company Product, (b) latent or overt design, manufacturing or other defect in any Company Product, or (c) Company Product, the reasonably foreseeable use of which may expose any Person to any Hazardous Substance, assuming proper installation in accordance with Company instructions and in compliance with all applicable Regulations.

-42-

(f)    Schedule 3.19(f) sets forth a true and complete list and description of all material Software Used by the Company or any of its Subsidiaries.

Section 3.20    Insurance.  Schedule 3.20 contains a true and complete list and description (including policy number, amount and type of coverage, deductible and expiration date) of all insurance policies which are owned by the Company or its Subsidiaries or PREE or which name the Company or any Subsidiary or PREE as an insured (or loss payee), including without limitation those which pertain to the Company's and the Subsidiaries' respective Assets, employees or operations or to the Owned Real Property (the "**Insurance Policies**").  The Company has made full and complete copies of all material Insurance Policies, including, without limitation, all property and casualty, product liability and directors and officers Insurance Policies, available to the Buyer.  The Insurance Policies and all premiums due and payable thereon have been paid in full.  The Company and its Subsidiaries and PREE are otherwise in compliance in all respects with the terms and provisions of the Insurance Policies except where the failure to comply would have an immaterial effect, individually or in the aggregate, on the enforceability of the Insurance Policies.  As of the date hereof, there are no pending material claims under any Insurance Policy as to which the respective insurers have denied coverage.  Schedule 3.20 sets forth (i) the claims history for the Company and each of its Subsidiaries and PREE during the past two (2) years (including with respect to insurance obtained but not currently maintained) and (ii) any material written correspondence, including, without limitation, reservation of rights letters, with any current or former insurance carrier of the Company, in each case, with respect to claims having a value equal to or greater than US$50,000.  As of the date hereof, neither the Company nor any Subsidiary nor PREE has received either a written notice or, to the Knowledge of the Company, verbal notice that could reasonably be expected to be followed by a written notice of cancellation or non-renewal of any Insurance Policy.  None of the Insurance Policies contains any "change of control" provisions triggered by the consummation of the transactions contemplated by this Agreement.

Section 3.21    Affiliate Transactions; Interests in Clients, Suppliers, Etc. Except for employment relationships and the payment of compensation and benefits in the Ordinary Course or as disclosed on Schedule 3.21, neither the Company nor any Subsidiary is a party to any agreement with, or involving the making of any payment, benefit or transfer of assets to any Seller Affiliated Person.  No Seller Affiliated Person possesses, directly or indirectly, any leasehold or other ownership interest in any asset owned or used by the Company or any subsidiary (except by virtue of their stock ownership of the Company) or any financial interest in, or is a director, officer or employee of, any Person which is a material supplier, customer, lessor, lessee, or competitor of the Company or any Subsidiary.

Section 3.22    Suppliers.  Schedule 3.22 sets forth the names of the ten (10) largest suppliers (the "**Top Suppliers**") of the Company and its Subsidiaries (on a consolidated basis) measured by dollar value for the twelve (12) calendar months ended December 31, 2005. None of the suppliers listed on Schedule 3.22 has notified the Company or its Subsidiaries, orally or in writing, that it is (i) canceling or terminating (or notified the Company or any Subsidiary of its intention to cancel or terminate) its relationship with the Company or any Subsidiary, or (ii) materially modifying its relationship with (or notified the Company or any Subsidiary of its intention to materially modify its relationship with), or materially reducing the supply of

materials to (or notified the Company or any Subsidiary of its intention to reduce the supply of materials to), the Company or any Subsidiary.

Section 3.23    Customers.    Schedule 3.23 sets forth the names of the ten (10) largest customers (the "**Top Customers**") of the Company and its Subsidiaries (on a consolidated basis) measured by dollar value for the twelve (12) calendar months ended December 31, 2005.  None of the Top Customers has notified the Company or any Subsidiary, orally or in writing, that it is (i) canceling or terminating (or notified the Company or any Subsidiary of its intention to cancel or terminate) its relationship with the Company or any Subsidiary, or (ii) materially modifying (or notified the Company or any Subsidiary of its intention to materially modify) its relationship with the Company or any Subsidiary.  Except as set forth on Schedule 3.23, the Company has no reason to believe that any arrangements between the Company or any Subsidiary and any of the Top Customers will be terminated on or before December 31, 2006 or modified in a manner materially adverse (based on pricing, sales, or other material terms) to the terms currently in effect as of the date hereof.

Section 3.24    Warranty Matters.    No customer has made any warranty claim against any of the Company or its Subsidiaries since January 1, 2004, other than in the ordinary course of business consistent with past practice.  To the Sellers' Knowledge, no transactions with any customer prior to the Closing will give rise to any warranty claims after the Closing Date. To the extent any warranty claims relating to transactions with any customer prior to the Closing arise after the Closing Date, the reserve for warranty claims in the Financial Statements is sufficient to settle such warranty claims.  No warranty claim made within the immediately preceding twelve (12) month period from the date hereof has cost any of the Company and its Subsidiaries, in the aggregate, more US$25,000 to remedy to the customer's satisfaction.

Section 3.25    Product Liability Claims.    There are no pending product liability claims against the Company or its Subsidiaries which are not fully covered by product liability insurance coverage with the Company's or its Subsidiaries' current insurance carrier.

Section 3.26    Accounting Records; Internal Controls.

(a)    Each of the Company and its Subsidiaries maintains accurate Books and Records reflecting its Assets and Liabilities and maintains, in the reasonable judgment of the Company, proper and adequate internal accounting controls which provide reasonable assurance that (i) material transactions are executed with management's authorization; (ii) transactions are recorded as necessary to permit preparation of the combined financial statements of the Company and its Subsidiaries and to maintain accountability for the consolidated assets of the Company and its Subsidiaries; and (iii) accounts, notes and other receivables and inventory are recorded accurately, and proper and adequate procedures are implemented to effect the collection thereof on a current and timely basis.

(b)    There have been no written disclosures by any representative of the Company or its Subsidiaries to the Company's independent auditors relating to (i) any significant deficiencies in the design or operation of internal controls which would adversely affect the ability of the Company or any of its Subsidiaries to record, process, summarize and report financial data and any material weaknesses in internal controls and (ii) any fraud, whether or not

material, that involves management or other employees who have a significant role in the internal control over financial reporting of the Company or any of its Subsidiaries.

Section 3.27    Books and Records.  All accounting and financial books and records have been fully, properly and accurately kept and are complete in all material respects. The Books and Records are not recorded, stored, maintained, operated or otherwise wholly or partly dependent upon or held by any means (including any electronic, mechanical or photographic process, whether computerized or not) which are not or will not be available to the Company in the Ordinary Course prior to and after Closing.

Section 3.28    Prior Acquisitions.  Schedule 3.28 sets forth all earn-out or other contingent payments and claims that (i) may hereafter be payable or (ii) that have been paid, relating to all acquisitions by the Company or any of its Subsidiaries within the prior five (5) years of any operating business or the capital stock of any other Person (the acquisition agreements relating to such acquisitions, the "**Acquisition Agreements**").  None of the Company or its Subsidiaries, or to the Company's Knowledge, any other Person, has breached in any material respect any of the Acquisition Agreements.  The right of the Company or its Subsidiaries to make indemnity claims pursuant to such Acquisition Agreements will not be affected by the consummation of the transactions contemplated hereby.  No claims for indemnification under such Acquisition Agreements have been made, are pending or are threatened by the Company or its Subsidiaries and no claims for indemnification have been made, are pending, or to the Company's Knowledge, are threatened, by the counterparty thereto.

Section 3.29    Prohibited Payments.  To the Company's Knowledge, neither the Company, its Subsidiaries nor any of their respective directors, officers, agents or employees has (a) used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to political activity, (b) made any unlawful payments to governmental officials or employees or to political parties or campaigns or violated any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended, or (c) made any other unlawful payment or engaged in any unlawful business practice.

Section 3.30    Brokers.  None of the Company, its Subsidiaries or any of their respective officers, directors or employees acting on behalf of the Company or any Subsidiary has entered into any contract, agreement, arrangement or understanding with any financial advisor, broker, finder or similar agent or any Person, other than Shattuck Hammond Partners, LLC, which will result in the obligation of the Company or its Subsidiaries to pay any financial advisory fee, finder's fee, brokerage fees or commission or similar payment in connection with this Agreement and the transactions contemplated hereby.

Section 3.31    Disclaimer of Other Representations and Warranties.  Except for the representations and warranties contained in this Article III and Article IV, the Sellers make no other representations or warranties, express or implied, and the Sellers hereby disclaim any such other representations or warranties, whether by the Company, any Subsidiary or any of their respective officers, directors, employees, agents or representatives, or any other Person, with respect to this Agreement and the transactions contemplated hereby, notwithstanding the delivery or disclosure to the Buyer or any of its directors, officers, employees, agents or representatives, or any other Person, of any documentation or other information by the Company,

any Subsidiary or any of their respective officers, directors, employees, agents or representatives, or any other Person, with respect to any of the foregoing.

# ARTICLE IV
## ADDITIONAL REPRESENTATIONS AND WARRANTIES
## OF THE SELLERS AND PREE

The Sellers and PREE hereby, jointly and severally, represent and warrant to the Buyer as follows:

Section 4.1    Authorization.  The Sellers and PREE have all requisite power and authority, and have taken all action necessary, to execute and deliver this Agreement and the other Transaction Documents to which the Sellers and PREE are a party, to consummate the transactions contemplated hereby and thereby, and to perform their respective obligations hereunder, thereunder and in connection therewith.  This Agreement and the other Transaction Documents to which the Sellers and PREE are a party have been, or will be, duly executed and delivered by the Sellers and PREE and, assuming the due authorization, execution and delivery hereof and thereof by the Company, PREE and the Buyer, are, or will be, the legal, valid and binding obligations of the Sellers and PREE, enforceable against each of them in accordance with their terms.

Section 4.2    Title to Shares and the Owned Real Property.  The Sellers own and will transfer to the Buyer, the Shares free and clear of all Encumbrances.  PREE owns the Owned Real Property and will transfer to the Buyer the Owned Real Property free and clear of all Encumbrances.

Section 4.3    Governmental Consents and Approvals; No Conflict or Violation.

(a)    No consent, approval, authorization of or notice of, declaration to or filing or registration with, any Governmental Authority is required to be made or obtained by the Sellers, PREE or any of its Affiliates in connection with the execution, delivery and performance by the Sellers and PREE of this Agreement, the other Transaction Documents, and the consummation of the transactions contemplated hereby and thereby.

(b)    Neither the execution, delivery or performance of this Agreement or the other Transaction Documents nor the consummation of the transactions contemplated hereby or thereby, nor compliance by the Sellers and PREE with any of the provisions hereof or thereof, will (i) violate, conflict with, or result in or constitute a material Default under, or result in or permit the termination of, or accelerate the performance required by, or result in a right of termination or acceleration under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, license, contract, agreement or other instrument or obligation to which any Seller or PREE is a party or by which the Sellers or PREE or any of their Assets may be bound or (ii) materially violate, conflict with, contravene or give any Person the right to exercise any remedy or obtain any relief under, any Court Order or Regulation.

Section 4.4     <u>Compliance with Law</u>.  The Sellers and PREE are in compliance with all Regulations and Court Orders which would materially affect their ability to perform their obligations hereunder.  There is no Action pending or, to the Knowledge of the Sellers and PREE, threatened against the Sellers or PREE that may affect their abilities to perform their obligations hereunder.

Section 4.5     <u>Brokers</u>.  Neither of the Sellers or PREE has entered into any contract, agreement, arrangement or understanding with any financial advisor, broker, finder or similar agent or any Person, other than Shattuck Hammond Partners, LLC, which will result in the obligation of the Sellers or PREE or any of their Affiliates to pay any financial advisory fee, finder's fee, brokerage fees or commission or similar payment in connection with this Agreement and the transactions contemplated hereby.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer hereby represents and warrants to the Sellers as follows:

Section 5.1     <u>Organization</u>.  The Buyer is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with the requisite corporate power and authority to conduct its business as it is currently being conducted and to own or lease, as applicable, its assets.  The Buyer is duly qualified to do business as a foreign entity and is in good standing in each jurisdiction where the character of its properties owned or leased or the nature of its activities make such qualification necessary, except where the failure to be so qualified or in good standing would not, individually or in the aggregate have, or reasonably be expected to have, a Material Adverse Effect on the Buyer.  Copies of the charter and bylaws of the Buyer, and all amendments thereto, heretofore delivered to the Sellers, are correct and complete as of the date hereof.  The Buyer was formed for the purpose of consummating the transactions contemplated hereby and has no Liabilities other than hereunder.

Section 5.2     <u>Authorization</u>.  The Buyer has all requisite corporate power and authority, and has taken all corporate action necessary, to execute and deliver this Agreement and the other Transaction Documents to which it is a party, to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder.  The execution and delivery by the Buyer of this Agreement and the other Transaction Documents to which it is a party and the consummation by the Buyer of the transactions contemplated hereby and thereby have been duly approved by the board of directors of the Buyer.  No other corporate proceedings on the part of the Buyer or its stockholders are necessary to authorize this Agreement and the other Transaction Documents to which it is a party and the transactions contemplated hereby and thereby.  This Agreement and the other Transaction Documents to which it is a party has been, or will be, duly executed and delivered by the Buyer and, assuming the due authorization, execution and delivery hereof and thereof by the Sellers, the Company and PREE, are, or will be, the legal, valid and binding obligations of the Buyer, enforceable against it in accordance with its terms.

Section 5.3     <u>Governmental Consents and Approvals; No Conflict or Violation</u>.

-47-

(a)      No consent, approval, authorization of or notice of, declaration to or filing or registration with, any Governmental Authority is required to be made or obtained by the Buyer in connection with the execution, delivery and performance by the Buyer of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby.

(b)      Neither the execution, delivery or performance of this Agreement or the other Transaction Documents nor the consummation of the transactions contemplated hereby or thereby, nor compliance by the Buyer with any of the provisions hereof or thereof, will (i) violate or conflict with any provision of the Organizational Documents of the Buyer, (ii) violate, conflict with, or result in or constitute a material Default under, or result in or permit the termination of, or accelerate the performance required by, or result in a right of termination or acceleration under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, license, contract, agreement or other instrument or obligation to which the Buyer is a party or by which the Buyer or any of its assets may be bound or (iii) materially violate, conflict with, contravene or give any Person the right to exercise any remedy or obtain any relief under, any Court Order or Regulation.

Section 5.4      Compliance with Law.  The Buyer is in compliance with all Regulations and Court Orders which would materially affect its ability to perform its obligations hereunder.  There is no Action pending or, to the knowledge of the Buyer, threatened against the Buyer that may affect its abilities to perform its obligations hereunder.

Section 5.5      Brokers.  Neither the Buyer nor any of its officers, directors, employees or stockholders has entered into any contract, agreement, arrangement or understanding with any financial advisor, broker, finder or similar agent or any Person which will result in the obligation of the Sellers to pay any financial advisory fee, finder's fee, brokerage fees or commission or similar payment in connection with this Agreement and the transactions contemplated hereby.

Section 5.6      Investment Intent.  Buyer is acquiring the Shares for its own account and not with a view to their distribution within the meaning of Section 2(11) of the Securities Act of 1933, and the rules and regulations promulgated thereunder.

Section 5.7      Certain Proceedings.  There is no pending Action that has been commenced against Buyer that challenges, or may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the transactions contemplated hereunder.  To Buyer's knowledge, no such proceeding has been threatened.

Section 5.8      Financial Ability.  Subject to receipt of financing, the Buyer has the financial ability to consummate the transactions contemplated by this Agreement.

Section 5.9      National Instrument 45-106 Compliance.  Canadian Holdings is a person in respect of which all of the owners of interests, direct, indirect or beneficial, except the voting securities required by law to be owned by directors, are persons that are "accredited investors" as such term is used and defined in Regulation 45-106 respecting prospectus and registration exemptions, R.R.Q., c. V-1.1, r.0.1.001 made under the Securities Act (Québec)

("**Regulation 45-106**") relating to prospectus and registration exemptions, and thus is an "accredited investor" as such term is used and defined in Regulation 45-106.

# ARTICLE VI
# COVENANTS

Section 6.1    Approvals and Consents.  Each of the parties shall, as applicable to such party, make all filings with and provide all notices to all appropriate Governmental Authorities and obtain all consents, waivers, approvals, authorizations or orders, including (a) all regulatory rulings and approvals of any Governmental Authority and (b) all actions, consents, approvals or waivers set forth on Schedule 2.7(b)(iii), in connection with the consummation of this Agreement and the other Transaction Documents or the transactions contemplated hereby or thereby.  Subject to the terms and conditions of this Agreement, in taking such actions or making any such filings, the parties hereto shall use their respective commercially reasonable efforts to assemble, prepare and file any information (and, as needed, to supplement such information) as may be reasonably necessary in order to obtain, as promptly as possible, all consents and approvals required to be obtained from any Governmental Authority in order to execute and deliver this Agreement in accordance with its terms and conditions.  In the event that any of the parties or their respective Affiliates shall fail to obtain any such approval or consent described in clause (a) or clause (b) hereof, it shall use commercially reasonable efforts, and shall take any such actions reasonably requested by the other party, at its own expense, to minimize any adverse effect upon the Buyer, the Sellers, the Company, PREE or their respective Affiliates resulting, or which could reasonably be expected to result after the Closing Date, from the failure to obtain such approval or consent.  Notwithstanding anything to the contrary contained in this Section 6.1, the Buyer shall not be required to incur any expenses in connection with the obtaining of any such approvals or consents pursuant to this Section 6.1, or to accept any changes to any agreements, arrangements, understandings or otherwise in connection with the obtaining of any such approvals or consents.

Section 6.2    Additional Agreements; Reasonable Commercial Efforts.  Subject to the terms and conditions herein provided, each of the parties hereto agrees to use reasonable commercial efforts to take or cause to be taken all actions and to do or cause to be done all things reasonably necessary, proper or advisable under applicable Regulations or otherwise to consummate and make effective this Agreement and the transactions contemplated hereby, including (a) contesting any legal proceeding by a third party and (b) executing any additional instruments necessary to consummate this Agreement or the transactions contemplated hereby.  If at any time after the Closing Date any further action is necessary to carry out the purposes of this Agreement, the proper officers and directors of each party hereto shall take all such necessary action.

Section 6.3    Non-Solicitation, Non-Hire, Confidentiality.  In consideration of the benefits of this Agreement to the Sellers, and in order to induce the Buyer to enter into this Agreement, each of the Sellers hereby covenants and agrees that:

-49-

(a)    For a period of four (4) years beginning on the Closing Date, each Seller and/or any person, firm, corporation or other entity which controls, is controlled by or is under common control with each Seller, shall not, without the prior written consent of the Buyer, engage in a business which competes with the business of the Buyer or its subsidiaries, directly or indirectly, personally or as an employee, owner, consultant, manager, associate, partner, agent or otherwise, or by means of any corporate or other device within Canada or the United States (the "**Territory**"); nor shall any Seller and/or his affiliates, for such period and in the Territory, solicit orders, directly or indirectly, from any customer of the Buyer or its subsidiaries for any product substantially similar to those sold, manufactured or distributed by the Buyer or its subsidiaries, personally or as an employee, owner, consultant, manager, associate, partner, agent or otherwise, or by means of any corporate or other device; nor shall each Seller and/or his affiliates for such period and in such Territory solicit for employment any employee of the Buyer or any affiliate.  The Sellers acknowledge that the restrictions contained in this Section 6.3(a) are reasonable and necessary to protect the legitimate interests of the Buyer, do not cause the Sellers or their affiliates undue hardship, and that any violation of any provision of this Section 6.3(a) will result in irreparable injury to the Buyer and that, therefore, the Buyer shall be entitled to preliminary and permanent injunctive relief in any court of competent jurisdiction and to an equitable accounting of all earnings, profits and other benefits arising from such violation, which right shall be cumulative and in addition to any other rights or remedies to which the Buyer may be entitled.

(b)    from and after the Closing and until the fourth anniversary of the Closing Date, the Sellers, and their respective current and future Affiliates shall not, directly or indirectly, as a partner, stockholder, proprietor, consultant, joint venturer, investor or in any other capacity, solicit, hire or attempt to hire any employees to perform services (as an employee, consultant or otherwise), or take any actions which are intended to persuade any employees to terminate his or her association with the Company or any of its Subsidiaries, as the case may be;

(c)    from and after the Closing, the Sellers and their respective current and future Affiliates shall keep confidential and not disclose to any other Person or use for their own benefit or the benefit of any other Person, any information relating or in regard to the Company, its Subsidiaries, the Owned Real Property or the Business, except that such information may be disclosed to such Sellers' professional advisors in connection with the preparation or any audit of each Seller's Tax Returns, or the defense or prosecution of any claim brought under Article VII or Article VIII hereof, or any Third Party Claim.  The obligation of the Sellers and their respective Affiliates under this Section 6.3(c) shall not apply to information which:  (A) is or becomes generally available to the public, without breach of the commitment provided for in this Section 6.3(c); or (B) is required to be disclosed by law, order or Regulation of a court or tribunal or Governmental Authority; provided, however, that in any such case, the relevant Seller shall notify the Buyer as early as promptly as practicable prior to disclosure to allow the Buyer to take appropriate measures to preserve the confidentiality of such information, and shall reasonably cooperate with the Buyer in taking any steps to resist or narrow any such requirement to disclose any such information; and

(d)    the Sellers and the Buyer agree and acknowledge that the duration and scope of the non-compete, non-solicitation/no-hire, and other provisions described in this Section 6.3 are fair, reasonable and necessary in order to protect the legitimate interests of the

Buyer, and that adequate consideration has been received by the Sellers for such obligations. If, however, for any reason any court determines that the restrictions in this <u>Section 6.3</u> are not reasonable or that such consideration is inadequate, such restrictions shall be interpreted, modified or rewritten to include as much of the duration and scope identified in this <u>Section 6.3</u> as will render such restrictions valid and enforceable.

       Section 6.4    <u>Subsection 256(9) Election</u>.  Plastival Canada will, in its federal and Québec income tax returns for the taxation year ending immediately prior to the acquisition of control, elect not to have subsection 256(9) of the ITA (and the equivalent provisions under the Québec Taxation Act) apply, such that control of Plastival Canada will be deemed to occur at the actual time of day that its issued and outstanding share capital is acquired by Canadian Holdings and not at the beginning of such day.

       Section 6.5    <u>Certificate of Authorization</u>.  The Company shall prepare and submit to the applicable Governmental Authority a true and correct application for a Certificate of Authorization for the Québec facility and diligently pursue until issued, as more specifically described below.

       (a)    The Sellers shall, at their sole cost and expense, submit to the competent Governmental Authority all applications in proper form with all required information, testings, reports and documentation to obtain, in the name of Plastival Canada, each and every Certificate of Authorization to operate the Owned Real Property in accordance with all applicable laws. Should all Certificates of Authorization not be obtained by Closing, the Sellers shall, following Closing, at their sole cost and expense and in the name of Plastival Canada, diligently pursue the obtention of all Certificates of Authorization and shall cooperate with the Buyer, but at no cost to the Buyer, and the whole until all Certificates of Authorization are unconditionally issued by the competent Governmental Authority.

       (b)    The Sellers shall pay for any and all costs related directly or indirectly to the foregoing applications and the related documents and the issuance of all Certificates of Authorization by the competent Governmental Authority, including without limitation (i) fees and other amounts payable to any Governmental Authority, (ii) fees and disbursements of any and all consultants (including without limitation legal and environmental consultants), experts and professionals involved, (iii) costs of any and all tests, analysis, investigations, inspections, reports, characterizations and studies performed, and (iv) costs of any and all remedial or corrective work and of any apparatus, accessory and equipment (including their installation and testing) required by the competent Governmental Authority, (collectively, the "**Certificate of Authorization Expenses**").

## ARTICLE VII
## TAX MATTERS

       Section 7.1    <u>Tax Returns</u>.

       (a)    The Sellers shall cause the Company and each Subsidiary and PREE to prepare all Tax Returns and file such Tax Returns that are required to be filed (with extensions) on or before the Closing Date and shall pay all Taxes shown as due on such Tax Returns.  All

Tax Returns will be prepared and filed by the Company and each Subsidiary and PREE in a manner consistent with the prior practice of the Company and such Subsidiary and PREE, except as required by law.  The Buyer shall cause the Company and each Subsidiary to prepare and file all Tax Returns of or including the Company or such Subsidiary that are required to be filed (with extensions) following the Closing Date that include Pre-Closing Tax Periods or portions thereof ending on or before the Closing Date.  The Sellers shall be responsible for Taxes attributable to any Pre-Closing Tax Period ("**Pre-Closing Taxes**") due in respect of such Tax Returns, to the extent that the amount of Pre-Closing Taxes due in respect of any such Tax Return exceeds the amount of any such Tax that is included as a current Liability on the Final Closing Balance Sheet.  The Buyer shall notify the Sellers of any amounts due from the Sellers in respect of such Tax Return no later than ten (10) Business Days prior to the date on which such Tax Return is due, and the Sellers shall remit such payment to the Buyer no later than five (5) Business Days prior to the date such Tax Return is due.  All such Tax Returns prepared following the Closing Date, to the extent such Tax Returns relate to Pre-Closing Tax Periods, will be made and filed by the Company and each Subsidiary, as the case may be, in a manner consistent with the prior practice of the Company and each Subsidiary, except as required by law.  From time to time at the Buyer's request, the Sellers shall reimburse the Buyer for all expenses incurred by the Buyer in the connection with the preparation of such Tax Returns.

(b)     In the case of any Income Tax Return of the Company or any Subsidiary that is required to be filed (with extensions) after the Closing Date with respect to any Pre-Closing Tax Period (each, a "**Pre-Closing Income Tax Return**"), the Buyer shall provide the Sellers with a copy of such completed Pre-Closing Income Tax Return, together with the related work papers and such other documents as Sellers shall reasonably request.  Sellers and their Representatives shall have the right to review each Pre-Closing Income Tax Returns received from the Buyer pursuant to this Section 7.1(b).

(c)     If the Sellers dispute the treatment of any items relating to a Pre-Closing Tax Period on the Income Tax Returns prepared by the Buyer, the Sellers and the Buyer agree to consult with each other and attempt to resolve in good faith any such dispute.  If the parties are unable to resolve any such dispute with respect to a Pre-Closing Income Tax Return for a Straddle Period within thirty (30) days after the receipt of any such Pre-Closing Income Tax Return by the Sellers, the parties shall submit such dispute to a mutually acceptable national accounting firm, whose decision shall be conclusive and binding on the parties.  The fees and expenses of such accounting firm will be borne by the Sellers and the Buyer in inverse proportion as they may prevail on the matters resolved by such accounting firm, which proportionate allocations shall be determined by such accounting firm at the time the determination of such accounting firm is rendered on the merits of the matters submitted.

(d)     If the Pre-Closing Income Tax Return is a Pre-Closing Corporate Income Tax Return that is not a Straddle Period, then within ten (10) days after the receipt of such Pre-Closing Income Tax Return, the Sellers shall pay to the Buyer an amount equal to the Income Tax shown on such Pre-Closing Corporate Income Tax Return reduced by the amount of the liability attributable to that Income Tax shown on the Final Closing Balance Sheet.  However, if any dispute relating to a Pre-Closing Income Tax Return has not been resolved prior to the due date for the filing of such Pre-Closing Income Tax Return, the Pre-Closing Income Tax Return in question, to the extent any issues thereon remain unresolved, shall be filed (and the Sellers shall

-52-

make payments pursuant to this Section 7.1(d)) in accordance with the positions taken by the Sellers; provided that the fact that such Pre-Closing Income Tax Return will have been filed in accordance with the Sellers' position shall not be taken into account for purposes of any dispute resolution under this Section 7.1(d). If a determination is made through the dispute resolution process after a Pre-Closing Income Tax Return is filed that the Sellers' position was inappropriate, the Buyer shall promptly file an amended Pre-Closing Income Tax Return in respect of such Taxable Period (to the extent permitted by applicable law) reflecting the final decision of the accounting firm and an adjusting payment will be made by the Sellers to the Buyer or by the Buyer to the Sellers, as the case may be, to reflect any difference between the Income Tax due with respect to the amended Pre-Closing Income Tax Return and the Pre-Closing Income Tax due with respect to the Pre-Closing Income Tax Return as originally filed.

(e)    If the Pre-Closing Income Tax Return is a Pre-Closing Corporate Income Tax Return for a Straddle Period, then within ten (10) days after the receipt of such Pre-Closing Income Tax Return, the Sellers shall pay to the Buyer an amount equal to the Income Tax that is attributable to the Sellers pursuant to Section 7.1(f), reduced by the amount of the liability attributable to that Income Tax shown on the Final Closing Balance Sheet. However, if any dispute relating to a Pre-Closing Income Tax Return has not been resolved prior to the due date for the filing of such Pre-Closing Income Tax Return, the Pre-Closing Income Tax Return in question, to the extent any issues thereon remain unresolved, shall be filed (and the Sellers shall make payments pursuant to this Section 7.1(e)) in accordance with the positions taken by the Buyer; provided that the fact that such Pre-Closing Income Tax Return will have been filed in accordance with the Buyer's position shall not be taken into account for purposes of any dispute resolution under this Section 7.1(e). If a determination is made through the dispute resolution process after a Pre-Closing Income Tax Return is filed that the Buyer's position was inappropriate, the Buyer shall promptly file an amended Pre-Closing Income Tax Return in respect of such Taxable Period (to the extent permitted by applicable law) reflecting the final decision of the accounting firm and an adjusting payment will be made by the Sellers to the Buyer or by the Buyer to the Sellers, as the case may be, to reflect any difference between the Income Tax due with respect to the amended Pre-Closing Income Tax Return and the Pre-Closing Income Tax due with respect to the Pre-Closing Income Tax Return as originally filed.

(f)    For the purpose of allocating the payments pursuant to Section 7.1(e), the Sellers shall be solely responsible for all Taxes of the Company and any Subsidiary attributable to the portion of the period ending on, and which includes, the Closing Date, and the Buyer shall be solely responsible for all Income Taxes attributable to the portion of the period which begins after the Closing Date. For purposes of this Agreement, the portion of any Tax that is attributable to the Sellers shall to the extent possible be the Tax that would be due with respect to the portion of the Straddle Period through and including the Closing Date if such portion of the Straddle Period were a separate Pre-Closing Tax Period, except that exemptions, allowances, deductions or credits that are calculated on an annual basis (such as the deduction for depreciation or capital allowances) were apportioned on a per diem basis.

(g)    The Sellers and the Buyer agree that for Income Tax purposes the Taxable Period of the Company shall be terminated as of the close of business on the Closing Date and items of income, gain, loss, deduction or credit (other than transactions properly allocable to the portion of the day after the Closing shall occur) shall be apportioned based upon a "closing of the

books" for Income Tax purposes and in accordance with preparation of the Final Closing Balance Sheet.  The Sellers and the Buyer further agree to file (or cause the Company and each Subsidiary to file) all Tax Returns (including all U.S. (federal and state) and Canadian (federal and provincial) Income Tax Returns), handle the contest of any audit and otherwise act for all Tax purposes consistent with the provisions of this Section 7.1(g).

(h)    The Sellers shall not without the prior written consent of the Buyer (which consent shall not be unreasonably conditioned, delayed or withheld), directly or indirectly (i) make, change or revoke, or permit to be made, changed or revoked, any election or method of accounting or file any amended Tax Returns with respect to Income Taxes that would materially and adversely affect the Company and any Subsidiary for Post-Closing Tax Periods or (ii) enter into, or permit to be entered into, any closing or other agreement or settlement with respect to Taxes of the Company or any Subsidiary affecting or relating to Post-Closing Tax Periods.

(i)    To the Knowledge of the Sellers, the Company and PREE, there is no U.S. or Canadian, state, provincial, local or non-U.S. or non-Canadian income or franchise and any other suit, claim, action, investigation, proceeding or audit (collectively, "**Tax Actions**") pending against or with respect to the Company or any of its Subsidiaries or PREE in respect of any Tax matter, including (without limitation) Tax Liabilities and refund claims.  To the Knowledge of the Sellers and the Company, there is no Tax Sharing Agreements to which the Company or any of its Subsidiaries is a party such that there is no further liability thereunder except as provided as a current liability on the Closing Balance Sheet.

Section 7.2    Tax Audits and Contests; Cooperation.

(a)    After the Closing Date, except as provided in (b) and (c) below, the Buyer shall control the conduct, through counsel of its own choosing, of any audit, claim for refund, or administrative or judicial proceeding involving any asserted Tax liability or refund with respect to the Company or any of its Subsidiaries (any such audit, claim for refund, or proceeding relating to an asserted Tax liability referred to herein as a "**Contest**").

(b)    In the case of a Contest after the Closing Date that relates solely to Taxes for which the Buyer is indemnified under Section 7.3, the Sellers shall control the conduct of such Contest, but the Buyer shall have the right to participate in such Contest at its own expense, and the Sellers shall not be able to settle, compromise and/or concede any portion of such Contest that is reasonably likely to affect the Tax liability of the Buyer, the Company or its Subsidiaries for any taxable year (or portion thereof) beginning after the Closing Date without the reasonable consent of the Buyer, which consent shall not be unreasonably withheld or delayed; provided, that if the Sellers fail to assume control of the conduct of any such Contest within a reasonable period following the receipt by the Sellers of notice of such Contest, the Buyer shall have the right to assume control of such Contest and shall be able to settle, compromise and/or concede such Contest in its sole discretion.

(c)    In the case of a Contest after the Closing Date that relates both to Taxes for which the Buyer is indemnified under Section 7.3 and Taxes for which the Buyer is not indemnified under Section 7.3, the Buyer shall control the conduct of such Contest, but the Sellers shall have the right to participate in such Contest at its own expense, and the Buyer shall

not settle, compromise and/or concede such Contest without the consent of the Sellers, which consent shall not be unreasonably withheld or delayed.

(d)    The Sellers and the Buyer agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information (including access to books and records) and assistance relating to the Company and its Subsidiaries as is reasonably requested for the filing of any Tax Returns and the preparation, prosecution, defense or conduct of any Contest. The Sellers and the Buyer shall reasonably cooperate with each other in the conduct of any Contest or other proceeding involving or otherwise relating to the Company or its Subsidiaries (or their income or assets) with respect to any Tax and each shall execute and deliver such powers of attorney and other documents as are necessary to carry out the intent of this Section 7.2(d). Any information obtained under this Section 7.2(d) shall be kept confidential, except as may be otherwise necessary in connection with the filing of Tax Returns or in the conduct of a Contest or other Tax proceeding.

Section 7.3    Tax Indemnification.

(a)    From and after the Closing Date, the Sellers shall indemnify the Buyer, the Company, its Subsidiaries and their respective Affiliates (each a "**Tax Indemnified Buyer Party**" and collectively, the "**Tax Indemnified Buyer Parties**") against and hold harmless from any and all liabilities, losses, damages, claims, costs, expenses, interest, awards, judgments and penalties (including, without limitation, reasonable fees for counsel, accountants and other outside consultants) suffered or incurred (each a "**Tax Loss**" and collectively, the "**Tax Losses**") arising out of (i) any Pre-Closing Taxes in excess of the amount reserved with respect to such Taxes as current liabilities (excluding any reserve for deferred taxes established to reflect timing differences between book and Tax income) on the Final Closing Balance Sheet; (ii) Taxes imposed on a Tax Indemnified Buyer Party as a result of (x) a breach of a representation or warranty set forth in Section 3.10 of this Agreement or (y) a breach of a covenant or agreement set forth in Article VII of this Agreement; provided, that for purposes of this Section 7.3(a)(ii) only, any breach of a representation, warranty, covenant or agreement shall be determined without reference to any materiality qualifier with respect thereto; (iii) all Taxes of any member of an affiliated, consolidated, combined or unitary group of which the Company or any Subsidiary (or any predecessor of any of the foregoing) is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulation Section 1.1502-6 (or any analogous state, local or non-U.S. law or regulation; (iv) any and all Taxes of any person (other than the Company or any Subsidiary) imposed on Buyer, the Company or any Subsidiary as a transferee or successor, by contract or pursuant to any law, rule or regulation, which Taxes relate to an event or transaction occurring before the Closing Date; and (v) Taxes arising out of any transactions contemplated by this Agreement, except for Taxes on the transfer of the Owned Real Property imposed on the Buyer.

(b)    From and after the Closing Date, the Buyer shall indemnify the Sellers for the amount reserved with respect to Pre-Closing Taxes as current liabilities (excluding any reserve for deferred taxes established to reflect timing differences between book and Tax income) on the Final Closing Balance Sheet and shall pay over to the Sellers when received by the Company any refund or credit of Pre-Closing Taxes received after the Closing Date, except for those refunds reflected as assets on the Final Closing Balance Sheet.

-55-

Section 7.4    <u>Tax Indemnification Procedures.</u>

(a)    After the Closing, the Buyer, the Company or its Subsidiaries, as the case may be, shall promptly notify the Sellers in writing of any demand, claim or notice of the commencement of an audit received by such party from any Governmental Authority or any other Person with respect to Taxes for which the Sellers are liable pursuant to <u>Section 7.3</u> of this Agreement; provided, however, that a failure to give such notice will not affect the Buyer's rights to indemnification under this <u>Article VII</u>, except to the extent that the Sellers are actually prejudiced thereby.  Such notice shall contain factual information (to the extent known) describing the asserted Tax liability and shall include copies of the relevant portion of any notice or other document received from any Taxing Authority or any other Person in respect of any such asserted Tax liability.

(b)    Payment by an indemnitor of any amount due to an indemnitee under <u>Article VII</u> of this Agreement shall be made within ten (10) days following written notice by the indemnitee that payment of such amounts to the appropriate Taxing Authority or other applicable third party is due by the indemnitee, provided that the indemnitor shall not be required to make any payment earlier than five (5) Business Days before it is due to the appropriate Taxing Authority or applicable third party.  All amounts required to be paid pursuant to this <u>Article VII</u> shall be paid promptly in immediately available funds by wire transfer to a bank account designated by the indemnified party.

Section 7.5    <u>Post-Closing Tax Matters</u>.  Each of the Sellers and the Buyer will provide the other (and the other's representatives) with, and the Buyer, after the Closing Date, shall, and shall cause the Company and each Subsidiary to, cooperate in good faith (including the copying of relevant records and providing access to relevant personnel) with the Sellers (and the Sellers' representatives) in connection with the preparation of any Income Tax Returns (including any amended Income Tax Returns), the determination of the requesting party's own (or the partner's of such party) liability for Taxes, any audit or other examination by any Taxing Authority, or any judicial or administrative proceedings relating to liability for Taxes.  The party requesting assistance hereunder shall (i) make such request in writing and (ii) reimburse the other party for reasonable out-of-pocket expenses (but not internal time charges) incurred in providing such assistance.  Any information obtained pursuant to this <u>Section 7.5</u> shall be held in strict confidence and shall be used solely in connection with the reason for which it was requested.

Section 7.6    <u>Allocation of Purchase Price</u>.  Prior to the Closing, the Buyer and the Sellers shall agree on the allocation of the Purchase Price among the stock of Plastival US, and Plastival Canada and the Owned Real Property for Tax purposes.  The Sellers and the Buyer agree to file all Tax Returns (including all U.S. (federal and state) and Canadian (federal and provincial) Income Tax Returns), handle the contest of any audit and otherwise act for all Tax purposes consistent such allocation.  Canadian Holdings shall be responsible to pay the portion of the Purchase Price payable for the Canadian Shares and Owned Real Property.  US Holdings shall be responsible to pay the portion of the Purchase Price payable for the US Shares.

Section 7.7    <u>Transfer Taxes</u>.  The Buyer shall pay any real property transfer, stock transfer, transfer gains or similar Taxes (including penalties and interest) which become

payable in connection with the transactions contemplated by this Agreement (collectively, "**Transfer Taxes**").

Section 7.8    Proration of Owned Real Property Taxes.  All real estate and personal property Taxes and all rents, utilities and other charges against, or payable by the owner of the Owned Real Property relating to a time period beginning prior to, and ending after, the Closing shall be prorated (based on the most recent available tax statement, latest tax valuation and latest bills) as of the Closing Date.  If the Closing occurs before the tax rate is fixed for the then current fiscal or calendar year, whichever is applicable, the proration of the corresponding Taxes shall be on the basis of the tax rate for the last preceding year applied to the latest assessed valuation.  The Sellers or the Company or its Subsidiaries' or PREE's estimated accrued liability (to the Closing) for any of the above-described Taxes and charges that are due and payable after the Closing, to the extent practicable, shall be made as a credit against the amount payable at the Closing by the Buyer.  As to those prorations of Taxes and other charges which are not capable of being ascertained on or prior to the Closing Date, such prorations shall be payable by the Sellers to the Buyer as an adjustment to the Purchase Price within ninety (90) days of the Closing Date.

Section 7.9    Effect on Purchase Price.  The Buyer and the Sellers agree to treat any payments under this Article VII as an adjustment to the Purchase Price for all Tax purposes.

# ARTICLE VIII
# INDEMNIFICATION

Section 8.1    Survival of Representations, Etc.  The parties hereto agree that the representations, warranties and covenants of the parties hereto shall survive the Closing and terminate, with respect to the representations and warranties, on the Release Date, except that (i) the representations and warranties contained in Section 3.1 (Company Organization), Section 3.2 (PREE Organization), Section 3.3 (The Guy David Trust Organization), Section 3.4 (Authorization), Section 3.6 (Capitalization), Section 3.7(b) (Existing Indebtedness), Section 4.1 (Authorization), Section 4.2 (Title to Shares), Section 5.1 (Organization), and Section 5.2 (Authorization), shall survive indefinitely, (ii) the representations and warranties contained in Section 3.30 (Brokers), Section 4.5 (Brokers), and Section 5.5 (Brokers), shall survive until thirty (30) days following the expiration of the applicable statute of limitations (including all periods of extension, whether automatic or permissive), and (iii) the representations and warranties of the Seller and the Company contained in Section 3.10 (Tax Matters) and Section 3.17 (Hazardous Materials) of this Agreement shall survive the Closing and remain in full force and effect with respect to any claim based on such representations and warranties until the date which is thirty (30) days after the date upon which the liability to which any such claim may relate is barred by all applicable statutes of limitations (including all periods of extension, whether automatic or permissive).

Section 8.2    General Indemnification.

(a)    Subject to the limitations set forth in this Article VIII, from and after the Closing Date, the Sellers, jointly and severally, shall indemnify and hold harmless, to the fullest

extent permitted by law, the Buyer and the Company and their respective officers, directors, members, employees, agents and Affiliates (collectively, the "**Buyer Indemnitees**") from, against and in respect of damages, losses, liabilities, obligations, claims of any kind, interest or expenses (including, without limitation, reasonable attorneys' fees and expenses, but excluding punitive, exemplary, special, unforeseen or other consequential damages, except with respect to a claim for such damages by a third party against the party seeking indemnification) ("**Losses**") incurred as a result of: (i) without duplication of any item provided for under Section 7.3(a)(ii), any breach of, or inaccuracy in, any representation or warranty made by the Company, the Sellers or PREE in this Agreement or any of the other Transaction Documents; (ii) any breach or Default in performance by the Sellers, the Company or PREE of any covenant or agreement of the Sellers or PREE in this Agreement or any of the other Transaction Document or any breach or Default in performance by the Sellers, the Company or PREE of any covenant or agreement of the Company in this Agreement or any of the other Transaction Documents that is to be performed at or prior to the Closing; (iii) the Litigations or (iv) fines or penalties imposed as a result of the failure to timely obtain the Certificate of Authorization pursuant to Section 6.5; provided, that, there shall be no indemnity as to the transactions that will be effected pursuant to Section 2.12(a) - (f).

(b)     Subject to the limitations set forth in this Article VIII, from and after the Closing Date, each of the Buyer and the Company shall jointly and severally indemnify and hold harmless, to the fullest extent permitted by law, the Sellers and their Affiliates (collectively, the "**Seller Indemnitees**") from, against and in respect of Losses incurred as a result of:  (i) any breach of, or inaccuracy in, any representation or warranty made by the Buyer in this Agreement or any of the other Transaction Documents to which the Buyer is a party; or (ii) any breach or Default in performance by the Buyer of any covenant or agreement of the Buyer in this Agreement or any of the other Transaction Documents to which the Buyer is a party or any breach or Default in performance by the Company of any covenant or agreement of the Company in this Agreement or any of the other Transaction Documents that is to be performed after the Closing.

(c)     The obligations to indemnify and hold harmless pursuant to Section 8.2(a) and pursuant to clause (i) of Section 8.2(b) shall survive the consummation of the transactions contemplated hereby until the Release Date (other than as set forth in Section 8.1), in each case, except for claims for indemnification asserted prior to the end of the applicable period, which claims shall survive until final resolution thereof; provided that any such claim shall be deemed to have been withdrawn and waived no later than one (1) year after being made, unless court proceedings shall have been commenced with respect to such claim within such one (1) year period.

(d)     All indemnification payments under this Article VIII shall be adjustments to the Purchase Price for all Tax purposes except as otherwise required by applicable law.

Section 8.3    Third Party Claims.

(a)     If a claim, action, suit or proceeding by a third party (a "**Third Party Claim**") is made against any person or entity entitled to indemnification pursuant to Section 8.2 hereof (an "**Indemnified Party**"), and if such Indemnified Party intends to seek indemnity with

respect thereto under this Article VIII, such Indemnified Party shall promptly notify the party obligated to indemnify such Indemnified Party (such notified party, the "**Responsible Party**") of such claims; provided that the failure to so notify shall not relieve the Responsible Party of its obligations hereunder, except to the extent that the Responsible Party is actually prejudiced thereby. The Responsible Party shall have sixty (60) days after receipt of such notice to assume the conduct and control, through counsel reasonably acceptable to the Indemnified Party at the expense of the Responsible Party, of the settlement or defense thereof, and the Indemnified Party shall cooperate with it in connection therewith; provided that the Responsible Party shall permit the Indemnified Party to participate in such settlement or defense through counsel chosen by such Indemnified Party, provided that, the fees and expenses of such counsel shall be borne by such Indemnified Party. Notwithstanding the foregoing, the Responsible Party shall not be entitled to assume control of such defense and shall pay the reasonable fees and expenses of counsel (reasonably acceptable to the Responsible Party) retained by the Indemnified Party if: (i) the claim for indemnification relates to or arises in connection with any criminal proceeding, action, indictment, allegations or investigation; (ii) the claim seeks an injunction or equitable relief against the Indemnified Party or a change in the business practices of the Company or its Subsidiaries; (iii) the Responsible Party failed or is failing to vigorously prosecute or defend such claim; (iv) the Indemnified Party reasonably shall have concluded (upon advice of its counsel) that there may be one or more legal defenses available to such Indemnified Party or other Indemnified Parties which are not available to the Responsible Party; or (v) if the Indemnified Party reasonably shall have concluded (upon advice of its counsel after consultation with counsel for the Responsible Party) that, with respect to such claims, the Indemnified Party and the Responsible Party may have different, conflicting, or adverse legal positions or interests. So long as the Responsible Party is reasonably contesting any such claim in good faith, the Indemnified Party shall not pay or settle any such claim. Notwithstanding the foregoing, the Indemnified Party shall have the right to pay or settle any such claim, provided that in such event it shall waive any right to indemnity therefor by the Responsible Party or from the Escrow Account, as the case may be, for such claim unless the Responsible Party shall have consented to such payment or settlement. If the Responsible Party does not notify the Indemnified Party within sixty (60) days after the receipt of the Indemnified Party's notice of a claim of indemnity hereunder that it elects to undertake the defense thereof, the Indemnified Party shall have the right to contest, settle or compromise the claim but shall not thereby waive any right to indemnity therefor pursuant to this Agreement. The Responsible Party shall not, except with the consent of the Indemnified Party: (i) enter into any settlement that does not include as an unconditional term thereof the giving by the person or persons asserting such claim to all Indemnified Parties of an unconditional release from all liability with respect to such claim; (ii) consent to entry of any judgment; or (iii) enter into any settlement that attributes by its terms liability to the Indemnified Party or that provides for a remedy for anything other than the payment of money.

(b)     Any Indemnified Party shall cooperate in all reasonable respects with the Responsible Party and its attorneys in the investigation, trial and defense of any Third Party Claim and any appeal arising therefrom and, at no out-of-pocket cost to the Indemnified Party, shall furnish such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials and appeals as may be reasonably requested in connection therewith. Such cooperation shall include access during normal business hours afforded to the Responsible Party and its agents and representatives to, and reasonable retention by the

-59-

Indemnified Party of, records and information which have been identified by the Responsible Party as being reasonably relevant to such Third Party Claim, and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  The parties shall cooperate with each other in any notifications to insurers.

Section 8.4    Limitations on Sellers' Indemnification Obligations.  The rights of the Buyer Indemnitees to indemnification pursuant to the provisions of Section 8.2(a) are subject to the following limitations:

(a)    The amount of any and all Losses will be determined net of (i) any accruals to the extent specifically identified in the Final Working Capital Statement, (ii) any amounts actually recovered by the Buyer Indemnitees under indemnification agreements or arrangements with third parties or under insurance policies (net of incremental premiums and out-of-pocket costs of collecting such insurance proceeds) with respect to such Losses, and (iii) an amount equal to the Tax savings or benefits actually realized in the year in which the indemnified Loss is sustained by the Buyer Indemnitees that is attributable to any deduction, loss, credit or other Tax benefit resulting from or arising out of such Losses;

(b)    If the amount to be netted hereunder from any payment required under Section 8.2(a) or (b) is determined after payment of any amount otherwise required to be paid to an Indemnified Party under this Article VIII, the Indemnified Party shall repay to the Responsible Parties, promptly after such determination, any amount that the Responsible Parties would not have had to pay pursuant to this Article VIII had such determination been made at the time of such payment;

(c)    Nothing provided in this Section 8.4 shall limit any duty of an Indemnified Party to mitigate Losses under applicable law;

(d)    Except with respect to the Specified Exceptions, the Buyer Indemnitees will not be entitled to recover Losses pursuant to clause (i) of Section 8.2(a) until the total amount which the Buyer Indemnitees would recover under clause (i) of Section 8.2(a) (as limited by the provisions of Section 8.4(a) and (b)), but for this Section 8.4(d), exceeds US$225,000 (the "**Threshold**") and then only for the excess over the Threshold; provided, however, that the Buyer Indemnitees may recover Losses arising out of the Specified Exceptions whether or not the Threshold has been met and regardless of the amount; and

(e)    The Buyer Indemnitees (i) will not, except with respect to Specified Exceptions, be entitled to recover pursuant to this Article VIII an aggregate amount in excess of 30% of the Purchase Price (the "**Exposure Cap**").  Notwithstanding the foregoing, with respect to Losses incurred in respect of a Specified Exception, there shall be no cap on the recovery sought.  For the avoidance of doubt, in no event shall the aggregate amount of payments relating to breaches of non-Specified Exceptions exceed the Exposure Cap.

(f)    The term "**Specified Exceptions**" shall mean:  (i) any breach of, or inaccuracy in, any of the representations or warranties contained in Section 3.1 (Company Organization), Section 3.2 (PREE Organization), Section 3.3 (The Guy David Trust Organization), Section 3.4 (Authorization), Section 3.6 (Capitalization), Section 3.7(b) (Existing

-60-

Indebtedness), <u>Section 3.10</u> (Tax Matters), <u>Section 3.17</u> (Hazardous Materials), <u>Section 4.1</u> (Authorization) and <u>Section 4.2</u> (Title to Shares); or (ii) any breach or Default in performance by the Sellers of any covenant or agreement of the Sellers contained in this Agreement.

(g)     Solely for determining the amount of Losses due to the breach of a representation or warranty and not to determine whether a breach has occurred, all references to "material" (or other correlative meaning) or "Material Adverse Effect" in respect of the representations and warranties contained herein shall be disregarded.

Section 8.5     <u>Exclusive Remedy</u>.  Notwithstanding anything else contained in this Agreement to the contrary, after the Closing, except in the case of any post-Closing covenants, indemnification pursuant to the provisions of <u>Article VIII</u> shall be the exclusive remedy for the parties hereto for any misrepresentation or breach of any warranty, covenant or other provision contained in this Agreement or in any certificate delivered pursuant hereto.

## ARTICLE IX
## MISCELLANEOUS

Section 9.1     <u>Entire Agreement; Assignment</u>.  This Agreement (including the schedules hereto) and the other Transaction Documents (a) constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof and (b) shall not be assigned by operation of law or otherwise; <u>provided</u>, <u>however</u>, that upon notice to the Sellers and without releasing the Buyer from any of their obligations or liabilities hereunder, (x) the Buyer may assign or delegate any or all of its respective rights or obligations under this Agreement to any Affiliate of the Buyer or to any party providing financing in connection with the acquisition of the Company as contemplated by this Agreement and (y) after the Closing Date, the Buyer may assign or delegate any or all of its respective rights or obligations under this Agreement to any Person with or into which the Buyer, or any parent company of the Buyer merges or consolidates; provided, however, that the Buyer, or the surviving corporation into which the Buyer merges or consolidates, remains primarily liable for its obligations hereunder and such surviving corporation has sufficient assets to consummate the transactions contemplated herein.

Section 9.2     <u>Validity</u>.  If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby and, to such end, the provisions of this Agreement are agreed to be severable.

Section 9.3     <u>Notices</u>.  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by facsimile, by nationally-recognized overnight courier or by registered or certified mail (postage prepaid, return receipt requested) to each other party as follows:

| | |
|---|---|
| if to the Buyer, or, after the Closing, the Company: | Plastival Holdings, Inc.<br>c/o Key Principal Partners Corp.<br>9 Greenwich Office Park<br>Greenwich, Connecticut 06831<br>Telecopier: (203) 422-2517<br>Attention: Leland Lewis |
| with copies to: | Key Principal Partners Corp.<br>800 Superior Avenue, 10th Floor<br>Cleveland, Ohio 44114<br>Telecopier: (216) 828-8135<br>Attention: Dennis Wagner and Beth Laschinger |
| and: | Dechert LLP<br>30 Rockefeller Plaza<br>New York, New York 10112-2200<br>Telecopier:  (212) 698-3599<br>Attention:  Adam M. Fox, Esq. |
| if to Sellers or, prior to the Closing, the Company: | Guy David<br>James N. Quinn<br>Plastival, Inc.<br>1685 Holmes Road<br>Elgin, Illinois 60123<br>Telecopier: (847) 931-1771 |
| with copies to: | Shattuck Hammond Partners, LLC<br>123 North Wacker Drive<br>Chicago, Illinois 60606<br>Telecopier: (312) 541-6444<br>Attention: John F. Patek |
| and: | Dykema Gossett PLLC<br>10 South Wacker Drive, Suite 2300<br>Chicago, Illinois 60606<br>Telecopier: (312) 876-1155<br>Attention: Jeffrey M. Dalebroux, Esq. and Nick Marsico, Esq. |

or to such other address as the Person to whom notice is given may have previously furnished to the others in writing in the manner set forth above.

Section 9.4    Governing Law.  This Agreement, and all claims arising in whole or in part out of, related to, based upon, or in connection herewith or the subject matter hereof will be governed by, construed and enforced in accordance with the domestic substantive laws of the State of Illinois, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction.

Section 9.5    <u>Consent to Jurisdiction</u>.  Each party to this Agreement, by its execution hereof, hereby (a) irrevocably submits to the exclusive jurisdiction of the state courts of the State of Illinois or the United States District Court located in the State of Illinois for the purpose of any and all actions, suits or proceedings arising in whole or in part out of, related to, based upon or in connection with this Agreement or the subject matter hereof, (b) waives to the extent not prohibited by applicable law, and agrees not to assert, by way of motion, as a defense or otherwise, in any such action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that any such action brought in one of the above-named courts should be dismissed on grounds of forum non conveniens, should be transferred to any court other than one of the above-named courts, or should be stayed by reason of the pendency of some other proceeding in any other court other than one of the above-named courts, or that this Agreement or the subject matter hereof may not be enforced in or by such court, and (c) agrees not to commence any such action other than before one of the above-named courts nor to make any motion or take any other action seeking or intending to cause the transfer or removal of any such action to any court other than one of the above-named courts, whether on the grounds of forum non conveniens or otherwise. Each party hereby (x) consents to service of process in any such action in any manner permitted by Illinois law; (y) agrees that service of process made in accordance with clause (x) or made by registered or certified mail, return receipt requested, at its address specified pursuant to <u>Section 9.3</u> hereof, will constitute good and valid service of process in any such action; and (z) waives and agrees not to assert (by way of motion, as a defense, or otherwise) in any such action any claim that service of process made in accordance with clause (x) or (y) does not constitute good and valid service of process.

Section 9.6    <u>WAIVER OF JURY TRIAL</u>.  TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HEREBY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE. ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 11.6</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

Section 9.7    <u>Parties in Interest</u>.  This Agreement shall be binding upon and inure solely to the benefit of each party hereto and its successors and permitted assigns and, except as provided in <u>Article VII</u> and <u>Article VIII</u>, nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement.

Section 9.8    <u>Personal Liability</u>.  Except as expressly set forth herein, this Agreement shall not create or be deemed to create or permit any personal liability or obligation

on the part of any direct or indirect stockholder, member or partner of the Company or the Buyer or any officer, director, employee, agent, representative or investor of any party hereto.

Section 9.9    Expenses.  Except as otherwise expressly provided in this Agreement or the other Transaction Documents, the provisions relating to the deduction of the Seller Expenses from the Purchase Price, each of the parties hereto will bear all legal, accounting, investment banking and other expenses incurred by it or on its behalf in connection with any due diligence investigation, or the negotiation, execution and delivery of this Agreement, and the consummation of the transactions contemplated hereby, whether or not such transactions are consummated.

Section 9.10    Specific Performance.  The parties hereby acknowledge and agree that the failure of any party to perform its agreements and covenants hereunder will cause irreparable injury to the other parties, for which damages, even if available, will not be an adequate remedy.  Accordingly, each party hereby consents to the issuance of injunctive relief by any court of competent jurisdiction to compel performance of such party's obligations and to the granting by any court of the remedy of specific performance of its obligations hereunder.

Section 9.11    Counterparts.  This Agreement may be executed by facsimile in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.

Section 9.12    Negotiation of Agreement.  Each of the parties acknowledges that it has been represented by independent counsel of its choice throughout all negotiations that have preceded the execution of this Agreement and that it has executed the same with consent and upon the advice of said independent counsel. Each party and its counsel cooperated in the drafting and preparation of this Agreement and the documents referred to herein, and any and all drafts relating thereto will be deemed the work product of the parties and may not be construed against any party by reason of its preparation. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this Agreement against the party that drafted it is of no application and is hereby expressly waived.

**[Signatures on following page]**

IN WITNESS WHEREOF, each of the parties has caused this Securities and Asset Purchase Agreement to be duly executed on its behalf as of the day and year first above written.

_____
**GUY DAVID**

_____
**JAMES N. QUINN**

**THE GUY DAVID DECLARATION OF TRUST DATED MARCH 6, 2001**

By: _____
Name: Guy David
Title: Trustee

**PLASTIVAL, INC.**

By: _____
Name: Jim Quinn
Title: President

**PLASTIVAL INC.**

By: _____
Name: Guy David
Title: President

**4038673 CANADA INC.**

By: _____
Name: Guy David
Title: President.

**PLASTIVAL US HOLDINGS, INC.**

By: _____

Name:

Title:

**PLASTIVAL CANADIAN HOLDINGS, INC.**

By: _____

Name:

Title:

SCHEDULES

TO

SECURITIES AND ASSET PURCHASE AGREEMENT

(THE "AGREEMENT")

BY AND BETWEEN

GUY DAVID AND JAMES N. QUINN AND THE GUY DAVID DECLARATION OF TRUST
DATED MARCH 6, 2001

(THE "SELLERS")

PLASTIVAL, INC. (USA), PLASTIVAL INC. (CANADA)

(THE "COMPANY")

AND 4038673 CANADA INC. ("PREE")

AND

PLASTIVAL US HOLDINGS, INC. AND

PLASTIVAL CANADIAN HOLDINGS INC.

("PURCHASER")

ANY DISCLOSURE MADE IN ANY SECTION OF THESE SCHEDULES SHALL BE DEEMED MADE FOR ALL OTHER SECTIONS HEREOF TO WHICH SUCH DISCLOSURE MAY APPLY TO THE EXTENT THAT THE NATURE AND SCOPE OF SUCH DISCLOSURE MAKES CLEAR ON ITS FACE THE RELEVANCE OF SUCH DISCLOSURE TO SUCH OTHER SECTIONS.  THE LISTING OF ANY DISCLOSURE IN THESE SCHEDULES (AS SET FORTH ON THE DATE OF THIS AGREEMENT OR AS SET FORTH ON ANY SUPPLEMENT OR AMENDMENT TO THESE DISCLOSURES MADE AT ANY TIME HEREAFTER) SHALL NOT CONSTITUTE ANY ACKNOWLEDGEMENT REGARDING THE MATERIALITY OF SUCH DISCLOSURE.  ALL DEFINED TERMS SHALL HAVE THE DEFINITIONS ASCRIBED TO THEM IN THE AGREEMENT.

EXHIBIT B

| Schedule | Description |
|---|---|
| Schedule 2.1 | Allocation of Purchase Price |
| Schedule 2.3(d) | Calculation of Working Capital |
| Schedule 2.7(b)(iii) | Consents and Approvals |
| Schedule 2.10 | Termination of Affiliate Obligations |
| Schedule 2.11 | Minute Book Deficiencies |
| Schedule 3.1 | Company Organization |
| Schedule 3.2 | PREE Organization |
| Schedule 3.3 | Guy David Trust Organization |
| Schedule 3.4 | Authorization |
| Schedule 3.5 | No Conflict or Violation; Required Consents |
| Schedule 3.6(a) | Company Capitalization |
| Schedule 3.6(c) | Company Subsidiaries |
| Schedule 3.6(d) | Subsidiary Capitalization |
| Schedule 3.6(g) | PREE Capitalization |
| Schedule 3.7 | Existing Indebtedness |
| Schedule 3.8 | No Material Undisclosed Liabilities |
| Schedule 3.9 | Absence of Certain Changes |
| Schedule 3.10 | Tax Matters |
| Schedule 3.11 | Material Contracts |
| Schedule 3.12 | Encumbrances |
| Schedule 3.13(a) | Owned Real Property of PREE |
| Schedule 3.13(b) | Leased Real Property of Company and Subsidiaries |
| Schedule 3.13(c) | Owned or Leased Real Property |
| Schedule 3.16 | Litigation |
| Schedule 3.17 | Hazardous Materials |
| Schedule 3.18(a)(ii) | Employment Agreements |
| Schedule 3.18(a)(iv) | Compliance with Employment Laws |
| Schedule 3.18(b) | ERISA |
| Schedule 3.19(a) | Intellectual Property |
| Schedule 3.19(b) | Intellectual Property Infringement |
| Schedule 3.19(c) | License Agreements |
| Schedule 3.19(d) | Intellectual Property Claims |
| Schedule 3.19(f) | Software |
| Schedule 3.20 | Insurance |
| Schedule 3.21 | Affiliate Transaction; Interests in Clients, Suppliers, Etc. |
| Schedule 3.22 | Top-Ten Suppliers |
| Schedule 3.23 | Top-Ten Customers |
| Schedule 3.28 | Prior Acquisitions With Earn-Outs or Contingent Payments |
| Schedule 7.1 | Changes Impacting Post-Closing Tax Periods |

2

Schedule 2.1

Allocation of Purchase Price Between Sellers and Classes of Shares

**A.     Plastival, Inc (USA)**

| Name of Seller | Allocation between Sellers of the proportion of the Purchase Price allocated to the US Shares |
|---|---|
| James N. Quinn | 50% |
| Guy David Trust | 50% |

**B.     Plastival Inc. (Canada)**

**Allocation by classes of shares of the proportion of the Purchase Price allocated to the Canadian Shares**

| Name of Seller | Class A Shares | Class B Shares | Class C Shares | Class D Shares |
|---|---|---|---|---|
| **Guy David** | 50% of the balance of the portion of the Purchase Price allocated to the Canadian Shares | | | |
| **James N. Quinn** | 50% of the balance of the portion of the Purchase Price allocated to the Canadian Shares | Cdn$26 | Cdn$425,000 | Cdn$943,949 |
| **Guy David Trust** | | Cdn$26 | Cdn$425,000 | Cdn$943,949 |

3

Schedule 2.3(d)

Calculation of Working Capital

Management will determine raw material and other inventory production input costs (including, as applicable, appropriate foreign exchange rates) incurred by the Company in the course of purchasing and/or producing inventory for purposes of determining the cost of the Company's inventory in the Estimated Working Capital calculation in accordance with the Company's stated accounting policy being:

Raw materials are valued at the lower of cost and replacement cost, using the first in, first out method.  Finished goods are valued at the lower of cost and net realizable value.  The cost includes raw materials, direct labour and manufacturing overhead.

KPMG or another accounting firm chosen by KPP in its sole discretion will audit the opening balance sheet of the Company (the "Opening Balance Sheet").  In conjunction with these procedures, the Company will perform, using its personnel under its supervision, a physical inventory count that will begin subsequent to the date of close.  The cost of such inventory will be determined in accordance with the Company's stated accounting policy, as set out above. During and/or after the performance of the physical inventory count by the Company and the costing thereof, KPMG and/or another accounting firm chosen by KPP in its sole discretion may perform audit procedures as is deemed necessary by KPMG or another accounting firm chosen by KPP in its sole discretion.  Once the Opening Balance Sheet is finalized, actual working capital as of the date of close ("Actual Working Capital") can be determined.  To the extent that Actual Working Capital deviates from Estimated Working Capital, an adjustment will be made to the Purchase Price.

In order to estimate the cost of the Company's inventory as of the date of close.  Buyer and Sellers agree that management will value its finished goods inventory utilizing the weighted average cost of PVC resin purchases from September 1, 2005 through the closing date.  The value of PVC resin included in raw material shall be based upon its actual purchase price.  For all other raw materials the last demonstrable purchase price may be used for costing purposes.

To the extent that Lowes has not agreed to an invoice amount related to the pricing errors in 2005 and documentation of such agreement cannot be provided, any such amount must be excluded from the Estimated Working Capital calculation.

4

Schedule 2.7(b)(iii)

Consents and Approvals

**A.     Plastival, Inc (USA)**

- Lease Agreement between Plastival USA and the Manufacturers Life Insurance Company (U.S.A.) dated July 17, 2003 regarding the premises at 1675-85 Holmes Road (may not be assigned or otherwise transferred) without the landlord's prior written consent; a "change of control" is deemed a transfer).

**B.     Plastival Inc. (Canada)**

- Agreement terminating the Financial Contribution Agreements dated December 6, 2002 and May 19, 2005 between IQ Immigrants Investisseurs Inc. and Plastival Canada and PREE, and confirmation of IQ Immigrants Investisseurs Inc. that Plastival Canada and PREE are not in default under such agreements at the time of termination and will not be in default under such agreements by reason of such termination.

5

Schedule 2.10

Termination of Affiliate Obligations

**A.     Plastival, Inc (USA)**

None

B.     **Plastival Inc. (Canada)**

None

CHICAGO\2165096.20
ID\SDS

Schedule 2.11

Minute Book Deficiencies

**A.    Plastival, Inc (USA)**

None

**B.    Plastival Inc. (Canada)**

- Executed copy of resolution regarding change of registered office (12/16/02) to be provided

- Executed copies of 2/4/04 annual resolutions to be provided

- Executed copy (by James N. Quinn ) of 1/28/05 annual resolutions in connection with 12/31/04 financial statements

- Share certificates cancelled and issued following the pre-closing share transfers to be provided, and shareholders registers, share registers, and register of share certificates to be updated.

7

<u>Schedule 3.1</u>

<u>Company Organization</u>

**A.     Plastival, Inc (USA)**

•       Organized under the laws of the State of Illinois.

**B.     Plastival Inc. (Canada)**

•       Organized under the Canada Business Corporations Act.

•       Qualified to do business in the Province of Quebec.

8

Schedule 3.2

PREE Organization

- Organized under the Canada Business Corporations Act.

- Qualified to do Business in the Province of Quebec.

9

<u>Schedule 3.3</u>

<u>The Guy David Trust Organization</u>

- Organized under the laws of the State of Illinois

CHICAGO\2165096.20
ID\SDS

<u>Schedule 3.4</u>

<u>Authorization</u>

**A.**    **Plastival, Inc. (USA)**

- Guy David – Chief Executive Officer; Director.

- James N. Quinn – President; Director.

**B.**    **Plastival Inc. (Canada)**

- Guy David – President; Director.

- James N. Quinn – Vice President; Director.

- Stephanie David Pellerin – Secretary-Treasurer; Director.

**C.**    **PREE**

- Guy David – President; Director.

- James N. Quinn – Vice President; Director.

- Stephanie David-Pellerin – Secretary-Treasurer; Director.

**D.**    **THE GUY DAVID TRUST**

- Guy David - Trustee

11

<u>Schedule 3.5</u>

<u>No Conflict or Violation; Required Consents</u>

**A.    Plastival, Inc. (USA)**

None

**B.    Plastival Inc. (Canada)**

None

CHICAGO\2165096.20
ID\SDS

<u>Schedule 3.6(a)</u>

<u>Company Capitalization</u>

**A.    Plastival, Inc. (USA)**

- 1,334 Common shares, no par value held by James N. Quinn.

- 1,334 Common shares, no par value held by Guy David Trust.

- 1,334 Common shares, no par value held by Plastival Inc. (Canada).

Total Shares:  4,002

**B.    Plastival Inc. (Canada)**

- 24 Class A shares held by Guy David.

- 24 Class A shares held by James N. Quinn.

- 26 Class B shares held by James N. Quinn.

- 425,000 Class C shares held by James N. Quinn.

- 943,949 Class D shares held by James N. Quinn.

- 26 Class B shares held by Guy David Trust.

- 425,000 Class C shares held by Guy David Trust.

- 943,949 Class D shares held by Guy David Trust.

Total Shares:  2,737,998

13

Schedule 3.6(c)

Company Subsidiaries

**A.     Plastival, Inc. (USA)**

None

**B.     Plastival Inc. (Canada)**

None

CHICAGO\2165096.20
ID\SDS

<u>Schedule 3.6(d)</u>

<u>Subsidiary Capitalization</u>

**A.    Plastival, Inc. (USA)**

None

**B.    Plastival Inc. (Canada)**

None

CHICAGO\2165096.20
ID\SDS

<u>Schedule 3.6(g)</u>

<u>PREE Capitalization</u>

- 50 Common shares held by Guy David Trust.

- 50 Common shares held by James N. Quinn.

Total Shares:  100

16

Schedule 3.7

Existing Indebtedness

**A.      Plastival, Inc. (USA)**

- Revolving Secured Promissory Note with JPMorgan Chase Bank, N.A. dated November 23, 2004, and amended pursuant to the Note Modification Agreement dated as of September 12, 2005 in the original principal amount of $3,500,000.

- Credit Agreement with JPMorgan Chase Bank, N.A. dated as of August 27, 2004 and amended pursuant to the Amendments to Credit Agreement dated as of November 5, 2004, November 23, 2004 and September 12, 2005.

- Guarantee dated May 8, 2005 between Plastival US, as guarantor, the Business Development Bank of Canada as Creditor and Plastival Canada and PREE as debtors in the amount of $1,800,000.

- Guarantee dated April 22, 2004 between Plastival US as guarantor, the Business Development Bank of Canada as Creditor and Plastival Canada and PREE as debtors in an unlimited amount.

**B.      Plastival Inc. (Canada)**

- Letter Agreement for Offer of Loan dated March 15, 2000 between Plastival Canada and the Business Development Bank of Canada.  Re: Loan #351042-08 for the Loan Amount of $539,800.00.

- Deed of Movable Hypothec dated March 22, 2000 granted by Plastival Canada in the amount of $539,800.00 in favor of the Business Development Bank of Canada (Ref.  #2728).

- Letter Agreement for Offer of Credit dated August 23, 2002 between Plastival Canada, PREE and the Business Development Bank of Canada.  Re: Loan number 018319-01 for the Loan Amount of $4,400,000.00.

- Movable Hypothec dated October 1, 2002 granted by Plastival Canada in the amount of $4,400,000.00 in favor of the Business Development Bank of Canada registered at the Register of Personal and Movable Real Rights under number 02-0437727-0001.

- Guarantee dated October 1, 2002 between Plastival Canada as guarantor, the Business Development Bank of Canada as creditor and Plastival Canada and PREE as debtors in the amount of $4,400,000.

- Immovable Hypothec in the amount of $4,400,000 granted by PREE in favor of the Business Development Bank of Canada registered at the Land Registry for the registration division of Terrebonne under number 1 307 956.

17

- Letter Agreement for Offer of Credit dated March 3, 2005 between Plastival Canada, PREE and the Business Development Bank of Canada.  Re: Loan Account #018319-03 for the Loan Amount of $300,000.00.

- Letter Agreement for Offer of Credit dated March 3, 2005 between Plastival Canada, PREE and the Business Development Bank of Canada.  Re: Loan Account 018319-02 for the Loan Amount of $1,800,000.00.

- Universal Hypothec dated April 27, 2005 granted by Plastival Canada in the amount of $300,000.00 in favor of the Business Development Bank of Canada registered at the Register of Personal and Movable Real Rights under number 05-0247059-0001.

- Universal Hypothec dated April 27, 2005 granted by Plastival Canada in the amount of $1,800,000.00 in favor of the Business Development Bank of Canada registered at the Register of Personal and Movable Real Rights under number 05-0247028-0001.

- Immovable Hypothec in the amount of $1,800,000 granted by PREE in favor of the Business Development Bank of Canada registered at the Land Registry for the registration division of Terrebonne under number 12 252 429.

- Offers of financing with Services Financiers CIT Ltée dated as follows for the following amounts representing the purchase price of the equipment to be financed under lease agreements:

  -March 27, 2002:      $416,000
  -September 20, 2002: $1,200,000
  -September 22, 2004:   $500,000

  And the following related Lease Agreements with Services Financiers CIT Ltée for the equipment described in the equipment schedules and for variable amounts as set out in each equipment schedule:

  -Master Lease Agreement dated April 11, 2002 and equipment schedules numbers 810-0290527-001 (dated April 11, 2002) and 810-0293263-001 (dated May 28, 2002) relating thereto.

  -Master Lease Agreement dated February 25, 2003 and equipment schedules numbers 810-0310378-001 (dated March 31, 2003), 810-0352390-002 (dated March 28, 2005) and 810-0352390-001 (dated January 16, 2005) related thereto.

- Provisional Lease Financing Agreement annexed to the Master Lease Agreement dated February 25, 2003 in the amount of $275,000.00 between Plastival Canada and Services Financiers CIT Ltée.

18

- Provisional Lease Financing Agreement annexed to the Master Lease Agreement dated February 25, 2003 in the amount of $1,400,000.00 between Plastival Canada and Services Financiers CIT Ltée.

- Master Lease Agreement #CCB0398A dated March 30, 2001 with Alter Moneta Corporation and the related equipment schedules numbers 1 to 7 dated from March 30, 2001 to March 7, 2002 for variable amounts as set out in each equipment schedule.

- Vehicle Lease Agreement between Plastival Canada, Mark C. McCallum and FinanciaLinx Corporation dated November 12, 2003 in the amount of $527.86 per month for 36 months starting on December 1, 2003 for 2004 Kia Sedona LX 4D Wagon AT.

- Agreement with Scotia Bank of Montreal Re: purchase of 2003, Kia Sedona EX dated as of October 6, 2003 in the amount of $408.94 per month for 60 months.

- Agreement with Scotia Bank of Calgary Re: purchase of 2004 Kia Sedona LX delivered as of October 16, 2003 in the amount of $768.02 per month for 36 months.

- Credit Agreement with Banque Nationale du Canada dated July 11, 2001 which was the object of verbal renewal in April 2002 and written renewal by way of a letter by the Banque Nationale du Canada in favor of Plastival Canada dated June 23, 2003, October 4, 2004 and May 26, 2005.

19

<u>Schedule 3.8</u>

<u>No Material Undisclosed Liabilities</u>

**A.    Plastival, Inc. (USA)**

None

**B.    Plastival Inc. (Canada)**

None

CHICAGO\2165096.20
ID\SDS

Schedule 3.9

Absence of Certain Changes

**A.    Plastival, Inc. (USA)**

The bonus paid to the Quinn David Corporation in June 2006.

**B.    Plastival Inc. (Canada)**

None

21

Schedule 3.10

Tax Matters

**A.      Plastival, Inc. (USA)**

- During 2005, the Commonwealth of Pennsylvania proposed that Plastival, Inc. (USA) qualify to do business in the Commonwealth of Pennsylvania and assessed against it $2,000 in taxes and $200 in penalties. The company does not believe it is legally required to qualify to do business in the Commonwealth of Pennsylvania.

- During 2004, Plastival, Inc. (USA) paid to the Illinois Department of Revenue $15,335 for uncollected sales and use tax resulting from a sales and use tax audit. No further payments to the Illinois Department of Revenue are required.

**B.      Plastival Inc. (Canada)**

- During 2004, following a GST and QST audit Plastival Inc. (Canada) paid $22,783 to Revenu Quebec because of a misinterpretation of a part of the law. This misinterpretation was resolved and no amounts were due to Revenu Québec in 2005.

- GST#889479374RT0001

- QST#1020661646TQ0001

- Plastival Inc. (Canada) does business in countries other than Canada, including the United States, China and Italy.

CHICAGO\2165096.20
ID\SDS

Schedule 3.11

Material Contracts

**A.     Plastival, Inc. (USA)**

- Lowe's Master Standard Buying Agreement dated February 27, 2003.

- Letter Consulting Agreement dated as of October 28, 2001 and March 23, 2004 with NAFTA Resources Inc. regarding J.E. Gerard Hogue Consulting Services.

- Sales Agency Agreement dated as of April 1, 2005 with Sales Force Northwest Inc.

- Sales Agency Agreement dated as of April 3, 2001 with Northern Marketing Inc.

- Sales Agency Agreement dated as of April 1, 2005 with Harmco Sales Corporation.

- Engagement Letter with Prigge, Simon and Hedrick, LLC (auditing firm) dated as of March 23, 2005.

- 84 Lumber Company 2006 Purchasing Agreement dated as of October 17, 2005.

- Premier Technical Support Agreements with EDI Source, Inc. dated as of September 8, 2004, December 2, 2004, February 15, 2005 and August 11, 2005.

- Letter Employment Agreement dated as of November 30, 1999 with Christian Lepage.

- Engagement Letter with Shattuck Hammond Partners LLC dated August 31, 2004.

- Confidentiality Agreement with Key Principal Partners Corp. and Shattuck Hammond Partners LLC.

- Sales Agency Agreement dated as of March 22, 2000 with Jim Cook & Associates.

- Employee Confidentiality Agreement with Nicholas Rust dated March 16, 2006.

- Employee Confidentiality Agreement with Edgar Baltazar dated March 16, 2006.

- Employee Confidentiality Agreement with Joe Schnur dated March 20, 2006.

- Employee Confidentiality Agreement with Gary Campbell dated May 28, 2004.

- Lease with St. Charles Toyota dated June 19, 2004.

23

- Lease with Schaumburg Audi dated August 28, 2004.

- Lease with Patrick BMW dated July 28, 2005.

- Guarantee dated April 22, 2004 between Plastival US as guarantor, Business Development Bank of Canada as creditor and Plastival Canada and PREE as debtors in an unlimited amount.

- Guarantee dated May 8, 2005 between Plastival US as guarantor, Business Development Bank of Canada as creditor and Plastival Canada and PREE as debtors in the amount of $1,800,000.

**B.    Plastival Inc. (Canada)**

- Letter Agreement with Al Hulme dated March 23, 2004 as amended by Letter Agreement dated August 31, 2004.

- Financial Agreement dated January 3, 2006 (effective January 1, 2006) with Christian Laplante.

- Financial Contribution Agreements dated December 6, 2002 and May 19, 2005 between IQ Immigrants Investisseurs Inc. and Plastival (Canada) and PREE in which IQ contributes $435,000 and $210,000, respectively to Plastival (Canada) projects.

- The contracts listed on the attached Schedule "A".

CHICAGO\2165096.20
ID\SDS

*Schedule "A" – All Material contracts*

| | **TITLE** |
|---|---|
| **1.** | Letter Agreement for Offer of Loan dated March 15, 2000 between Plastival Canada and the Business Development Bank of Canada<br><br>Re: Loan #351042-08 for the Loan Amount of $539,800.00 |
| **2.** | Deed of Movable Hypothec dated March 22, 2000 granted by Plastival Canada in the amount of $539,800.00 in favour of the Business Development Bank of Canada (Ref. #2728) |
| **3.** | Master Lease Agreement #CCB0398A dated March 30, 2001 between Plastival Canada and Alter Moneta Corporation and Equipment Schedules #001, 002, 003, 004, 005, 006 and 007 to Master Lease #CCB0398A |
| **4.** | Letter Agreement dated March 27, 2002 between Plastival Canada and Services Financiers CIT Ltée<br>Re: Offer to Finance in the amount of $416,000.00 representing the purchase price of the new equipment to be financed under a Lease Agreement |
| **5.** | Master Lease Agreement dated April 11, 2002 between Plastival Canada and Services Financiers CIT Ltée for equipment |
| **6.** | Schedule #810-0290527-001 to Master Lease Agreement dated April 11, 2002 between Plastival Canada and Services Financiers CIT Ltée for equipment and Amendment to Schedule #810-0290527-001 dated April 11, 2002 |
| **7.** | Schedule #810-0293263-001 to Master Lease Agreement dated April 11, 2002 between Plastival Canada and Services Financiers CIT Ltée for equipment and Amendment to Schedule #810-0293263-001 dated Mai 28, 2002 |
| **8.** | Letter Agreement for Offer of Credit dated August 23, 2002 between Plastival Canada, PREE and the Business Development Bank of Canada<br>Re: Loan number 018319-01 for the Loan Amount of $4,400,000.00 |
| **9.** | Letter Agreement dated September 20, 2002 between Plastival Canada and Services Financiers CIT Ltée<br>Re: Offer to Finance in the amount of $1,200,000.00 representing the purchase price of the new equipment to be financed under a Lease Agreement |
| **10.** | Deed of Immovable Hypothec dated October 1, 2002 in the amount of $4,400,000 granted by PREE in favour of the Business Development Bank of Canada registered at the Land Registry for the registration division of Terrebonne under number 1 307 956 |

| | TITLE |
|---|---|
| 11. | Movable Hypothec dated October 1, 2002 granted by Plastival Canada in the amount of $4,400,000.00 in favour of the Business Development Bank of Canada registered at the Register of Personal and Movable Real Rights under number 02-0437727-0001 |
| 12. | Guarantee dated October 1, 2002 between Guy David and James Quinn as guarantors, Business Development Bank of Canada as creditor and Plastival Canada and PREE as debtors in the amount of $1,100,000 |
| 13. | Guarantee dated October 1, 2002 between Plastival Canada as guarantor, Business Development Bank of Canada as creditor and Plastival Canada and PREE as debtors in the amount of $4,400,000 |
| 14. | Master Lease Agreement dated February 25, 2003 between Plastival Canada and Services Financiers CIT Ltée for equipment |
| 15. | Schedule #810-0310378-001 to Master Lease Agreement dated February 25, 2003 between Plastival Canada and Services Financiers CIT Ltée for equipment and Amendment to Schedule #810-0310378-001 dated March 31, 2003 |
| 16. | Provisional Lease Financing Agreement annexed to the Master Lease Agreement dated February 25, 2003 in the amount of $275,000.00 between Plastival Canada and Services Financiers CIT Ltée |
| 17. | Provisional Lease Financing Agreement annexed to the Master Lease Agreement dated February 25, 2003 in the amount of $1,400,000.00 between Plastival Canada and Services Financiers CIT Ltée |
| 18. | Schedule #810-0352390-002 to Master Lease Agreement dated February 25, 2003 between Plastival Canada and Services Financiers CIT Ltée for equipment and Amendment to Schedule #810-0352390-002 dated March 28, 2005 |
| 19. | Schedule #810-0352390-001 to Master Lease Agreement dated February 25, 2003 between Plastival Canada and Services Financiers CIT Ltée for equipment and Amendment to Schedule #810-0352390-001 dated January 16, 2005 |
| 20. | Agreement between Plastival Canada and Scotia Bank of Calgary<br>Re: purchase of 2004 Kia Sedona LX Serial #KNDUP131046504896 delivered by the merchant on October 16, 2003 in the amount of $768.02 per month for 36 months |
| 21. | Agreement between Plastival Canada and Scotia Bank of Montréal<br>Re: purchase of 2003 Kia Sedona EX Serial #KNDUP131636364352 from Bourassa Kia in the amount of $24,497.25 or $408.94 per month for 60 months (Loan Request #328984 dated as of October 6, 2003) |

26

| | TITLE |
|---|---|
| 22. | Lease Agreement #3353361 dated November 12, 2003 in the amount of $527.86 per month for 36 months between Plastival Canada and Mark C. McCallum and FinanciaLinx Corporation for 2004 Kia Sedona LX 4D Wagon AT Serial #KNDUP131146504700 |
| 23. | Letter Agreement dated September 22, 2004 between Plastival Canada and Services Financiers CIT Ltée,<br>Re: Offer to Finance in the amount of $500,000.00 under a Lease Agreement |
| 24. | Credit Agreement with Banque Nationale du Canada dated July 11, 2001 which was the object of verbal renewal in April 2002 and written renewal by way of a letter by the Banque Nationale du Canada in favour of Plastival Canada dated June 23, 2003, October 4, 2004 and May 26, 2005 |
| 25. | Letter Agreement for Offer of Credit dated March 3, 2005 between Plastival Canada, PREE and the Business Development Bank of Canada Re: Loan Account 018319-03 for the Loan Amount of $300,000.00 |
| 26. | Letter Agreement for Offer of Credit dated March 3, 2005 between Plastival Canada, PREE and the Business Development Bank of Canada<br>Re: Loan Account 018319-02 for the Loan Amount of $1,800,000.00 |
| 27. | Universal Hypothec dated April 27, 2005 granted by Plastival Canada in the amount of $300,000.00 in favour of the Business Development Bank of Canada registered at the Register of Personal and Movable Real Rights under number 05-0247059-0001 |
| 28. | Universal Hypothec dated April 27, 2005 granted by Plastival Canada in the amount of $1,800,000.00 in favour of the Business Development Bank of Canada registered at the Register of Personal and Movable Real Rights under number 05-0247028-0001 |
| 29. | Deed of Immovable Hypothec dated April 27, 2005 granted by PREE in the amount of $1,800,000.00 in favour of the Business Development Bank of Canada registered at the Land Registry Office of the Registration Division of Terrebonne under number 12 252 429 |
| 30. | Guarantee dated May 8, 2005 between James N. Quinn and Guy David as guarantors, Business Development Bank of Canada as creditor and Plastival Canada and PREE as debtors in the amount of $300,000 |
| 31. | Notarized Sales Act dated November 23, 2005 between PREE and Le Groupe Laval Aubin Ltée pertaining to the sale of a vacant lot located in Terrebonne |

Schedule 3.12

Encumbrances

**A.     Plastival, Inc. (USA)**

     •     The lien of JPMorgan Chase Bank, N.A. on all of Plastival, Inc.'s assets.

     •     The lien of St. Charles Toyota/US Bank on leased 2004 Toyota Sienna.

**B.     Plastival Inc. (Canada)**

See Attached.

28

**Securities Registered at the Register of Personal and Movable Real Rights of Quebec**

**Plastival Inc. (Canada)**

| Nature of right<br>Date and Registration Number on the Register of Personal and Movable Real Rights of Quebec | Holder / Lessor / Seller | Property | Amount and Interest rate | Expiry Date |
|---|---|---|---|---|
| **1.** Conventional hypothec without delivery<br><br>November 27, 1997 at 9:00 a.m.<br><br>97-0144827-0002 | Banque Nationale du Canada Services aux Entreprises | Specific equipment and proceeds thereof | $156,000.00<br><br>Interest:<br>25% | November 18, 2007 |
| **2.** Conventional hypothec without delivery<br><br>January 20, 1998 at 2:03 p.m.<br><br>98-0005144-0001<br><br>*Accessory right:*<br>- rectification registered on January 29, 1998 at 2:04 p.m. under number 98-0009589-0001, rectifying the name of the holder from Les Services Financiers Newcourt Ltée/Newcourt Financial Services Ltd. to Services Financiers Newcourt Ltée/Newcourt Financial Ltd. | Services Financiers Newcourt Ltée/Newcourt Financial Ltd. | Specific equipment | $544,500.00<br><br>Interest:<br>24% per year | January 9, 2008 |
| **3.** Conventional hypothec without delivery<br><br>June 10, 1999 at 1:25 p.m.<br><br>99-0093205-0001 | Banque Nationale du Canada | All present and future stocks wherever situated and all present and future claims wherever the debtors of said claims are situated and proceeds thereof. | $1,956,000.00 | June 7, 2009 |
| **4.** Conventional hypothec without delivery<br><br>November 11, 1999 at 9:00 a.m.<br><br>99-0191164-0001 | Banque Nationale du Canada | Specific equipment and proceeds thereof | $441,600.00 | November 9, 2009 |

| Nature of right<br>Date and Registration Number on the Register of Personal and Movable Real Rights of Quebec | Holder / Lessor / Seller | Property | Amount and Interest rate | Expiry Date |
|---|---|---|---|---|
| **5.** Conventional hypothec without delivery<br><br>November 11, 1999 at 12:53 p.m.<br><br>99-0191739-0003 | Banque de Développement du Canada | Universality of movable and immovable property, corporeal and incorporeal, present and future, of any nature whatsoever and wherever situated. | $600,000.00<br><br>Interest:<br>25% per year | November 10, 2009 |
| *Accessory rights:*<br>- cession of rank by Banque de Développement du Canada ("BDC") in favour of National Bank of Canada ("NBC") registered on January 11, 2001 at 2:15 p.m. under number 01-0009275-0001<br>- cession of rank by BDC in favour of NBC registered on June 7, 2001 at 10:56 a.m. under number 01-0199053-0001<br>- cession of rank by BDC in favour of NBC registered on August 13, 2001 at 2:04 p.m. under number 01-0290912-0001 | | | | |
| **6.** Conventional hypothec without delivery<br><br>March 23, 2000 at 10:30 a.m.<br><br>00-0071026-0001 | Banque de Développement du Canada | Specific equipment, including proceeds, insurance and expropriation indemnity, fruits and revenues, titles and documents… | $647,760.00<br><br>Interest:<br>25% per year | March 22, 2010 |
| **7.** Conventional hypothec without delivery<br><br>December 20, 2000 at 10:51 a.m.<br><br>00-0389169-0002 | Banque Nationale du Canada | All present and future stocks wherever situated and all present and future claims wherever the debtors of said claims are situated and proceeds thereof. | $480,000.00 | December 18, 2010 |
| *Note:* The Grantor is also acting under the business names Re-Source and Matériaux Re-Source<br>*Accessory rights:*<br>- cession of rank by BDC in favour of NBC registered on January 11, 2001 at 2:15 p.m. under number 01-0009275-0001 | | | | |

30

CHICAGO/#2165096.20
IDISIDS

| Nature of right<br>Date and Registration Number on the Register of Personal and Movable Real Rights of Quebec | Holder / Lessor / Seller | Property | Amount and Interest rate | Expiry Date |
|---|---|---|---|---|
| **8.** Rights of ownership of the lessor<br><br>May 3, 2001 at 2:07 p.m.<br><br>01-0146344-0001<br><br>*Date of the Constitutive Act:*<br>*May 3, 2001* | Fiducie Alter Moneta | 3 installations of extruders<br>2 Vacuum Calibration Table<br>2 Auxiliary Vacuum Tank<br>1 Cleat Haul-Off<br>1 Traveling Cut-Off Saw<br>1 Extrusion Tek Milacron E-65 Conical Twin Screw | N/A | May 3, 2011 |
| **9.** Conventional hypothec without delivery<br><br>May 11, 2001 at 1:34 p.m.<br><br>01-0159598-0001 | Banque Nationale du Canada | All present and future stocks wherever situated and all present and future claims wherever the debtors of said claims are situated and the proceeds thereof. | $840,000.00 | May 9, 2011 |
| *Note: The Grantor is also acting under the business names Re-Source and Matériaux Re-Source*<br><u>*Accessory rights:*</u><br>- cession of rank by BDC in favour of NBC registered on June 7, 2001 at 10:56 a.m. under number 01-0199053-0001 | | | | |
| **10.** Rights of ownership of the lessor<br><br>May 28, 2001 at 10:53 a.m.<br><br>01-0181504-0001<br><br>*Date of the Constitutive Act:*<br>*May 28, 2001* | Fiducie Alter Moneta | 1 Head Twin Screw<br>1 Extrusion Tek - Milacron<br>1 Power Loader | N/A | May 28, 2011 |

31

| Nature of right<br>Date and Registration Number on the Register of Personal and Movable Real Rights of Quebec | Holder / Lessor / Seller | Property | Amount and Interest rate | Expiry Date |
|---|---|---|---|---|
| Accessory rights:<br>- modification registered on December 16, 2002 at 2:52 p.m. under number 02-0566591-0001, modifying the lessee's address.<br>- conventional hypothec by Fiducie Alter Moneta and Alter Moneta Limitée, as its trustee, in favour of QSPE-AMC/R Trust and 1462888 Ontario Inc., as its trustee, registered on July 16, 2001 at 9:00 a.m. under number 01-0250240-0001, affecting all right, title and interest in, to and under the Leased Property and the Leases described thereto.<br>- rectified by a rectification registered under number 03-0335688-0007, rectifying the text of the charged property.<br>- reduced by a voluntary reduction registered under number 05-0064073-0001, reducing specific registrations of leases. | | | | |
| 11.  Rights of ownership of the lessor<br><br>June 14, 2001 at 10:29 a.m.<br><br>01-0209759-0001<br><br>*Date of the Constitutive Act:*<br>*June 12, 2001* | Fiducie Alter Moneta | 1 Extrusion Tek-Milacrom<br>3 Transducers | N/A | June 12, 2011 |
| Accessory rights:<br>- modification registered on December 16, 2002 at 2:52 p.m. under number 02-0566591-0001, modifying the lessee's address.<br>- conventional hypothec by Fiducie Alter Moneta and Alter Moneta Limitée, as its trustee, in favour of QSPE-AMC/R Trust and 1462888 Ontario Inc., as its trustee, registered on July 16, 2001 at 9:00 a.m. under number 01-0250240-0001, affecting all right, title and interest in, to and under the Leased Property and the Leases described thereto.<br>- rectified by a rectification registered under number 03-0335688-0007, rectifying the text of the charged property.<br>- reduced by a voluntary reduction registered under number 05-0064073-0001, reducing specific registrations of leases. | | | | |
| 12.  Conventional hypothec without delivery<br><br>July 13, 2001 at 9:00 a.m.<br><br>01-0249323-0001 | Banque Nationale du Canada/<br>National Bank of Canada | Universality of all present and future movable and immovable property, corporeal and incorporeal; wherever situated including without limitation the property located at 3050 Industriel Blvd., Laval, Qc, H7L 4P7 | $8,000,000.00 plus additional hypothec of $1,600,000.00<br>Interest:<br>25% per year | July 10, 2011 |

*Note: The Grantor is also acting under the business names Matériaux Re-Source and Re-Source*
*Accessory rights:*
- cession of rank by BDC in favour of NBC registered on August 13, 2001 at 2:04 p.m. under number 01-0290912-0001
- cession of rank by NBC in favour of BDC registered on June 10, 2005 at 1:30 p.m. under number 05-0339846-0001

CHICAGO/2165096.20
IDISDS

32

| Nature of right Date and Registration Number on the Register of Personal and Movable Real Rights of Quebec | Holder / Lessor / Seller | Property | Amount and Interest rate | Expiry Date |
|---|---|---|---|---|
| 13. Conventional hypothec without delivery<br><br>July 13, 2001 at 9:00 a.m.<br><br>01-0249323-0002 | Banque Nationale du Canada/ National Bank of Canada | Universality of all present and future movable property which now is or will in the future become physically attached or jointed to the immovable situated at 3050 Industriel Blvd., Laval, Qc, H7L 4P7. | $8,000,000.00 plus additional hypothec of $1,600,000.00<br>Interest:<br>25% per year | July 10, 2011 |
| Note: The Grantor is also acting under the business names Matériaux Re-Source and Re-Source | | | | |
| 14. Conventional hypothec without delivery<br><br>July 13, 2001 at 9:00 a.m.<br><br>01-0249323-0003 | Banque Nationale du Canada/ National Bank of Canada | "All accounts receivable, book accounts, book debts, debts, claims, monies, rentals, revenues, incomes, loans receivable, demands, choses in action and any other amounts which now are or which may at any time in the future be due or owing to the GRANTOR from PLASTIVAL INC. (the "CUSTOMER") or in which the GRANTOR, now or at any time in the future, has or shall have any other interest as well as all security interests, hypothecs, assignments, guarantees, bills of exchange, notes, negotiable instruments, contracts, invoices, books of account, letters of credit and other documents and rights, now or at any time in the future, held or owned by the GRANTOR or any third party on behalf of the GRANTOR in respect of any of the foregoing." | $8,000,000.00<br><br>Interest:<br>25% per year | July 10, 2011 |

33

CHICAGO/2165096.20
IDISDS

| Nature of right Date and Registration Number on the Register of Personal and Movable Real Rights of Quebec | Holder / Lessor / Seller | Property | Amount and Interest rate | Expiry Date |
|---|---|---|---|---|
| **15.** Rights of ownership of the lessor<br><br>October 26, 2001 at 10:39 a.m.<br><br>01-0394904-0001<br><br>*Date of the Constitutive Act:*<br>*September 17, 2001* | Fiducie Alter Moneta | 3 Akron/Milacron | N/A | October 26, 2011 |
| *Accessory right:*<br>- modification registered on December 16, 2002 at 2:52 p.m. under number 02-0566591-0001, modifying the lessee's address. | | | | |
| **16.** Rights of ownership of the lessor<br><br>February 18, 2002 at 1:03 p.m.<br><br>02-0063684-0001<br><br>*Date of the Constitutive Act:*<br>*February 15, 2002* | Sound Trust<br>and Montreal Trust Company<br>of Canada, as its trustee<br>(pursuant to an assignment of<br>rights by Humberview Motors<br>Incorporated)<br><br>Jim Peplinski's Leasemaster<br>National | 2002 Ford E150 | N/A | February 28, 2007 |
| *Accessory right:*<br>- assignment of rights by Humberview Motors Incorporated in favour of Sound Trust and Montreal Trust Company of Canada, as its trustee, registered on July 16, 2002 at 9:00 a.m. under number 02-0306517-0001, rectified by a rectification correcting the postal code of the trustee's address.<br>Modification of a published right on February 2, 2006 at 12:17 p.m. modifying the address of the lessee under number 06-0052578-0001<br>Renewal registered on February 3, 2006 at 9:46 a.m. under number 06-0055113-0001 | | | | |

34

| Nature of right<br>Date and Registration Number on the Register of Personal and Movable Real Rights of Quebec | Holder / Lessor / Seller | Property | Amount and Interest rate | Expiry Date |
|---|---|---|---|---|
| **17.** Rights of ownership of the lessor<br><br>March 8, 2002 at 10:43 a.m.<br><br>02-0091079-0001<br><br>*Date of the Constitutive Act:*<br>*March 7, 2002*<br><br>Accessory rights:<br>- modification registered on December 16, 2002 at 2:52 p.m. under number 02-0566591-0001, modifying the lessee's address.<br>- conventional hypothec by Fiducie Alter Moneta and Alter Moneta Limitée, as its trustee, in favour of QSPE-AMC/R Trust and 1462888 Ontario Inc., as its trustee, registered on April 12, 2002 at 2:15 p.m. under number 02-0144334-0007, affecting all right, title and interest in, to and under the Leased Property and the Leases described thereto.<br>- rectified by two rectifications registered under number 03-0335705-0003, rectifying the text of the charged property.<br>- reduced by a voluntary reduction registered under number 05-0064073-0001, reducing specific registrations of leases. | Fiducie Alter Moneta | 1 Tunnel PP2212-48<br>1 Yale lift truck 2002 | N/A | March 7, 2012 |
| **18.** Rights of ownership of the lessor<br><br>April 22, 2002 at 2:38 p.m.<br><br>02-0159339-0001<br><br>*Date of the Constitutive Act:*<br>*April 11, 2002* | Services Financiers CIT Ltée | 1 Extrusion Tek-Milacrom | N/A | April 11, 2008 |
| **19.** Rights of ownership of the lessor<br><br>June 7, 2002 at 10:54 a.m.<br><br>02-0245915-0001<br><br>*Date of the Constitutive Act:*<br>*May 26, 2002* | Services Financiers CIT Ltée | 1 Akron Milacrom<br>2 Cleated Haul-offs<br>1 Traveling Cut-off Saw<br>1 Loader Powder | N/A | May 26, 2008 |

35

| Nature of right<br>Date and Registration Number on the Register of Personal and Movable Real Rights of Quebec | Holder / Lessor / Seller | Property | Amount and Interest rate | Expiry Date |
|---|---|---|---|---|
| **20.** Conventional hypothec without delivery<br><br>October 1st, 2002 at 1:20 p.m.<br><br>02-0437727-0001 | Banque de Développement du Canada | Universality of all present and future movable property, corporeal and incorporeal, including equipment, machinery, inventories, account receivables. | $4,400,000.00 (plus additional hypothec of $880,000)<br><br>Interest:<br>25% per year | October 1st, 2012 |
| **21.** Rights of ownership of the lessor<br><br>March 5, 2003 at 12:16 p.m.<br><br>03-0099195-0001<br><br>*Date of the Constitutive Act: February 25, 2003*<br><br><u>*Accessory right:*</u><br>- modification registered on April 8, 2003 at 9:18 a.m. under number 03-0162253-0001, modifying the property description | Services Financiers CIT Ltée | Specific equipment | N/A | February 25, 2009 |
| **22.** Reservation of ownership and assignment of the said reservation<br><br>August 28, 2003 at 2:55 p.m.<br><br>03-0452639-0001<br><br>*Date of the Constitutive Act: June 10, 2003*<br><br>*Note: The assignment affects all rights.* | Bourassa Kia<br>as assignor - *former seller*<br><br>The Bank of Nova Scotia<br>as assignee - *current seller* | 2003 Kia Sedona 4D Wagon AT | N/A | July 10, 2008 |

36

CHICAGO\2165096.20<br>IDISDS

| Nature of right<br>Date and Registration Number on the Register of Personal and Movable Real Rights of Quebec | Holder / Lessor / Seller | Property | Amount and Interest rate | Expiry Date |
|---|---|---|---|---|
| **23.** Reservation of ownership and assignment of the said reservation<br><br>October 31, 2003 at 9:00 a.m.<br><br>03-0580961-0001<br><br>*Date of the Constitutive Act:*<br>*October 15, 2003*<br><br>*Note: The assignment affects all rights.* | Kia City<br>as assignor -former seller<br><br>The Bank of Nova Scotia<br>as assignee - current seller | 2004 Kia Sedona and accessories | N/A | November 15, 2006 |
| **24.** Reservation of ownership and assignment of the said reservation<br><br>November 3, 2003 at 9:00 a.m.<br><br>03-0583685-0001<br><br>*Date of the Constitutive Act:*<br>*October 15, 2003*<br><br>*Note: The assignment affects all rights.* | Kia City<br>as assignor -former seller<br><br>The Bank of Nova Scotia<br>as assignee - current seller | 2004 Kia Sedona and accessories | N/A | November 15, 2006 |
| **25.** Rights of ownership of the lessor<br><br>November 23, 2004 at 11:45 a.m.<br><br>04-0675955-0001<br><br>*Date of the Constitutive Act:*<br>*November 16, 2004* | Services Financiers CIT Ltée | 2 Vacuum Spray Sizing Tanks<br>1 Deltaplast Swingline Horizontal-Vertical "Swingline" Extruder<br>1 Servo Precision Cut-Off Saw | N/A | November 16, 2011 |

37

CHICAGO/#2165096.20
IDSIDS

| Nature of right<br>Date and Registration Number on the Register of Personal and Movable Real Rights of Quebec | Holder / Lessor / Seller | Property | Amount and Interest rate | Expiry Date |
|---|---|---|---|---|
| **26.** Rights resulting from a lease<br><br>December 9, 2004 at 9:00 a.m.<br><br>04-0707931-0001<br><br>*Date of the Constitutive Act:*<br>*September 29, 2004* | Corporation CrediLinx | 2004 Kia Sedona 4D LX AT | N/A | December 7, 2006 |
| **27.** Rights of ownership of the lessor<br><br>January 24, 2005 at 1:24 p.m.<br><br>05-0034251-0001<br><br>*Date of the Constitutive Act:*<br>*January 18, 2005* | Services Financiers CIT Ltée | 1 Servo Precision Cut-Off Saw<br>2 Vacuum Spray Sizing Tanks<br>1 Deltaplast Swingline Horizontal-Vertical "Swingline" Extruder | N/A | January 18, 2011 |
| **28.** Rights of ownership of the lessor<br><br>February 11, 2005 at 9:00 a.m.<br><br>05-0072756-0001<br><br>*Master ("inscription globale")* | Services Financiers CIT Ltée | Universality of all present and future equipment, including production equipment, leased by the lessee, for its enterprise, as more fully described in the invoices and schedules issued from time to time by the lessor. | N/A | February 11, 2015 |

38

| Nature of right<br>Date and Registration Number on the Register of Personal and Movable Real Rights of Quebec | Holder / Lessor / Seller | Property | Amount and Interest rate | Expiry Date |
|---|---|---|---|---|
| **29.** Rights of ownership of the lessor<br><br>April 7, 2005 at 9:17 a.m.<br><br>05-0191460-0001<br><br>*Date of the Constitutive Act:*<br>*March 28, 2005* | Services Financiers CIT Ltée | 1 TYSHENG 50mm Extruder Single Screw Vector Motor<br>1 Deltaplast Extruder<br>1 Pressure Gauge Dynisco 1290<br>1 25 KVA Isolation Transformer<br>1 Vacuum Sizing Tank | N/A | March 28, 2011 |
| **30.** Conventional hypothec without delivery<br><br>May 2, 2005 at 1:57 p.m.<br><br>05-0247028-0001<br><br>*Accessory right:*<br>- cession of rank by BNC in favour of BDC registered on June 10, 2005 at 1:30 p.m. under number 05-0339846-0001 | Banque de Développement du Canada | Universality of all present and future movable and immovable property, corporeal and incorporeal, of any nature whatsoever and wherever situated, including equipment, machinery, inventories, account receivables. | $2,160,000.00 | April 27, 2015 |
| **31.** Conventional hypothec without delivery<br><br>May 2, 2005 at 1:59 p.m.<br><br>05-0247059-0001<br><br>*Accessory right:*<br>- cession of rank by BNC in favour of BDC registered on June 10, 2005 at 1:30 p.m. under number 05-0339846-0001 | Banque de Développement du Canada | Universality of all present and future movable and immovable property, corporeal and incorporeal, of any nature whatsoever and wherever situated, including equipment, machinery, inventories, account receivables. | $360,000.00<br><br>Interest:<br>25% per year | April 27, 2015 |

**3326471 CANADA INC.**

39

| Nature of right<br>Date and Registration Number | Holder / Lessor | Property | Amount and<br>Interest rate | Expiry Date |
|---|---|---|---|---|
| **32.** Conventional hypothec without delivery<br><br>July 13, 2001 at 9:00 a.m.<br><br>01-0249323-0005 | Banque Nationale du Canada | "All accounts receivable, book accounts, book debts, debts, claims, monies, rentals, revenues, incomes, loans receivable, demands, choses in action and any other amounts which now are or which may at any time in the future be due or owing to the GRANTOR from PLASTIVAL INC. (the "CUSTOMER") or in which the GRANTOR, now or at any time in the future, has or shall have any other interest as well as all security interests, hypothecs, assignments, guarantees, bills of exchange, notes, negotiable instruments, contracts, invoices, books of account, letters of credit and other documents and rights, now or at any time in the future, held or owned by the GRANTOR or any third party on behalf of the GRANTOR in respect of any of the foregoing." | $8,000,000.00<br><br>Interest:<br>25% per annum | July 10, 2011 |

## Security under Section 427 of the Bank Act (Canada)

| Bank | Registration<br>Date | Registration<br>Number | Expiry Date |
|---|---|---|---|
| Banque Nationale du Canada | May 23, 2001 | 01089183 | *December 31, 2006* |
| Banque Nationale du Canada | December 20, 2005 | 01188436 | *December 31, 2010* |

40

**Securities registered at the Personal Property Registry of Ontario pursuant to the Personal Property Security Act (Ontario)**

| Secured Party | Registration Number | Reference file |
|---|---|---|
| Humberview Motors Incorporated<br>Jim Peplinski's Leasemaster National | 20020218 1745 1531 7871 | 880662276 |

CHICAGO/#2165096.20<br>IDISIDS

Schedule 3.13(a)

Owned Real Property of PREE

Lot number 3 136 185 of the Cadastre of Québec, Registration division of Terrebonne.

With all the buildings, improvements and appurtenances erected on, over and under said immovable and/or incorporated, attached or joined to said immovable and/or buildings, including, without limitation, (a) the principal two storeys building bearing civic number 3055, Anderson Street, in the municipality of the City of Terrebonne, Province of Quebec, J6Y 1W5, and (b) the one storey cabin of reception located on the said property.

As the said property now subsists, with all its rights, members and appurtenances, the whole, without exception or reserve of any kind on the part of the Vendor.

Together with and subject to all servitudes, continued or discontinued, apparent or non-apparent attached thereto.

Encumbrances:

- Immovable Hypothec in the amount of $4,400,000 granted by PREE in favor of the Business Development Bank of Canada registered at the Land Registry for the registration division of Terrebonne under number 1 307 956.

- Immovable Hypothec in the amount of $1,800,000 granted by PREE in favor of the Business Development Bank of Canada registered at the Land Registry for the registration division of Terrebonne under number 12 252 429.

Schedule 3.13(b)

Leased Real Property of Company and Subsidiaries

**A.     Plastival, Inc. (USA)**

- Lease Agreement dated as of July 17, 2003 between The Manufacturers Life Insurance Company (U.S.A.) and Plastival, Inc. (USA), regarding premises at 1675-85 Holmes Road, Elgin, Illinois 60123.

**B.     Plastival Inc. (Canada)**

- Plastival Inc. (Canada) leases its facility at 3055, Anderson, Terrebonne (Quebec) J6Y 1W5 from PREE pursuant to an oral lease.

43

Schedule 3.13(c)

Previously Owned or Leased Real Property

**A.    Plastival, Inc. (USA)**

- 901 Raymond Street, Elgin, IL 60120

- 361-363 Bluff City Blvd., Elgin, IL 60120

- 920 Davis Road, Elgin, IL 60120

**B.    Plastival, Inc. (Canada)**

- Plastival Inc. (Canada) previously leased premises at 2025-2037 Francis Hughes, Laval (Quebec) H7S 2G2 from 140927 Canada Inc. and Garadex Inc.

- Plastival Inc. (Canada) previously owned premises at 3050 Industriel blvd., Laval (Quebec) H7S 2G2.

CHICAGO\2165096.20
ID\SDS

Schedule 3.16

Litigation

**A.     Plastival, Inc. (USA)**

- Victor Gonzales, on behalf of himself and other persons similarly situated, known and unknown v. Plastival, Inc. and Labor Network, Inc., No. 0564864, currently pending in the United States District Court for the Northern District of Illinois, Eastern Division.  Labor Network, Inc. has filed a cross-claim against Plastival, Inc. in connection with this action.

- Overnite Transportation Company v. Plastival, Inc., No. 2005-L-005065, currently pending in the Circuit Court of Cook County, Illinois, Law Division, First District.

- Pending freight charge dispute with The Custom Companies, Inc. (described in letter from John J. Chitkowski, Esq. dated as of May 9, 2001).

- Alejandra Lopez v. Plastival, No. 06 WC 002436, currently pending before the Illinois Workers Compensation Commission, case filed on January 18, 2006.

**B.     Plastival Inc. (Canada)**

1-      **Case number :** 500-05-064513-011
        **Nature:** Damages (principal action and action in warranty)
        **Plaintiff :** 135770 Canada Inc., **Plaintiffs in Warranty:**  154640 Canada Inc., 140927 Canada Inc., Garadex Inc.
        **Defendants:** Plastival Inc. (and 154640 Canada Inc., 140927 Canada Inc., Garadex Inc.).
        **Defendant in Warranty**:  Plastival Inc.
        **Amount :** $877,667.26
        **Last proceeding :**  A motion for examination was granted on June 30, 2005
2-      **Case number :** 500-22-104624-047
        **Nature:** Account
        **Plaintiff :** Groupe Conseil Aon Inc.
        **Defendant :** Plastival Inc.
        **Amount :** $12,742.90
        **Last proceeding :** motion to be continued *sine die* on January 11, 2005

45

Schedule 3.17

Hazardous Materials

**A.      Plastival, Inc. (USA)**

    •      Glue used in operations in the past; no longer used.  Glue was purchased from Henkyle Loctite, their product number 42261, described 422 Superbonder.  Glue was purchased in 1 lb. bottles and used to glue components together when making gates.  Glue was used until company ceased making gates in Elgin in December 2005.

**B.      Plastival Inc. (Canada)**

    •      Barrels of oil for use with its machines stored on site, which are picked up by waste disposal company when they are full.

CHICAGO\2165096.20
ID\SDS

Schedule 3.18(a)(ii)

Employment Agreements

**A.    Plastival, Inc. (USA)**

- Letter Employment Agreement dated as of November 30, 1999 with Christian Lepage.

**B.    Plastival Inc. (Canada)**

(a)    See attached list of active employees

(b)    Employment Agreements to which Plastival Canada is a party providing for annual compensation in excess of US $100,000:

Financial Agreement dated January 3rd 2006 with Christian Laplante.

47

| DEPARTMENT | NO. | EMPLOYEE NAME | HIRING DATE |
|---|---|---|---|
| ADMINISTRATION | 1278 | CHARETTE, JULIE | 2003/05/07 |
| ADMINISTRATION | 1396 | DAVID, STEPHANIE | 2004/08/23 |
| ADMINISTRATION | 1298 | GAUTHIER, FRANCIS | 2003/06/09 |
| ADMINISTRATION | 0366 | GRAVEL, NICOLE | 1992/05/25 |
| ADMINISTRATION | 1488 | KANARAS, ANNA | 2005/10/17 |
| ADMINISTRATION | 1348 | PELLERIN, EDWARD | 1995/09/01 |
| COMMANDES / ORDER | 1443 | FILIATRAULT, GABRIEL | 2005/06/02 |
| COMMANDES / ORDER | 0819 | LEGAULT, MARIE-CLAUDE | 2001/07/06 |
| COMMANDES / ORDER | 1437 | MARTIN, SOPHIE | 2005/05/02 |
| COMMANDES / ORDER | 0602 | ROY, CAROLE | 1997/02/04 |
| CONTR / FOREMAN | 1357 | BOULAY, NICOLAS | 2004/02/11 |
| CONTR / FOREMAN | 0337 | CHIORPEC, IULIAN | 1992/03/16 |
| CONTR / FOREMAN | 1475 | ETHIER, PATRICK | 2005/09/16 |
| CONTR / FOREMAN | 0618 | LACROIX, GINO | 1999/04/02 |
| CONTR / FOREMAN | 0782 | LUCIA, ROSARIO | 2001/04/23 |
| D. ADMAN / ADSHIP | 0920 | BEAUDRY, MANON | 2001/12/04 |
| ENTR / MAINTEN. | 1068 | CSATLOS, LASZLO | 2002/05/06 |
| ENTR / MAINTEN. | 1276 | DECARUFEL, GUY | 2003/05/01 |
| ENTR / MAINTEN. | 1377 | ULKEI, ISTVAN-GEZA | 2004/06/14 |
| EXTRUSION | 1481 | BEAUSÉJOUR, STÉPHANE | 2005/09/29 |
| EXTRUSION | 1489 | BUICAN, COSTIN | 2005/10/19 |
| EXTRUSION | 1171 | CABEL, DANIEL | 2002/10/07 |
| EXTRUSION | 1083 | CAMPOS, PABLO | 2002/05/15 |
| EXTRUSION | 1272 | CEREZI, LENOR | 2003/04/28 |
| EXTRUSION | 1378 | CHARLAND, STEVE | 2004/06/14 |
| EXTRUSION | 1212 | CORDERO, FRANCISCO | 2003/02/06 |
| EXTRUSION | 1473 | D'AMOURS, PHILIPPE | 2005/09/08 |
| EXTRUSION | 1321 | DOBRE, AURELIAN | 2003/09/01 |
| EXTRUSION | 1103 | FOUCHER, MARIO | 2002/06/01 |
| EXTRUSION | 1483 | GRIGNON, JEAN-FRANÇOIS | 2005/10/10 |
| EXTRUSION | 1318 | LAFORGE, MATHIEU | 2003/08/16 |
| EXTRUSION | 0217 | MONTANEAU, LOUIS | 1990/02/21 |
| EXTRUSION | 0642 | OUELLETTE, JEAN | 1999/01/04 |
| EXTRUSION | 0096 | PATEL, DINESH | 1988/10/25 |
| EXTRUSION | 1130 | ROOPNARAINE, PHULESHWARNAUTH | 2002/07/18 |
| EXTRUSION | 1279 | SERBANESCU, THEODORE | 2003/05/03 |

CHICAGO\2165096.20
ID\SDS

| | | | |
|---|---|---|---|
| EXTRUSION | 1494 | SITHIPHANH, VILAYVONG | 2005/11/01 |
| EXTRUSION | 1432 | ST-CYR, ALEXANDRE | 2005/03/30 |
| EXTRUSION | 1239 | TELLUS, JOSEPH | 2003/03/14 |
| EXTRUSION | 1207 | TRUJILLO-PERAZA, CARLOS E. | 2003/01/27 |
| EXTRUSION | 0903 | VARGAS, AURELIO | 2001/11/20 |
| FABR / FINISHING | 1465 | BEAUCHAMPS, SEBASTIEN | 2005/08/24 |
| FABR / FINISHING | 1454 | BEAUPRÉ, PASCAL | 2005/08/15 |
| FABR / FINISHING | 1484 | BERGERON, MARTIN | 2005/10/11 |
| FABR / FINISHING | 1479 | BERGHELLA GALVEZ, THOMAS MILTON | 2005/09/26 |
| FABR / FINISHING | 1498 | BERNARD, KARL | 2005/11/30 |
| FABR / FINISHING | 1433 | CARON, MARCEL | 2005/04/11 |
| FABR / FINISHING | 1189 | CHALIFOUX, RENÉ | 2003/12/22 |
| FABR / FINISHING | 1447 | CHARBONNEAU, CHANTAL | 2005/06/27 |
| FABR / FINISHING | 1512 | CHENG, CAMILLE | 2006/03/15 |
| FABR / FINISHING | 1458 | CHERRIER, SEBASTIEN | 2005/08/23 |
| FABR / FINISHING | 1515 | CODERRE, CHRISTOPHER | 2006/03/17 |
| FABR / FINISHING | 1286 | CONSTANTINEAU, MANON | 2003/05/20 |

CHICAGO\2165096.20
ID\SDS

Schedule 3.18(a)(iv)

Compliance with Employments Laws


**A.    Plastival, Inc. (USA)**

- Victor Gonzales, on behalf of himself and other persons similarly situated, known and unknown v. Plastival, Inc. and Labor Network, Inc., No. 0564864, currently pending in the United States District Court for the Northern District of Illinois, Eastern Division, alleging that Plastival US and its employment agency, Labor Network, Inc. failed to pay overtime to workers employed by both Labor Network, Inc. and Plastival US working at Plastival US's facility.   Labor Network, Inc. has filed a cross-claim against Plastival, Inc. in connection with this action.

**B.    Plastival Inc. (Canada)**

None

50

Schedule 3.18(b)

ERISA

**A.    Plastival, Inc. (USA)**

- It is the policy of the company to provide its employees with various welfare and pension benefits, including health insurance.  The company also provides a number of other benefits such as leaves of absence, paid vacation, holidays and sick days.

- Victor Gonzales, on behalf of himself and other persons similarly situated, known and unknown v. Plastival, Inc. and Labor Network, Inc., No. 0564864, currently pending in the United States District Court for the Northern District of Illinois, Eastern Division, alleging that Plastival US and its employment agency, Labor Network, Inc. failed to pay overtime to workers employed by both Labor Network, Inc. and Plastival US working at Plastival US's facility.  Labor Network, Inc. has filed a cross-claim against Plastival, Inc. in connection with this action.

**B.    Plastival Inc. (Canada)**

- Company pays one-half of each employee's group insurance (health, life, etc.).

51

<u>Schedule 3.19(a)</u>

<u>Intellectual Property</u>

**A.     Plastival, Inc. (USA)**

- "RE-SOURCE Building Products" registered trademark, USPTO registration number 2868672.

- "PVC PRO SERIES" registered trademark, USPTO registration number 2660395.

- "CAROLIN" registered trademark, USPTO registration number 2864418.

- "PLASTIVAL" registered trademarks, USPTO registration numbers 2873657, 2374181 and 2520459.

- The Company does not have agreements with all its employees and independent contractors assigning their intellectual property rights to the Company.

**B.     Plastival Inc. (Canada)**

- "CITAFLEX" registered trademark TMA370468

- "CITAFLEX & DESIGN" registered trademark TMA374814

- "STARTRAX & DESIGN" registered trademark TMA397241

- "STARTRAX" registered trademark TMA397234

- "NORACEL" registered trademark TMA327020

CHICAGO\2165096.20
ID\SDS

Schedule 3.19(b)

Intellectual Property Infringement

**A.    Plastival, Inc. (USA)**

None

**B.    Plastival Inc. (Canada)**

None

CHICAGO\2165096.20
ID\SDS

Schedule 3.19(c)

License Agreements

**A.      Plastival, Inc. (USA)**

- Software License Agreement and Maintenance and Renewal Agreement with EDI SOURCE, Inc. dated as of July 7, 2004.

**B.      Plastival Inc. (Canada)**

- License of Advantage Accounting Program; serial # 61175

54

<u>Schedule 3.19(d)</u>

<u>Pending Intellectual Property Claims</u>

**A.     Plastival, Inc. (USA)**

None

**B.     Plastival Inc. (Canada)**

None

55

Schedule 3.19(f)

Software

**A.    Plastival, Inc. (USA)**

- EDI Complete-STP (1 trading partner), ASN Complete-STP (1 trading partner) software.

- Microsoft Office 2000

- Microsoft Office 2003

- DacEasy

- QuarkXpress

- Excel Costing System

- Plus EDI

**B.    Plastival Inc. (Canada)**

- Accounting Excel Spreadsheet developed by Guy David.

- Microsoft Office 2000.

- Microsoft Office 2003.

- QuarkXpress.

- AutoCad 20000.

- Excel Costing System.

- Advantage Accounting System.

- Plus EDI.

56

Schedule 3.20

Insurance

**A.    Plastival, Inc. (USA)**

| Type | Insurance Carrier | Policy Number |
|---|---|---|
| General Liability | Safeco Insurance Company | 02CEO67681-2 |
| Automobile Liability | Safeco Insurance Company | 01CG753304-1 |
| Excess/Umbrella Liability | Zurich Insurance Services, Inc. | AUC5327486-01 |
| Worker's Comp and Employer's Liability | Safeco Insurance Company | 01WC017995-02 |

- Claims history reports produced in due diligence are incorporated herein and attached hereto.

**B.    Plastival Inc. (Canada)**

Policies provided by Citadelle Assurances Generales

a)    Damages

Type

All-risk on buildings and commercial goods

|   |   |
|---|---|
| -building | $5,570,000 |
| -equipment and machinery | $7,500,000 |
| -merchandise | $5,500,000 |
| -moulds | $  500,000 |

Deductibles:

|   |   |
|---|---|
| -general | $5,000 |
| -earthquake | $5%, minimum of $100,000 |
| -flood | $25,000 |
| -backflows | $2,500 |

b)    Loss of exploitation

|   |   |
|---|---|
| -benefits without co-insurance | $350,000 |
| -auditors fees | $50,000 |
| -supplementary expenditures | $50,000 |

c)    Computing

|   |   |
|---|---|
| -material | $75,000 |
| -data and machinable medium | $25,000 |
| -supplementary expenditures | $10,000 |
| -deductible | $5,000 |

d)    Objects being transported

-Amount - $30,000

-Deductible - $5000

e)    General civil liability

-Amount - $1,000,000; $250,000 for liability of tenants

-Deductible - $1000 per event (Canada); $5,000 per event (USA)

f)    Employee fraud

57

|   | | |
|---|---|---|
| | -embezzlement | $25,000 |
| | -losses in the premises | $7,500 |
| | -losses outside of the premises | $7,500 |
| g) | Umbrella | |
| | -Amount - $4,000,000 | |
| h) | Machine breakdown | |
| | -Amount - $19,070,000 | |
| | -Deductible - $1,000 | |

Policies provided by Promutel Les Prairies
    -Automobiles

| Car | Amount | Deductible |
|---|---|---|
| Ford E150 (1996) | $1,000,000 | |
| Ford Econoline E150 pickup (2002) | $1,000,000 | $1,000 |
| Kia Sedona LX, EX (2003) | $1,000,000 | $500 |
| Kia Sedona LX, EX (2004) | $1,000,000 | $1,000 |
| Ford Econoline E150 Panel (2002) | $1,000,000 | $1,000 |
| Kia Magentis LX Sedan (2001) | $1,000,000 | $1,000 |

CHICAGO\2165096.20
ID\SDS

Schedule 3.21

Affiliate Transaction; Interests in Clients, Suppliers, Etc.

- Each Guy David and Jim Quinn owes Plastival, Inc (USA) $10,064.37, which represents the personal portion of automobiles leased by Plastival, Inc. (USA).

- Guy David owes the Quinn David Corporation $33,896.06 and James Quinn owes the Quinn David Corporation $13,813.47. These amounts represent overdraws on salary.

- Guy David and Jim Quinn each owe Plastival Inc. (Canada) $150,000.

- Purchases and Sales with Plastival US.

- Expenses for PREE are paid by Plastival Inc. (Canada).

59

<u>Schedule 3.22</u>

<u>Top-Ten Suppliers</u>

**A.    Plastival, Inc. (USA)**

- ADP

- Canam Steel

- EMS

- Ovlette

- Plastival, Inc. (Canada)

- Plastic Age

- Montreal Mold

- Service Manufacturing

- Larsen Packaging

- LMT/Mercer Group

**B.    Plastival Inc. (Canada)**

- Atelier Donat Pelletier

- Acier Canam

- Nordchem

- Novel Polymers

- Outillage EMs

- Polyone

- Resource Quebec

- Return Polymers

- Formosa

- Excell Polymers

CHICAGO\2165096.20
ID\SDS

Schedule 3.23

Top-Ten Customers & 2006 Results YTD Versus Budget

| | | BUDGET | RESULT **5/31** |
|---|---|---|---|
| **A.** | **Plastival, Inc. (USA)** | **$000** | **$000** |
| • | Menards, Inc. | 4136 | 2702 |
| • | Lowes Companies | 2631 | 2197 |
| • | Aluma Kraft Sales | 120 | 263 |
| • | Cimarron Lumber | 115 | 162 |
| • | Prime Source Building Products | 139 | 104 |
| • | Boise Distribution | 42 | 43 |
| • | Reserve Supply | 2 | 83 |
| • | Morgan Wholesale BL Material | 95 | 66 |
| • | East Side Lumber | 202 | 143 |
| • | Buchheit | 54 | 103 |
| **B.** | **Plastival Inc. (Canada)** | | |
| • | Home Depot | 1458 | 1198 |
| • | Rona | 2093 | 1704 |
| • | Marcel Baril | 138 | 93 |
| • | Patio Ouellette | 40 | 37 |
| • | Resource Rive Nord | 80 | 50 |
| • | Echantillon National | 39 | 78 |
| • | Colwell | 29 | 139 |
| • | Manac | 66 | 62 |
| • | Equiparc | 66 | 109 |
| • | Aqua Bay | 9 | 20 |
| • | | | |

61

Schedule 3.28

Prior Acquisitions With Earn-Outs or Contingent Payments

**A.     Plastival, Inc. (USA)**

None

**B.     Plastival Inc. (Canada)**

None

CHICAGO\2165096.20
ID\SDS

<u>Schedule 7.1</u>

<u>Changes Impacting Post-Closing Tax Periods</u>

**A.    Plastival, Inc. (USA)**

None

**B.    Plastival Inc. (Canada)**

- New financial statements and income tax reports must be produced in respect of the deemed taxation year ending on the day immediately preceding the acquisition of control.

63

**Escrow Agreement**

This Escrow Agreement is dated as of July 7, 2006 (the "Agreement") and is among Plastival US Holdings, Inc., a Delaware corporation ("US Holdings"), Plastival Canadian Holdings Inc., a Canadian corporation ("Canadian Holdings") (collectively, the "Buyer"), Guy David ("David"), James N. Quinn ("Quinn") and the Guy David Declaration of Trust Dated March 6, 2001 (the "Guy David Trust") (collectively, the "Sellers") and Wells Fargo Bank, National Association, a national banking association, as escrow agent (the "Escrow Agent").

WHEREAS, the Buyer, Sellers, Plastival, Inc., an Illinois corporation ("Plastival US"), Plastival Inc., a Canadian corporation ("Plastival Canada"), and 4038673 Canada Inc., a Canadian corporation ("PREE"), have entered into a Securities and Asset Purchase Agreement, dated as of July 7, 2006 (the "Purchase Agreement"), pursuant to which, among other things, US Holdings will purchase 2,668 shares of Plastival US and Canadian Holdings will purchase all of the issued and outstanding shares of Plastival Canada and the real property owned in fee by PREE.

WHEREAS, Sellers have agreed to indemnify the Buyer with respect to certain representations, warranties and obligations of Sellers under the Purchase Agreement pursuant to Article VII and Article VIII.

WHEREAS, in order to support the indemnification obligations of Sellers, the parties have agreed, pursuant to Section 2.4(b)(iv) of the Purchase Agreement, that the Sellers shall deliver to the Escrow Account (as hereinafter defined), $1,375,000 (together with any interest or other income earned thereon, the "Indemnity Escrow Amount"), to be held and delivered by the Escrow Agent as provided in this Agreement.

WHEREAS, Sellers have opted to obtain the Canadian Closing Certificates prior to the Canadian Closing Certificate Due Date in order to avoid a withholding of 25% of the portion of the Purchase Price payable for the Canadian Shares.

WHEREAS, in order to support the obligation of the Sellers to pay to the CRA 25% of the portion of the Purchase Price, including any upward adjustments after the Closing, payable for the Canadian Shares if the Canadian Closing Certificates are not delivered to the Buyer prior to the Canadian Closing Certificate Due Date, the parties have agreed, pursuant to Section 2.4(b)(iv) of the Purchase Agreement, that the Sellers shall deliver to the Escrow Account (as hereinafter defined), 25% of the portion of the Purchase Price, including any upward adjustments after the Closing, payable for the Canadian Shares (the "Withholding Escrow Amount"), to be held and delivered by the Escrow Agent as provided in this Agreement.

WHEREAS, Sellers have agreed to apply for and obtain the Certificate of Authorization pursuant to Section 6.5 of the Purchase Agreement.

WHEREAS, in order to fund the Certificate of Authorization Expenses, the parties have agreed, pursuant to Section 2.4(b)(iv) of the Purchase Agreement, that the Sellers shall deliver to the Escrow Account (as hereinafter defined), $15,000 (together with any interest or other income earned thereon, the "Certificate of Authorization Escrow Amount"), to be held and delivered by the Escrow Agent as provided in this Agreement.

EXHIBIT C

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, and for other good, fair and valuable considerations and reasonably equivalent value, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, the Escrow Agent , the Buyer and the Sellers do agree as follows, intending to be legally bound:

**Section 1.        Capitalized Terms**

Capitalized terms used herein and not otherwise defined shall have the respective meanings given to such terms in the Purchase Agreement.

**Section 2.        Establishment of Escrow Account**

(a)        The Buyer hereby deposits with the Escrow Agent (i) the Indemnity Escrow Amount into a subaccount referred to as the "Indemnity Escrow Subaccount," (ii) the Withholding Escrow Amount into a subaccount referred to as the "Withholding Escrow Subaccount," and (iii) the Certificate of Authorization Escrow Amount into a subaccount referred to as the "Certificate of Authorization Subaccount," to be held in escrow by the Escrow Agent.  The Escrow Agent accepts said sums and agrees to establish and maintain a separate account (each an "Escrow Subaccount" and collectively, the "Escrow Accounts") therefor in its capacity as Escrow Agent pursuant to the terms of this Agreement.

(b)        The Buyer and the Sellers shall each furnish the Escrow Agent with a completed Form W-8 or Form W-9, as applicable.

**Section 3.        Investments; Interest**

(a)        The Escrow Agent agrees to invest and reinvest funds in the Escrow Account, but only upon written instructions signed by an authorized agent of the Buyer and an authorized agent of the Sellers.

(b)        The parties recognize and agree that the Escrow Agent will not provide supervision, recommendations or advice relating to either the investment of moneys held in the Escrow Account or the purchase, sale, retention or other disposition of any permitted investment.

(c)        Interest and other earnings on permitted investments shall be added to each Escrow Subaccount.  Any loss or expense incurred as a result of an investment will be borne by the Escrow Subaccount.  In the event that the Escrow Agent does not receive written direction to invest funds held in the Escrow Account, the Escrow Agent shall invest such funds in the Wells Fargo money market deposit account, or a successor or similar fund or account offered by the Escrow Agent.

(d)        The Escrow Agent is hereby authorized to execute purchasers and sales of permitted investments through the facilities of its own trading or capital markets operations or those of any affiliated entity.  The Escrow Agent shall send statements to each of the parties hereto on a monthly basis reflecting activity in the Escrow Account for the preceding month. Although Buyer and the Sellers each recognizes that it may obtain a broker confirmation or written statement containing comparable information at no additional cost, the Buyer and the Sellers hereby agree that confirmations of permitted investments are not required to be issued by

the Escrow Agent for each month in which a monthly statement is rendered.  No statement need be rendered for the Escrow Account if no activity occurred for such month.

(e)    The Buyer and the Sellers acknowledge and agree that the delivery of the escrowed property is subject to the sale and final settlement of permitted investments.  Proceeds of a sale of permitted investments will be delivered on the business day on which the appropriate instructions are delivered to the Escrow Agent if received prior to the deadline for same day sale of such permitted investments.  If such instructions are received after the applicable deadline, proceeds will be delivered on the next succeeding business day.

**Section 4.    Disbursement of Escrow Account**

(a)    Indemnity Escrow Amount.

(i)    If the Final Working Capital is less than the Target Working Capital by more than US$100,000, the Sellers shall pay to the Buyer the amount required under Section 2.6(a) of the Purchase Agreement; provided, however, that the first $375,000 of such amount shall be paid out of the Indemnity Escrow Amount.

(ii)    Once the payment is made pursuant to Section 2.6 of the Purchase Agreement, the amount of the Indemnity Escrow Amount (if any) in excess of US$1,000,000 shall be released to an account or accounts, in the names of the Sellers.

(iii)    The then remaining Indemnity Escrow Amount, minus the aggregate amount of any pending indemnification claims made pursuant to Article VII and Article VIII of the Purchase Agreement, shall be released to an account, in the names of the Sellers, on the first anniversary of the Closing Date (the "Release Date").  Thereafter, the remaining undistributed balance of the Indemnity Escrow Amount shall be paid to the Sellers except to the extent of the amount of all pending claims made pursuant to Article VII and Article VIII prior to the Release Date (each, a "Pending Claim").  At such time as all remaining Pending Claims have been resolved and paid, the remaining balance of the Indemnity Escrow Amount shall be released and paid to the Sellers.

(iv)    The Escrow Agent shall release all or a portion of the Indemnity Escrow Amount only upon receipt of (i) joint written instructions executed by the Buyer and the Sellers in a form substantially similar to that attached hereto as **Exhibit B** or (ii) a final non-appealable order of a court of competent jurisdiction.

(v)    Notwithstanding anything to the contrary in this Agreement or the Purchase Agreement, the Escrow Agent shall not release to Buyer an amount equal to the estimated federal, state, and local taxes due and payable by Sellers under Section 7(c) on the income earned in the Indemnity Escrow Subaccount, based on the maximum taxable rate applicable to Sellers.

(b)    Withholding Escrow Amount.

(i)    If the Canadian Closing Certificates for each Seller are not delivered to the Buyer four (4) days prior to the later (the "Canadian Closing Certificate Due

Date") of (A) if no Comfort Letter is issued, August 30, 2006, (B) if a Comfort Letter is issued, by the due date specified by the CRA in a letter addressed to Buyer, which letter is acceptable to counsel to Buyer and relieves Buyer from remitting amounts withheld within prescribed delays (provided, however, that if no due date is specified by CRA in such letter, then the Withholding Escrow Amount shall not be released until required by CRA pursuant to such letter, any subsequent letter or other request or as otherwise required by law), then the portion of the Withholding Escrow Amount allocable to each Seller who did not deliver a Canadian Closing Certificate shall be released to the CRA, on behalf of the Buyer, and the remaining undistributed balance of the Withholding Escrow Subaccount shall be released to the Sellers.  For purposes hereof, "Comfort Letter" shall mean a letter issued by CRA on or before August 26, 2006 addressed to Buyer acknowledging the receipt by CRA of notification under subsection 116 of the ITA and requesting that the Withholding Escrow Amount be held in trust for the Receiver General for Canada and not be remitted to CRA pending completion of the review of such notification, which letter from CRA is reasonably acceptable to counsel to Buyer and relieves Buyer from remitting amounts withheld within prescribed delays.

(ii)    If the Canadian Closing Certificate for a Seller is delivered to the Buyer prior to the Canadian Closing Certificate Due Date, then the portion of the Withholding Escrow Amount allocable to such Seller and the remaining undistributed balance of the Withholding Escrow Subaccount allocable to such Seller shall be released to an account or accounts, in the name of such Seller.

(iii)    If at such time as the CRA demands payment of the Withholding Escrow Amount and at such time the Canadian dollar equivalent of the Withholding Escrow Amount exceeds the Withholding Escrow Amount by any amount, the Buyer, at its option, may demand payment by the Sellers, within one business day, into the Withholding Escrow Subaccount of the US dollar equivalent of such excess amount.  In the event that the Sellers fail to provide such monies in a timely manner after such demand is made, the Buyer may set off such amounts against other payments due to the Sellers until such excess amount is recaptured and paid into the Withholding Escrow Subaccount.

(iv)    The Escrow Agent shall release the Withholding Escrow Amount only upon receipt of joint written instructions executed by the Buyer and the Sellers in a form substantially similar to that attached hereto as **Exhibit B**, except for amounts to be released to the CRA as mentioned in Section 4(b)(i) above, which the Escrow Agent shall release upon receipt of written instructions executed by the Buyer.

(c)    Certificate of Authorization Escrow Amount.

(i)    The Certificate of Authorization Escrow Amount, minus the Certificate of Authorization Expenses paid by the Buyer, shall be released to an account or accounts, in the names of the Sellers, upon the issuance of the Certificate of Authorization.

(ii)    The Escrow Agent shall release the Certificate of Authorization Escrow Amount, minus the Certificate of Authorization Expenses paid by the Buyer, only upon receipt of joint written instructions executed by the Buyer and the Sellers in a form substantially similar to that attached hereto as **Exhibit B**.

(iii)    Notwithstanding anything to the contrary in this Agreement or the Purchase Agreement, the Escrow Agent shall not release to Buyer an amount equal to the estimated federal, state, and local taxes due and payable by Sellers under Section 7(c) on the income earned in the Certificate of Authorization Escrow Subaccount, based on the maximum taxable rate applicable to Sellers.

**Section 5.        Concerning the Escrow Agent**

Notwithstanding any provision contained herein to the contrary, the Escrow Agent including its officers, directors, employees and agents, shall:

(a)    not be liable for any action taken or omitted under this Agreement so long as it shall have acted in good faith and without gross negligence;

(b)    have nor responsibility to inquire into or determine the genuineness, authenticity, or sufficiency of any securities, checks, or other documents or instruments submitted to it in connection with its duties hereunder;

(c)    be entitled to deem the signatories of any documents or instruments submitted to it hereunder as being those purported to be authorized to sign such documents or instruments on behalf of the parties hereto, and shall be entitled to rely upon the genuineness of the signatures of such signatories without inquiry and without requiring substantiating evidence of any kind;

(d)    be entitled to refrain from taking any action contemplated by this Agreement in the event that it becomes aware of any disagreement between the parties hereto as to any facts or as to the happening of any contemplated event precedent to such action;

(e)    have no responsibility or liability for any diminution in value of any assets held hereunder which may result from any investments or reinvestment made in accordance with any provision which may be contained herein;

(f)    be entitled to compensation for its services hereunder as per **Exhibit A** attached hereto, which is made a part hereof, and for reimbursement of its out-of-pocket expenses including, but not by way of limitation, the fees and costs of attorneys or agents which it may find necessary to engage in performance of its duties hereunder, all to be paid in equal parts by the Buyer, on one hand, and the Sellers, on the other hand, and the Escrow Agent shall have, and is hereby granted, a prior lien upon any property, cash, or assets of the Escrow Account, with respect to its unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights, superior to the interests of any other persons or entities;

(g)    be entitled and is hereby granted the right to set off and deduct any unpaid fees, non-reimbursed expenses and unsatisfied indemnification rights from amounts on deposit in the Escrow Account;

(h)    be under no obligation to invest the deposited funds or the income generated thereby until it has received a Form W-8 or W-9, as applicable, from the Sellers, regardless of whether the Sellers are exempt from reporting or withholding requirements under the Internal Revenue Code of 1986, as amended;

(i)      be, and hereby is, jointly and severally indemnified and saved harmless by the Buyer and the Sellers from all losses, liabilities, costs and expenses, including attorney fees and expenses, which may be incurred by it as a result of its acceptance of the Escrow Account or arising from the performance of its duties hereunder, unless such losses, liabilities, costs and expenses shall have been finally adjudicated to have resulted from the bad faith or gross negligence of the Escrow Agent, and such indemnification shall survive its resignation or removal, or the termination of this Agreement;

(j)      in the event that (i) any dispute shall arise between the parties with respect to the disposition or disbursement of any of the assets held hereunder or (ii) the Escrow Agent shall be uncertain as to how to proceed in a situation not explicitly addressed by the terms of this Agreement whether because of conflicting demands by the other parties hereto or otherwise, be permitted to interplead all of the assets held hereunder into a court of competent jurisdiction, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets.  The parties hereto other than the Escrow Agent further agree to pursue any redress or recourse in connection with such a dispute, without making the Escrow Agent a party to same;

(k)      have only those duties as are specifically provided herein, which shall be deemed purely ministerial in nature, and shall under no circumstance be deemed a fiduciary for any of the parties to this Agreement.  The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument or document between the other parties hereto, in connection herewith.  This Agreement sets forth all matters pertinent to the escrow contemplated hereunder, and no additional obligations of the Escrow Agent shall be inferred from the terms of this Agreement or any other Agreement.  IN NO EVENT SHALL THE ESCROW AGENT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (i) DAMAGES OR EXPENSES ARISING OUT OF THE SERVICES PROVIDED HEREUNDER, OTHER THAN DAMAGES WHICH RESULT FROM THE ESCROW AGENT'S FAILURE TO ACT IN ACCORDANCE WITH THE STANDARDS SET FORTH IN THIS AGREEMENT, OR (ii) SPECIAL, INDIRECT OR CONSEQUENTIAL LOSSES OR DAMAGES, EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES;

(l)      have the right, but not the obligation, to consult with counsel of choice and shall not be liable for action taken or omitted to be taken by Escrow Agent either in accordance with the advice of such counsel or in accordance with any opinion of counsel to the Buyer addressed and delivered to the Escrow Agent, subject to Section 5(a) above; and

(m)      have the right to perform any of its duties hereunder through its agents, attorneys, custodians or nominees.

Any banking association or corporation into which the Escrow Agent may be merged, converted or with which the Escrow Agent may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Escrow Agent shall be a party, or any banking association or corporation to which all or substantially all of the corporate trust business of the Escrow Agent shall be transferred, shall succeed to all the Escrow Agent's rights, obligations and immunities hereunder without the execution or filing of any instrument or any

further act, deed or conveyance on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

**Section 6.        Attachment of Escrow Account; Compliance with Legal Orders**

In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ order or decree it shall not be liable to any of the parties hereto or to any other person, firm of corporation, by reason of such compliance notwithstanding such writ, order or decree by subsequently reversed, modified, annulled, set aside or vacated.

**Section 7.        Tax Matters**

(a)        <u>Reporting of Income</u>.  The Escrow Agent shall report to the Internal Revenue Service (the "IRS"), as of each calendar year-end, and to Buyer and Sellers, all income earned from the investment of any sum held in the Escrow Account against the Sellers, who shall share such income equally, as and to the extent required under the provisions of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder (the "Code").

(b)        <u>Preparations and Filing of Tax Returns</u>.  The Sellers are required to prepare and file any and all income or other tax returns applicable to the Escrow Account with the IRS and all required state and local departments of revenue in all years income is earned in any particular tax year to the extent required under the provisions of the Code.

(c)        <u>Payment of Taxes</u>.  Up until the release of each of the Indemnity Escrow Amount, the Withholding Escrow Amount and the Certificate of Authorization Escrow Amount, the Sellers shall pay any taxes payable on income earned from the investment of any sums held in the Escrow Accounts, whether or not the income was distributed by the Escrow Agent during any particular year and to the extent required under the provisions of the Code.  Upon receipt of joint written instructions executed by the Buyer and the Sellers in a form substantially similar to that attached hereto as **Exhibit B**, the Escrow Agent shall distribute to the Sellers an amount sufficient to pay such taxes at the highest applicable marginal rate.

(d)        <u>Unrelated Transactions</u>.  The Escrow Agent shall have no responsibility for the preparation and/or filing of any tax or information return with respect to any transactions, whether or not related to the Agreement, that occurs outside the Escrow Account.

**Section 8.        Resignation or Removal of Escrow Agent**

The Escrow Agent may resign as such following the giving of thirty (30) calendar days prior written notice to the other parties hereto.  Similarly, the Escrow Agent may be removed and replaced following the giving of thirty (30) days prior written notice to the Escrow Agent by the other parties hereto.  In either event, the duties of the Escrow Agent shall terminate (30) days

after receipt of such notice (or as of such earlier date as may be mutually agreeable); and the Escrow Agent shall then deliver the balance of the moneys or assets then in its possession to a successor escrow agent as shall be appointed by the other parties hereto as evidenced by a written notice filed with the Escrow Agent.

If the other parties hereto have failed to appoint a successor prior to the expiration of thirty (30) calendar days following receipt of the notice of resignation or removal, the Escrow Agent may appoint a successor or petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

**Section 9.    Termination**

This Agreement shall terminate upon receipt of a letter, in a form substantially similar to that attached hereto as **Exhibit B**, signed on behalf of the Buyer and the Sellers by authorized representatives thereof.

**Section 10.    Notices**

Any notice, consent or request to be given in connection with any of the terms or provisions of this Agreement shall be in writing and be given in person, by facsimile transmission, courier delivery service or by mail, and shall become effective (a) on delivery if given in person, (b) on the date of delivery if sent by facsimile or by courier delivery service, or (c) four business days after being deposited in the mail, with proper postage for first-class registered or certified mail, prepaid.

Notices shall be addressed as follows:

(i)    if to the Buyer:

Key Principal Partners Corp.
9 Greenwich Office Park
Greenwich, Connecticut 06831
Telecopier: (203) 422-2517
Attention: Leland Lewis

and

Key Principal Partners Corp.
800 Superior Avenue, 10th Floor
Cleveland, Ohio 44114
Telecopier: (216) 828-8135
Attention: Dennis Wagner and Beth Laschinger

and

Dechert LLP
30 Rockefeller Plaza

New York, New York 10112-2200
Telecopier:  (212) 698-3599
Attention:  Adam M. Fox, Esq.

(ii)    if to the Sellers:

Guy David
James N. Quinn
Plastival, Inc.
1685 Holmes Road
Elgin, Illinois 60123
Telecopier: (847) 931-1771

and

Dykema Gossett PLLC
10 South Wacker Drive, Suite 2300
Chicago, Illinois 60606
Telecopier: (312) 876-1155
Attention: Nick Marsico, Esq.

(iii)   if to the Escrow Agent:

Wells Fargo Bank, National Association
230 W. Monroe Street
29th Floor, Corporate Trust Dept.
Chicago, IL 60606
Attention:  Timothy P. Martin
Fax Number: 312-726-2158
Phone Number: 312-726-2137

## Section 11.     Governing Law, Counterparts

This Agreement shall be construed in accordance with the laws of the State of Illinois.  It may be executed in several counterparts, each one of which shall constitute an original and all collectively shall constitute but on instrument.

## Section 12.     Amendment, Modification or Waiver

This Agreement may be amended or modified and any term of this Agreement may be waived if such amendment, modification or waiver is in writing and signed by all parties.

## Section 13.     Assignments of Interests

No assignment of the interest of any of the parties hereto shall be binding upon the Escrow Agent unless and until written notice of such assignment shall be filed with and acknowledged by the Escrow Agent.

IN WITNESS WHEREOF, the parties have duly executed this Escrow Agreement as of the date first above written.

**PLASTIVAL US HOLDINGS, INC.**

By: _____

    Name:

    Title:

**PLASTIVAL CANADIAN HOLDINGS, INC.**

By: _____

    Name:

    Title:


_____

**GUY DAVID**

_____

**JAMES N. QUINN**

**THE GUY DAVID TRUST DECLARATION OF TRUST DATED MARCH 6, 2001**

By: _____

    Name:

    Title:


**Wells Fargo Bank, National Association, as Escrow Agent**


By: _____

Its: _____

IN WITNESS WHEREOF, the parties have duly executed this Escrow Agreement as of the date first above written.

**PLASTIVAL US HOLDINGS, INC.**

By: _____
    Name:
    Title:

**PLASTIVAL CANADIAN HOLDINGS, INC.**

By: _____
    Name:
    Title:

_____
**GUY DAVID**

_____
**JAMES N. QUINN**

**THE GUY DAVID DECLARATION OF TRUST DATED MARCH 6, 2001**

By: _____
    Name: GUY DAVID
    Title: TRUSTEE

**Wells Fargo Bank, National Association,** as Escrow Agent

By: _____

Its: _____

IN WITNESS WHEREOF, the parties have duly executed this Escrow Agreement as of the date first above written.

**PLASTIVAL US HOLDINGS, INC.**

By:_____
    Name:
    Title:

**PLASTIVAL CANADIAN HOLDINGS, INC.**

By:_____
    Name:
    Title:


_____
**GUY DAVID**

_____
**JAMES N. QUINN**

**THE GUY DAVID DECLARATION OF TRUST DATED MARCH 6, 2001**

By:_____
    Name:
    Title:


**Wells Fargo Bank, National Association, as Escrow Agent**

By: _____

Its: _____**Vice President**_____

# EXHIBIT A

SCHEDULE OF ESCROW AGENT FEES

Annual Charge                            $3,200


Any out-of-pocket expenses, or extraordinary fees or expenses such as attorney's fees or messenger costs, are additional and are not included in the above schedule.


These fees cover a full year, or any part thereof, and thus are not prorated in the year of termination.  The annual fee is billed in advance and payable prior to that year's service.

**EXHIBIT B**

_____, 20__

Wells Fargo Bank, National Association
230 W. Monroe Street
29th Floor, Corporate Trust Dept.
Chicago, IL 60606
Attn: Timothy P. Martin

      Re:   Escrow Account No. _____ among
              Buyer and the Sellers, and Wells Fargo Bank, National Association,
              as Escrow Agent (the "Escrow Agent")

      Please release [____] held in the [_____] Escrow Subaccount and distribute such amount by (wire transfer) (cashier's check) to _____ (if wire transfer – name of bank, bank's ABA number, customer's name and account number for credit) or as _____ shall otherwise direct.

Very truly yours,

**PLASTIVAL US HOLDINGS, INC.**
**PLASTIVAL CANADIAN HOLDINGS,**
**INC.**

By:    PLASTIVAL HOLDINGS, INC.

Name: _____
Its:     _____

_____
**GUY DAVID**

_____
**JAMES N. QUINN**

**THE GUY DAVID TRUST**
**DECLARATION OF TRUST DATED**
**MARCH 6, 2001**

By: _____
    Name:
    Title: